UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

JOSEPH CASAGRANDE,          :
                            :
      PLAINTIFF,            :
                            :
vs.                         : CASE NO. 2:13-CV-00238
                            :
OHIOHEALTH                  :
CORPORATION, ET AL.,        :
                            :
      DEFENDANTS.           :

                    - - -

     Deposition of JOSEPH CASAGRANDE, the Plaintiff
herein, called by the Defendants for cross-
examination under the applicable Federal Rules of
Civil Procedure, taken before Sylvia A. Fraley, a
Registered Diplomate Reporter, Certified Realtime
Reporter and Notary Public in and for the State of
Ohio, by agreement of counsel and without notice or
other legal formality, at the Offices of Baker &
Hostetler, 65 East State Street, Suite 2100,
Columbus, Ohio  43215 commencing on Tuesday, March
11, 2014, at 9:08 a.m.


                    - - -


          FRALEY COOPER & ASSOCIATES
       222 East Town Street, Second Floor
             Columbus, Ohio 43215
       (614) 228-0018 - (800) 852-6163
             Fax - (614) 224-5724

2

```
 1              DEPOSITION OF JOSEPH CASAGRANDE

 2                      APPEARANCES

 3                        - - -

 4         GREG R. MANSELL, ESQUIRE
           CARRIE J. DYER, ESQUIRE
 5         MANSELL LAW, LLC
           1457 South High Street
 6         Columbus, Ohio 43215
           (614) 610-4134
 7         Greg.Mansell@Ohio-EmploymentLawyer.com
           Carrie.Dyer@Ohio-EmploymentLawyer.com
 8
               On behalf of the Plaintiff.
 9
           M.J. ASENSIO, ESQUIRE
10         LINDSEY D'ANDREA, ESQUIRE
           BAKER & HOSTETLER
11         65 East State Street
           Suite 2100
12         Columbus, Ohio  43215
           (614) 228-1541
13         masensio@bakerlaw.com
           ldandrea@bakerlaw.com
14
               On behalf of the Defendants.
15
     ALSO PRESENT:
16
           MS. AMY SAYERS
17
           MS. SUSAN TALEBI
18
                        - - -
19

20

21

22

23

24
```

3

```
 1               DEPOSITION OF JOSEPH CASAGRANDE

 2                    INDEX TO EXHIBITS

 3   JC           DESCRIPTION                   PAGE

 4    1      A THREE-PAGE OFFER LETTER FROM      42
            MOUNT CARMEL DATED 2.7.14,
 5          BATES-STAMPED JFC323 THROUGH
            325
 6
      2      A COVER PAGE OF ASSOCIATE          49
 7          HANDBOOK AND "RECEIPT AND
            ACKNOWLEDGEMENT" PAGE,
 8          BATES-STAMPED 000609 AND 613

 9    3      A SIX-PAGE "OFFICIAL               50
            TRANSCRIPT" DATED 3/10/14,
10          BATES-STAMPED 001784 THROUGH
            789
11
      4      A CASAGRANDE/SAYERS E-MAIL         52
12          DATED 11.17.11, BATES-STAMPED
            000006
13
      5      A 42-PAGE DOCUMENT ENTITLED,       55
14          "GENERAL NURSING ORIENTATION
            MANUAL," BATES-STAMPED 000117
15          THROUGH 160

16    6      A DOCUMENT ENTITLED, "POLICY       58
            AND PROCEDURE ACKNOWLEDGEMENT,"
17          DATED 4/6/12, BATES-STAMPED
            000182
18
      7      AN 11-PAGE DOCUMENT ENTITLED,      59
19          "POLICY AND/OR PROCEDURE," RE:
            MEDICATION ADMINISTRATION,
20          BATES-STAMPED 001790 THROUGH
            1800
21
      8      A THREE-PAGE DOCUMENT ENTITLED,    61
22          "NURSING POLICY/PROCEDURE" RE:
            NURSING MANAGEMENT OF PATIENT
23          WITH ALCOHOL WITHDRAWAL,
            BATES-STAMPED 001801 THROUGH
24          1803
```

4

| | | | |
|---|---|---|---|
| 1 | 9 | A ONE-PAGE DOCUMENT ENTITLED, "AUTHORIZATION TO RELEASE MEDICAL RECORDS," DATED 7/20/12, BATES-STAMPED 001168 | 64 |
| 2 | | | |
| 3 | | | |
| | 10 | A ONE-PAGE DOCUMENT ENTITLED, "LEAVE OF ABSENCE APPLICATION," DATED 7/20/12, BATES-STAMPED 001169 | 66 |
| 4 | | | |
| 5 | | | |
| 6 | 11 | A ONE-PAGE DOCUMENT ENTITLED, "FAMILY MEDICAL LEAVE MEDICAL CERTIFICATION," DATED 7/23/12, BATES-STAMPED 001170 | 67 |
| 7 | | | |
| 8 | | | |
| | 12 | A TWO-PAGE ASSOCIATE HEALTH AND WELLNESS/CASAGRANDE LETTER, DATED 7/24/12, BATES-STAMPED 001385 AND 1386 | 69 |
| 9 | | | |
| 10 | | | |
| 11 | 13 | A FIVE-PAGE DOCUMENT RE: LEAVE OF ABSENCE POLICY, BATES-STAMPED 001804 THROUGH 1808 | 74 |
| 12 | | | |
| 13 | | | |
| | 14 | AN EIGHT-PAGE (AND TWO BLANK PAGES) DOCUMENT RE: FAMILY MEDICAL LEAVE ISSUED FEBRUARY 2003, REVISED APRIL 2013, BATES-STAMPED 001094 THROUGH 001101 | 77 |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | 15 | A TWO-PAGE E-MAIL STRING BEGINNING WITH A SAYERS/CASAGRANDE E-MAIL DATED 8/3/12, BATES-STAMPED 001230 AND 1231 | 80 |
| 18 | | | |
| 19 | | | |
| 20 | 16 | A ONE-PAGE CACIOPPO/NUSS LETTER DATED 11/5/12, AND A ONE-PAGE ATTACHMENT, BATES-STAMPED 001177 AND 1178 | 85 |
| 21 | | | |
| 22 | | | |
| | 17 | A TWO-PAGE ASSOCIATE HEALTH AND WELLNESS/CASAGRANDE LETTER, DATED 11/5/12, BATES-STAMPED 001239 AND 1240 | 96 |
| 23 | | | |
| 24 | | | |

5

| 1 | 18 | A ONE-PAGE SAYERS/CASAGRANDE<br>LETTER, DATED 11/8/12, AND A | 99 |
| 2 | | ONE-PAGE ATTACHMENT,<br>BATES-STAMPED 000016 AND 0017 | |
| 3 | | | |
| | 19 | A TWO-PAGE ASSOCIATE HEALTH AND | 102 |
| 4 | | WELLNESS/CASAGRANDE LETTER,<br>DATED 11/27/12, BATES-STAMPED | |
| 5 | | 001262 AND 1263 | |
| 6 | 20 | A SEVEN-PAGE POLICY/PROCEDURE | 103 |
| | | ENTITLED, "TIME AWAY FROM | |
| 7 | | WORK," BATES-STAMPED 001812<br>THROUGH 1818 | |
| 8 | | | |
| | 21 | A ONE-PAGE SAYERS/CASAGRANDE | 104 |
| 9 | | LETTER, DATED 12/11/12, AND A<br>ONE-PAGE ATTACHMENT, | |
| 10 | | BATES-STAMPED 000556 AND 0557 | |
| 11 | 22 | A ONE-PAGE CANYON MEDICAL | 114 |
| | | CENTER/CASAGRANDE FAX AND A | |
| 12 | | ONE-PAGE ATTACHMENT,<br>BATES-STAMPED 001183 AND 1184, | |
| 13 | | | |
| | 23 | A ONE-PAGE ASSOCIATE HEALTH AND | 115 |
| 14 | | WELLNESS/CASAGRANDE LETTER,<br>DATED 12/13/12, BATES-STAMPED | |
| 15 | | 001272 | |
| 16 | 24 | A ONE-PAGE CASAGRANDE/TALEBI | 126 |
| | | E-MAIL, DATED 1/24/13, | |
| 17 | | BATES-STAMPED 001155 | |
| 18 | 25 | A ONE-PAGE CACIOPPO/CASAGRANDE | 133 |
| | | LETTER, DATED 2/15/13, | |
| 19 | | BATES-STAMPED 001279 | |
| 20 | 26 | A TWO-PAGE E-MAIL STRING, | 135 |
| | | BEGINNING WITH A HEYDER/SAYERS | |
| 21 | | E-MAIL DATED 2/15/13, AND A<br>TWO-PAGE ATTACHMENT, | |
| 22 | | BATES-STAMPED 001405 THROUGH<br>1408 | |
| 23 | | | |
| | 27 | A TWO-PAGE E-MAIL STRING, | 142 |
| 24 | | BEGINNING WITH A<br>KRAMB/CASAGRANDE E-MAIL DATED | |

6

```
 1                    2/22/13, BATES-STAMPED 001146
                      AND 1147
 2
         28           A ONE-PAGE CASAGRANDE/CACIOPPO    144
 3                    FAX COVER SHEET, DATED 2/27/13,
                      AND A ONE-PAGE ATTACHMENT,
 4                    BATES-STAMPED 001191 AND 1192

 5       29           A TWO-PAGE E-MAIL STRING,
                      BEGINNING WITH A
 6                    TALEBI/CACIOPPO, SAYERS E-MAIL
                      DATED 3/14/13, BATES-STAMPED
 7                    001131 AND 1132{TR:1}{P}

 8       30           A 42-PAGE DOCUMENT ENTITLED,     155
                      "GENERAL NURSING ORIENTATION
 9                    MANUAL," BATES-STAMPED 000068
                      THROUGH 0116
10
         31           A FOUR-PAGE DOCUMENT ENTITLED,   156
11                    "JUMPSTART ... NEW ASSOCIATE
                      ORIENTATION FOR THE STAFF RN,"
12                    BATES-STAMPED 001311 THROUGH
                      1314
13
         32           A ONE-PAGE DOCUMENT BEGINNING,   158
14                    "JOSEPH CASAGRANDE GOALS,"
                      DATED 3/25/13, BATES-STAMPED
15                    000166

16       33           A TWO-PAGE DOCUMENT ENTITLED,    161
                      "STAFF EVALUATION," DATED
17                    2/7/12, BATES-STAMPED 000066
                      AND 0067
18
         34           A ONE-PAGE DOCUMENT ENTITLED,    164
19                    "STAFF PERFORMANCE EVALUATION,"
                      12/5/11 TO 3/5/12, AND NINE
20                    PAGES OF ATTACHMENTS,
                      BATES-STAMPED 000052 THROUGH
21                    0061

22       35           A SEVEN-PAGE DOCUMENT ENTITLED,  167
                      "2012 DECEMBER ASSOCIATE ANNUAL
23                    REVIEW, 12/1/12 TO 4/30/13,"
                      BATES-STAMPED 000685 THROUGH
24                    0691
```

7

| | | | |
|---|---|---|---|
| 1 | 36 | A FOUR-PAGE DOCUMENT ENTITLED, "PERFORMANCE MANAGEMENT RECORD," DATED 10/10/12, BATES-STAMPED 000205 THROUGH 0208 | 183 |
| 2 | | | |
| 3 | | | |
| 4 | 37 | A TWO-PAGE DOCUMENT ENTITLED, "PERFORMANCE MANAGEMENT RECORD," DATED 10/24/12, BATES-STAMPED 000209 AND 0210 | 189 |
| 5 | | | |
| 6 | | | |
| 7 | 38 | A TWO-PAGE DOCUMENT ENTITLED, "PERFORMANCE MANAGEMENT RECORD," DATED 11/5/12, BATES-STAMPED 000211 AND 0212 | 201 |
| 8 | | | |
| 9 | 39 | A THREE-PAGE CASAGRANDE/SAYERS E-MAIL DATED 4/23/13, BATES-STAMPED 000709 THROUGH 0711 | 224 |
| 10 | | | |
| 11 | | | |
| 12 | 40 | A THREE-PAGE E-MAIL STRING, BEGINNING WITH A CASAGRANDE/SAYERS, GRISKE E-MAIL DATED 4/29/13, BATES-STAMPED 000745 THROUGH 0747 | 233 |
| 13 | | | |
| 14 | | | |
| 15 | 41 | A TWO-PAGE E-MAIL STRING BEGINNING WITH A CASAGRANDE/SAYERS E-MAIL DATED 5/7/13, BATES-STAMPED 000748 AND 0749 | 247 |
| 16 | | | |
| 17 | | | |
| 18 | 42 | A ONE-PAGE DOCUMENT ENTITLED, "PERFORMANCE MANAGEMENT RECORD," DATED 7/1/13, BATES-STAMPED 000215 | 249 |
| 19 | | | |
| 20 | | | |
| 21 | 43 | A ONE-PAGE DOCUMENT ENTITLED, "PERFORMANCE MANAGEMENT RECORD," DATED 7/12/13, BATES-STAMPED 000216 | 267 |
| 22 | | | |
| 23 | 44 | A ONE-PAGE E-MAIL STRING, BEGINNING WITH A CASAGRANDE/SAYERS E-MAIL DATED 7/16/13, BATES-STAMPED 000803 | 269 |
| 24 | | | |

8

| | | | |
|---|---|---|---|
| 1 | | | |
| 2 | 45 | A TWO-PAGE DOCUMENT ENTITLED, "PERFORMANCE MANAGEMENT RECORD," DATED 7/18/13, | 276 |
| 3 | | BATES-STAMPED 000219 AND 0220 | |
| 4 | 46 | A TWO-PAGE DOCUMENT ENTITLED, "PERFORMANCE MANAGEMENT | 278 |
| 5 | | RECORD," DATED 9/20/13, BATES-STAMPED 000221 AND 0222 | |
| 6 | | | |
| 7 | 47 | A THREE-PAGE E-MAIL STRING, BEGINNING WITH A CASAGRANDE/SAYERS, KINDER | 286 |
| 8 | | E-MAIL DATED 9/16/13, BATES-STAMPED 000930 THROUGH | |
| 9 | | 0932 | |
| 10 | 48 | A TWO-PAGE DOCUMENT ENTITLED, "PERFORMANCE MANAGEMENT | 294 |
| 11 | | RECORD," DATED 10/11/13 | |
| 12 | 49 | A ONE-PAGE SAYERS/CASAGRANDE LETTER, DATED 10/11/13 | 296 |
| 13 | | | |
| 14 | 50 | A FOUR-PAGE E-MAIL STRING, BEGINNING WITH A CASAGRANDE/SAYERS E-MAIL DATED | 297 |
| 15 | | 9/23/13, BATES-STAMPED 000960 THROUGH 0963 | |
| 16 | | | |
| 17 | 51 | A SIX-PAGE DOCUMENT ENTITLED, "HUMAN RESOURCES POLICY AND PROCEDURE ... TITLE: | 300 |
| 18 | | PERFORMANCE MANAGEMENT," REVISED FEBRUARY 2012, | |
| 19 | | BATES-STAMPED 000329 THROUGH 0334 | |
| 20 | | | |
| 21 | 52 | A THREE-PAGE DOCUMENT ENTITLED, "HUMAN RESOURCES POLICY AND PROCEDURE ... TITLE:  PROBLEM | 301 |
| 22 | | REVIEW," REVISED JULY 2013, BATES-STAMPED 001809 THROUGH | |
| 23 | | 1811 | |
| 24 | 53 | A TWO-PAGE DOCUMENT FROM JOE CASAGRANDE, DATED 9/24/13, | 303 |

9

```
 1                    BATES-STAMPED JFC257 AND 258,

 2      54    A TWO-PAGE DOCUMENT FROM JOE         305
              CASAGRANDE ENTITLED, "MEMO
 3            10/18/2013 - APPEAL TO
              COMMITTEE," BATES-STAMPED
 4            JFC259 AND 260

 5      55    A ONE-PAGE MARKOVICH/CASAGRANDE      306
              LETTER, DATED 10/29/13,
 6            BATES-STAMPED JFC313

 7      56    AN 11-PAGE E-MAIL STRING,            308
              BEGINNING WITH A
 8            CASAGRANDE/SAYERS E-MAIL DATED
              11/2/13, BATES-STAMPED 001594
 9            THROUGH 1604

10      57    A ONE-PAGE GOSSETT/CASAGRANDE        309
              LETTER, DATED 11/13/13,
11            BATES-STAMPED JFC315

12      58    A SEVEN-PAGE E-MAIL STRING,          310
              BEGINNING WITH A
13            TALEBI/CASAGRANDE E-MAIL DATED
              12/18/13, BATES-STAMPED 001819
14            THROUGH 1825

15                         - - -

16

17

18

19

20

21

22

23

24
```

10

```
 1                    Tuesday Morning Session
                     March 11, 2014
 2                   9:08 a.m.

 3                          - - -

 4                    STIPULATIONS

 5            It is stipulated by and among counsel for the

 6     respective parties that the deposition of JOSEPH

 7     CASAGRANDE, the Plaintiff herein, called by the

 8     Defendants under the applicable Federal Rules of Civil

 9     Procedure, may be taken at this time in stenotype by

10     the Notary, by agreement of counsel and without notice

11     or other legal formality; that said deposition may

12     thereafter be transcribed by the Notary out of the

13     presence of the witness; that proof of the official

14     character and qualification of the Notary is waived;

15     that the witness may sign the transcript of his

16     deposition before a Notary other than the Notary taking

17     his deposition; said deposition to have the same force

18     and effect as though signed before the Notary taking

19     it.

20                          - - -

21

22

23

24
```

11

```
 1                    JOSEPH CASAGRANDE
 2  being by me first duly sworn, as hereinafter certified,
 3  deposes and says as follows:
 4                    CROSS-EXAMINATION
 5  BY MR. ASENSIO:
 6       Q.   Sir, could you state your name for the
 7  record?
 8       A.   Joseph Casagrande.
 9       Q.   Mr. Casagrande, you met me a few minutes ago.
10  Mike Asensio is my name.  I am an attorney for
11  OhioHealth and Amy Sayers, and with me is Lindsey
12  D'Andrea who is another attorney in this case.  I think
13  you know both Ms. Sayers and Ms. Talebi, who are here
14  as well.
15       A.   Yes.
16       Q.   What I would like to do is just get a couple
17  of ground rules understood up-front so that we have
18  this deposition go as expeditiously as possible.
19            First of all, if you could please answer for
20  the record.  If you nod your head or give an "uh-huh,"
21  "unt-uh," it won't read well into the record.
22       A.   Right.
23       Q.   And so if you could answer audibly and in
24  English, that will work for all us, and I will try to
```

12

1    do the same.

2           Secondly, if you could, as you and I go

3    through questions and answers today, please wait until

4    I am done asking a question.  Sometimes it may not

5    appear that I am done or you may not know whether I am

6    done, and I will try and do that so that we don't talk

7    over each other on the record because that also doesn't

8    read well.

9           And then, finally, if I ask you a question

10   that you don't understand, please tell me.  I don't

11   want you guessing at what I meant in my question.  I

12   don't want you guessing on the answers, as well.  Go

13   ahead and let me know that you didn't understand it and

14   I'll be happy to rephrase it.

15        A.   Okay.

16             Can we do something about that blind?

17        Q.   Yeah.

18             All right.  Have you ever had your deposition

19   taken before?

20        A.   No, I have not.

21        Q.   So have you ever been a party in a lawsuit,

22   either a Plaintiff as you are in this case, or a

23   Defendant?

24        A.   A Plaintiff.

13

1      Q.   What kind of case was that?

2      A.   It was a contract dispute.

3      Q.   What kind of contract?

4      A.   Health-club membership.

5      Q.   Were you the person who brought the lawsuit?

6      A.   Yes.

7      Q.   Where was that?

8      A.   What do you mean, where was it?

9      Q.   Here in town?

10     A.   Yes.

11     Q.   Was it State court?

12     A.   It was Municipal Court.

13     Q.   Municipal Court in Columbus?

14     A.   Yes.

15     Q.   Who did you sue?

16     A.   World Gym.

17     Q.   What was the nature of the dispute?

18     A.   It was just over the contract terms.

19     Q.   What about them?

20     A.   They violated the contract and we sued for

21  triple damages and won.

22     Q.   How did they violate the contract?

23     A.   They terminated the membership without cause.

24     Q.   Was this during the term of the membership?

14

1  A. Yes.

2  Q. Was there an issue that arose that resulted

3 in them terminating the membership?

4  A. They tried to force me and my training

5 partner not to work out at a particular facility and

6 our membership allowed us to go to all facilities.

7  Q. Did they give you a reason why they were

8 asking you not to work out at that facility?

9  A. I don't recall.  It's been like 15 years ago.

10  Q. So do you remember the year the case was

11 filed, litigated?

12  A. I don't remember.

13  Q. About 15 years ago, though?

14  A. Yeah.  I think it was around 1999, 2000,

15 something like that.

16  Q. And World Gym was the Defendant?

17  A. Yes.

18  Q. Any reason you can't testify truthfully here

19 today?

20  A. No.

21  Q. Not under the influence of alcohol or any

22 medication?

23  A. No.

24  Q. And any reason that you would not be able to

1  understand questions, answer them as best you can in

2  this process?

3      A.   No.

4      Q.   Have you ever filed any charges of

5  discrimination with either the Ohio Civil Rights

6  Commission, the Equal Employment Opportunity Commission

7  or --

8      A.   No, I have not.

9      Q.   -- any other agency?

10     A.   No charges, no.

11     Q.   Have you ever had any criminal charges filed

12  against you, other than traffic tickets?

13     A.   No.

14     Q.   Have you ever provided testimony of any kind

15  before in a legal proceeding?

16     A.   In an illegal?

17     Q.   In a legal proceeding.

18     A.   In a legal.

19     Q.   Have you ever testified in court?

20     A.   I'm trying to remember.

21          No.

22     Q.   What did you do to prepare for the deposition

23  today?

24     A.   I met with my attorney.

16

1      Q.   Mr. Mansell?

2      A.   Yes.

3      Q.   Did you review any documents?

4           MR. MANSELL:   You can answer.

5           THE WITNESS:   Yes.

6   BY MR. ASENSIO:

7      Q.   What documents did you review?

8      A.   The documents that were provided to him by

9   Defendant.

10      Q.   That were produced as part of the lawsuit?

11      A.   Yes.

12      Q.   Did you meet with anyone else in preparation

13   for today's deposition?

14      A.   No.

15      Q.   Was anyone else present other than

16   Mr. Mansell?

17      A.   Carrie.

18      Q.   All right.  Ms. Dire?

19      A.   I'm sorry, I almost forgot her name.

20      Q.   Anyone else?

21      A.   No.

22      Q.   What is your current address?

23      A.   It's 1426 Yorktown Road, Columbus.

24      Q.   How long have you lived at that address?

                                                    17

1        A.   29 years.

2        Q.   What is your date of birth?

3        A.   3/19/56.

4        Q.   Almost your birthday.

5        A.   Pardon me?

6        Q.   Almost your birthday.

7        A.   Yes.

8        Q.   Do you live with anyone?

9        A.   Yes.

10       Q.   Who?

11       A.   David Retamar.

12       Q.   Can you spell that for me?

13       A.   R-E-T-A-M-A-R.

14       Q.   All right.  Is he your domestic partner?

15       A.   Yes.

16       Q.   And are you married?

17       A.   No.

18       Q.   Do you have any children?

19       A.   No.

20       Q.   Are you a member of any clubs, social clubs,

21   civil organizations, anything like that?

22       A.   Just related to nursing.

23       Q.   What?

24       A.   The Franklin County -- I can't remember what

18

1   they call it.  It's some type of action -- I don't

2   remember the name of it.

3       Q.   All right.  A nursing association?

4       A.   Right.  It's where, you know, if there's any

5   type of emergency situation, they can call us up.

6       Q.   Okay.  Kind of a --

7       A.   Just give injections and things or -- like we

8   did flu shots when they had the flu outbreak.

9       Q.   Do you do this on a volunteer basis?

10      A.   Yeah.

11      Q.   Any hobbies or interests?

12      A.   I like gardening, working on my house,

13  working out, exercise, cooking.

14      Q.   All right.  Let me ask you if, in the recent

15  past, you have had any issues with a series of items.

16  Alcoholism.  Have you had any issues with alcoholism in

17  the recent past?

18      A.   How recent?

19      Q.   Within the last 10 years.

20      A.   Yes.

21      Q.   All right.

22      A.   Alcoholism or --

23      Q.   Alcohol abuse.

24      A.   Yes.

19

1        Q.   And what is it?  Please describe that for me?

2        A.   When I have issues with anxiety, I have

3    trouble sleeping, so I will get from my doctor a

4    prescription for, like, Ambien; and if that doesn't

5    allow me to sleep, which usually it doesn't, then I

6    will sometimes abuse alcohol, but that's on a very rare

7    situation.

8        Q.   When is the first time you had an issue with

9    abusing alcohol?

10       A.   That would have been 2006.

11       Q.   Was there an issue or event that was

12   associated with that abuse of alcohol in 2006?

13       A.   Yeah.  I was having issues with my employment

14   at the time.

15       Q.   Where were you employed at the time?

16       A.   Accent Energy.

17       Q.   What was your position at Accent Energy?

18       A.   I was the accounting manager.

19       Q.   What was the issue that you were having with

20   your employment?

21       A.   My boss was replacing the CFO, and the CFO

22   that came in had no energy experience and he was on

23   like a part-time basis so he was trying to get his job,

24   so he was trying to make everyone under him, including

1    my cohort, look bad.

2        Q.   Who was your cohort?

3        A.   You want her name?

4        Q.   Yeah.

5        A.   It's been a while.

6        Q.   If you recall.

7        A.   I'll have to think about it.

8        Q.   Okay.  And how did that issue result in the

9    alcohol-abuse issue?

10        A.   Well, I left employment there and so I

11   didn't -- I'm my own breadwinner, so I was concerned

12   about how I was going to continue earning money.

13        Q.   Financial concerns?

14        A.   Right.

15        Q.   What would have been the next instance in

16   which you had an issue with alcohol after 2006?

17        A.   That would have been in the fall of 2012 --

18        Q.   Okay.

19        A.   -- when I would have, again, trouble

20   sleeping.  So, to stay asleep, I would mix pain -- not

21   pain meds but the sleep meds with some alcohol to

22   intensify the effect.

23        Q.   And that was an issue, I think you indicated,

24   in the fall of 2012?

1      A.   Yes.

2      Q.   And at that point in time, when you were

3  employed by OhioHealth?

4      A.   Yes.

5      Q.   Did that precipitate or cause a leave of

6  absence with OhioHealth, that resulted --

7      A.   The anxiety; not the alcoholism -- or

8  alcohol.

9      Q.   But you ended up going on a leave of absence

10 after this issue; right?

11     A.   Correct.

12     Q.   All right.  We will get into that in some

13 depth in a bit.

14     A.   Okay.

15     Q.   After the 2006 issue, did you seek any

16 treatment for alcohol abuse?

17     A.   I went into like a 10-day rehab -- not a

18 rehab but a detox.

19     Q.   Where did you do that?

20     A.   Parkside in Gahanna.

21     Q.   Did you successfully complete that program?

22     A.   Yes.

23     Q.   Did you have any other treatment for alcohol

24 abuse?

1      A.   No.

2      Q.   After the issue in 2012, did you seek any

3 treatment?

4      A.   Yes.

5      Q.   Where did you seek treatment then?  And I

6 mean treatment for alcohol abuse.

7      A.   It was just detox at a place at Licking

8 Memorial Hospital.  Shepherd Hill.

9      Q.   Okay.

10      A.   I was there like three -- three days.

11      Q.   Did you go through a program there?

12      A.   I only did the detox.

13      Q.   And that was a three-day --

14      A.   Yeah, it was.

15      Q.   -- process?

16      A.   It was like a Friday, out on Monday; --

17      Q.   Any other --

18      A.   -- and it was for the benzos that were

19 prescribed for me.  There wasn't -- Like when they did

20 the test, there wasn't any alcohol.

21      Q.   Okay.  And was this all as a result of --

22      A.   Anxiety, --

23      Q.   The anxiety issue?

24      A.   -- panic attacks.

1      Q.   And this was all --

2           You had a singular issue, did you not,

3    towards the end of October, beginning of November,

4    where you had these panic attacks that resulted in the

5    leave of absence that you took at OhioHealth?

6      A.   Singular in what regard?

7      Q.   Well, in the regard that it was occasioned

8    over a couple of days; you missed some work at that

9    point and then went on an extended leave of absence?

10     A.   Right.

11     Q.   And that's the issue we are talking about

12   with the benzos and the alcohol?

13     A.   Yes.

14     Q.   All right.  Any other issues with alcohol

15   abuse?

16     A.   No.  I'd never had any.  In early life, I'd

17   never abused any drugs.

18     Q.   Do you drink alcohol today?

19     A.   No.

20     Q.   How long have you not been drinking alcohol?

21     A.   I may have like a beer socially.  Probably

22   the last time I did was two months ago.

23     Q.   Okay.

24     A.   I just don't drink.

1      Q.   You rarely drink?

2      A.   Yeah.

3      Q.   Drug addiction, any issues with that?

4      A.   No.

5      Q.   Have you had, within the last five years, the

6  death of a friend or a close family member, anything of

7  that nature?

8      A.   Last five years?

9      Q.   Yeah.

10     A.   No.

11     Q.   Any prolonged illnesses with regard to

12  friends or family members?

13     A.   My mom.

14     Q.   When would that have occurred?

15     A.   She passed away in 2003.

16     Q.   Anything else?

17     A.   Like how long are we talking?

18     Q.   Last five years.

19     A.   No.

20     Q.   How about financial issues?  Had any

21  financial issues that would have given you stress over

22  the last five years?

23     A.   Yes.

24     Q.   What are those?

1      A.    The one that comes to mind was the summer of

2  2012.  I had cosigned on Sallie Mae loans for my

3  partner and he was not able to pay them and so I had

4  to.

5      Q.    The Sallie Mae loans were for what?

6      A.    His medical school.

7      Q.    Was this a mortgage on the Yorktown

8  residence?

9      A.    No.  It was just a -- I cosigned his ....

10      Q.    Okay.  How much money was at stake for the

11  loan?

12      A.    The loans were like 120-some-thousand.  We

13  settled for like 49,000.

14      Q.    Were you in litigation at the time?

15      A.    No.  It was turned over to collection and I

16  was hoping he would be able to take care of it.

17      Q.    And he wasn't?

18      A.    No.

19      Q.    Did you end up paying part or all of that

20  49- --

21      A.    I paid all of it.

22      Q.    Of the 49,000?

23      A.    Yes.

24      Q.    When in the summer of 2012 did this occur?

1      A.   Well, it kind of was -- it started probably,

2   I don't know, May or June, is when, you know, it got

3   turned over; and then by the time we made the

4   settlement, it was sometime in July.

5      Q.   Any other financial issues that would have

6   caused you stress over the last five years?

7      A.   Just the fact that I'm the only breadwinner

8   and, you know, the fact that I felt my job was in

9   jeopardy is stressful.  So when I go on disability, I

10  have to worry about:  Am I going to have a position

11  when I return to work -- when I'm able to return to

12  work.  So that's the issue.

13     Q.   In 2006 at --

14     A.   Can I add to that?

15     Q.   Sure.

16     A.   So what caused some additional stress was the

17  fact that I received a letter --

18     Q.   When are we talking?  What period of time?

19     A.   You were talking presently; correct?

20     Q.   I'd asked you what other issues had caused

21  you stress within the last five years.

22     A.   Yes.

23     Q.   Financial issues?

24     A.   Yes.

1        Q.    And --

2        A.    The fact that I did not have -- Go ahead.

3        Q.    And you had given me an answer and then you

4   started back in with a further explanation, which is

5   fine.  I just want to know what timeframe you are

6   talking about.  What was the context?

7        A.    I was about to tell you.

8              December -- Right when I was on disability

9   the beginning of December, I was told by my case

10  manager, Rose, that not to be surprised if my position

11  would not be held, and then soon after that, I received

12  a letter from Amy Sayers saying that my position had

13  been replaced.

14             And one word was changed in that letter,

15  which changed the entire meaning of the document to

16  make it seem like I was not qualified for FMLA coverage

17  when I was.

18       Q.    All right.  And that whole issue caused you

19  stress; right?

20       A.    Absolutely.

21       Q.    In 2006 when you were at Accent Energy and

22  you had the accounting manager who was causing you

23  stress, at that point, did you seek any treatment for

24  the stress?

1        A.    Just my doctor.

2        Q.    And who was your doctor?

3        A.    Dr. Dipietra.

4        Q.    And has that been your doctor since then?

5        A.    Yes.

6        Q.    And where is he located?

7        A.    He's at Canyon Medical Center on East Broad

8    Street.  It's next to Mount Carmel East.

9        Q.    How long have you been a patient of Dr.

10   Dipietra?

11       A.    Probably like 30 years.

12       Q.    Did you seek any treatment or counselling or

13   medical care from anyone else as a result of the 2006

14   issue?

15       A.    I don't recall that I did.

16       Q.    Any psychiatric help at all?

17       A.    I don't believe so.

18       Q.    Have you ever --

19       A.    I don't recall.

20       Q.    Have you ever been a patient of a

21   psychiatrist?

22       A.    Psychiatrist?  No.

23       Q.    Psychologist?

24       A.    Yes.

1      Q.   When?

2      A.   That would have been back around the time my

3  mom was passing away.

4      Q.   Around 2003?

5      A.   Yeah.

6      Q.   Was it related --

7      A.   Even before that, actually.

8      Q.   All right.  And what was it in relation to?

9      A.   She had lived with me, and then when she

10  started to become not able to walk and navigate my

11  house, I had to move her into an assisted-living

12  facility and she basically laid the guilt trip on me

13  that I'm throwing her out and so that caused stress.

14      Q.   All right.  Did you seek therapy for that?

15      A.   Yeah.

16      Q.   Any other instances where you have sought

17  therapy or care from a mental-health provider?

18      A.   Not that I recall.

19      Q.   Any other physicians that you have been a

20  patient of other than Dr. Dipietra in the last 10

21  years?

22      A.   Just when I've had like a surgical procedure,

23  eye doctor.  That's ....

24      Q.   And other than what we've talked about thus

1   far, any other inpatient admissions that you would have

2   had at any hospitals?

3       A.   You mean other than --

4       Q.   Other than what you've told me thus far.

5       A.   No.  I mean, I was in the hospital a couple

6   times when I was having my anxiety attacks.

7       Q.   And that would have been in 2012?

8       A.   Yeah.

9            And Amy was aware of that.  I made her aware

10  of it.

11      Q.   All right.  We'll talk about those.

12           Where did you attend high school?

13      A.   Walnut Ridge.

14      Q.   What date did you graduate from there?

15      A.   It was June of 1974.

16      Q.   Did you attend college thereafter?

17      A.   Yes.

18      Q.   Where?

19      A.   Ohio State.

20      Q.   Did you graduate?

21      A.   Yes.

22      Q.   When?

23      A.   1978.

24      Q.   What was your degree in?

1          A.    A Bachelor of Science in Business

2     Administration.

3          Q.    Did you seek employment after graduating from

4     OSU or did you go on with other education?

5          A.    I interned at Deloitte, which is an

6     accounting firm, during my senior year, and I was

7     brought in and worked there probably about 11 years.

8          Q.    So you worked for Deloitte for 11 years.

9     What was your position at Deloitte?

10         A.    When I left?

11         Q.    Yes.

12         A.    Senior manager.

13         Q.    Were you on the accounting side?

14         A.    Yeah.  EBS, Emerging Business Services, so we

15    did accounting and tax services.

16         Q.    Was that locally, here in Columbus?

17         A.    Yes.

18         Q.    Were you always here in Columbus working for

19    Deloitte?

20         A.    Yes.

21         Q.    So 11 years later would take you to about

22    1989, in that realm?

23         A.    Correct.

24         Q.    What did you do after you left Deloitte?

1        A.    I was -- I went with one of my clients as

2    Chief Financial Officer, and it was Long's College Book

3    Company.  They were the main bookstore at OSU.

4        Q.    You became their CFO?

5        A.    Yes.

6        Q.    How long did you stay with them?

7        A.    Till like 2000.

8        Q.    So about another 11 years?

9        A.    Yes.

10        Q.    Then what?

11        A.    The owner passed away, they sold the company,

12    and I basically got a buyout.  Took some time, traveled

13    some.  Then talked to one of my ex-coworkers at

14    Deloitte.  That was when I went to work at Accent.

15    2003.

16        Q.    How long were you off work?  Couple years?

17        A.    Yes.  And I was also taking care of my mom.

18    That was during the time she was actively dying.

19        Q.    During your 11 years at Deloitte, were you

20    ever disciplined for any reason?

21        A.    Well, I'm sure I was but I don't recall.

22        Q.    Why are you sure you were?

23        A.    Because it happens.  I mean, obviously, there

24    are things, I mean, when you get reviews on your

33

1    clients; but generally, I had good reviews.  I don't

2    recall a specific instance.

3        Q.    How about during your time at Long's College

4    Book Company?

5        A.    No.

6        Q.    When you left Deloitte, was that a voluntary

7    decision to leave or were you asked to leave?

8        A.    It was a mutual, and --

9        Q.    What happened?

10       A.    The reason is:  They were -- it was difficult

11   to make partner, as you may know in the legal business,

12   and they were giving opportunities to people that were

13   basically working 80-hour weeks.  You had to be a

14   salesman and an accountant.  I was not a salesman.  So

15   I was a senior manager.  They were purging senior

16   managers.  So they encouraged those people, me and

17   other ones, to seek other employment; not because of

18   any issues with job performance.

19       Q.    All right.  Kind of an up-or-out if you don't

20   make partner?

21       A.    Right.

22       Q.    And Long's College Book Company, you told me

23   you weren't disciplined during your tenure there and

24   you left as a result of a buy-out --

34

1      A.   Correct.

2      Q.   -- after a change in ownership?

3      A.   Yes.

4      Q.   Accent, you went to work in about 2003.  What

5  position did you have there?

6      A.   Accounting manager.

7      Q.   Accounting manager?

8      A.   I don't remember what the exact title was.

9  Something like that.  Director of accounting is what it

10 was.

11     Q.   How long were you there?

12     A.   I started in -- I think it was July 2003

13 until July of 2006.

14     Q.   Stay in the same position?

15     A.   Yes.

16     Q.   What was your pay there?

17     A.   I think I started at like 72,000 plus bonus,

18 and I don't recall exactly when I left.  It was

19 somewhere around 78,000, plus I think I got a $19,000

20 bonus back that year.

21     Q.   So roughly 100K?

22     A.   Yes.

23     Q.   All right.  And when you left in 2006, why

24 did you leave?

1        A.   I was hired by -- in 2003 by someone I said I

2   worked with at Deloitte.

3        Q.   Right.

4        A.   He was the CFO at Accent.  He hired me.

5             He decided, in the fall of 20- -- no, I'm

6   sorry. -- 2002 to leave for another opportunity.  He

7   wasn't getting along with the CEO.  There were some, he

8   said, incompetent people he couldn't deal with.  So

9   that kind of surprised me.  And then the CEO talked to

10  me and said that he was going to bring someone in that

11  had no energy experience, and the energy market -- the

12  energy -- accounting for energy is a very specific type

13  of accounting and it's very complicated.  This guy that

14  they brought in on a temporary basis didn't know

15  anything about it so he felt not very confident.  So

16  his way of trying to get -- He was unemployed at the

17  time.  His way of trying to get into that company was

18  to make us, meaning the staff, look bad.  So he would

19  have meetings with, you know, the CEO and say, "Well,

20  Joe has access to payroll and no one checks what he

21  does," you know, things like that.  Kind of making it

22  seem like I was, you know, going to steal money from

23  the company.  So he just was planting things in

24  people's minds.

1      Q.    How many other people like yourself --

2      A.    Yeah.

3      Q.    -- reported to this guy?

4      A.    There was Lisa, who -- we were kind of --

5   because the company was growing and so I needed someone

6   kind of in my position.  We kind of handled ....

7           I'm trying to remember her last name.

8   Escapes me right now.  But she was having the same

9   issues --

10     Q.    All right.

11     A.    -- as me.

12     Q.    Was it just the two of you?

13     A.    No.  We had a finance person and then there

14  were people under me and her.  So I would say there was

15  probably like five people, including myself.

16     Q.    Did this all come to a head in 2006?

17     A.    Yes.

18     Q.    All right.

19     A.    And Lisa was looking for other employment and

20  so -- and I was -- I -- my intention was to stay until

21  she left, and then also then leave.

22     Q.    And did that happen?

23     A.    No.

24     Q.    What happened?

37

1        A.    What happened was that they decided that both

2    of us were going to leave at the same time and they

3    brought in temporary people.

4        Q.    All right.  So they terminated both of you at

5    the same time?

6        A.    About the same time.

7        Q.    Did --

8        A.    Actually me before her, like a week or so.

9        Q.    Okay.  The alcohol issue that you have

10   described for me earlier, did that happen at this same

11   time?

12       A.    Afterwards.

13       Q.    After your termination?

14       A.    Yes.

15       Q.    Did you have financial concerns at that

16   point?

17       A.    Oh, yes.

18       Q.    And you were the sole breadwinner, I think

19   you described, --

20       A.    Correct.

21       Q.    -- for you and your partner?

22       A.    He was in medical school at the time.

23       Q.    So he was --

24       A.    He wasn't here physically.

1    Q.   Okay.  Had you already signed on the notes

2    that you described earlier?

3    A.   Some of them, I believe.  I don't remember

4    the timing.

5    Q.   So safe to say you had a lot of financial

6    concerns at that point?

7    A.   Sure.

8    Q.   They were causing a lot of stress for you at

9    that point?

10   A.   I would say an appropriate amount of stress

11   given the situation, yes.

12   Q.   What did you do after you left Accent, in

13   terms of employment?

14   A.   I went back to school.

15   Q.   Where did you go to school?

16   A.   Columbus State.

17   Q.   Why did you go to Columbus State?

18   A.   Because they had a nursing program that was

19   well-recognized and the per-hour tuition was reasonable

20   and I could get in -- since I already had a Bachelor's

21   Degree, I got in their online program.

22   Q.   Was this a degree program that you were

23   entering at Columbus State?

24   A.   Yes.

39

1     Q.   What degree was it you were pursuing?

2     A.   Nursing.

3     Q.   Was it a two-year Associate Degree?

4     A.   Yes.

5     Q.   Why, after a career in business, did you

6   decide to pursue a career in nursing?

7     A.   Because one -- a couple of the things that I

8   did when I got out of public accounting and into these

9   companies, they were smaller companies and I wore a

10  number of different hats.  I was also the administrator

11  of all their benefit plans.  People would come to me

12  with questions on their insurance and I just found I

13  got a lot of satisfaction out of helping people.  So,

14  in accounting, you don't get a lot of satisfaction out

15  of generating numbers.

16    Q.   Okay.

17    A.   So it was kind of like a late-life awakening

18  that I needed to do something where I could get

19  satisfaction out of helping people, and what better

20  career than nursing.

21    Q.   Fair enough.

22         And so in 2006, you start in on a two-year

23  program?

24    A.   Yes.

1    Q.    When did you graduate?

2    A.    2010.  I wasn't able to get in right away.

3    There's like a waiting list.  So I started -- well,

4    actually, it was winter quarter Of 2007 that I started

5    taking some, like, science courses ahead of -- and then

6    I applied for the nursing -- online nursing program.  I

7    got in the following fall.  So 2008 is when I actually

8    started the nursing program there.

9    Q.    And did you go full-time?

10   A.    I worked part-time doing some accounting on

11   the side.

12   Q.    Was this accounting that you were doing --

13   A.    I just had some friends that needed

14   accounting services so --

15   Q.    So as a sole proprietor, you were doing it?

16   A.    Yeah.  It wasn't lucrative.

17   Q.    When you graduated in 2010 with your

18   Associate's Degree in Nursing, did you look for

19   employment then or continue with education?

20   A.    I looked for employment, but at the time,

21   there was a glut of nurses and I thought I'd made the

22   mistake by not being a PSA, a tech, a nursing tech

23   somewhere --

24   Q.    What does "PSA" stand for?

1      A.   What is it?

2           MS. TALEBI:  Patient Support Associate.

3           THE WITNESS:  Yeah, I don't remember the

4   exact term --

5   BY MR. ASENSIO:

6      Q.   Okay.

7      A.   -- but they are like nursing assistants.

8           So generally the people that got offers

9   worked in a position as a PSA, and when they graduated,

10  they were brought in because, you know, the managers

11  knew them, knew what kind of employee they were.

12          So at the time, I really didn't apply.  I

13  knew I wanted to get a Bachelor's Degree because I knew

14  that the magnet hospitals were -- they wanted

15  Bachelor's --

16     Q.   BSNs; right?

17     A.   Yeah.

18          -- so I studied and got my nursing license, I

19  think it was September after graduation, and then I

20  started that winter quarter with an online program, RN

21  to BSN through OU, Ohio University, and that was three

22  quarters.

23          So I got my Bachelor's Degree in August of

24  2011 and then that's when I actively started applying

42

1  for positions at, you know, the major hospitals.

2       Q.   All right.  And then you were hired when?

3       A.   I was hired like the end of November 2011 and

4  started December the 5th, 2011.

5       Q.   So you were hired, in essence, a couple of

6  months or so after you got your BSN?

7       A.   Yes, right.

8       Q.   Thank you for that.

9            Your current employment, where are you

10 employed?

11      A.   Mount Carmel East.

12           MR. ASENSIO:  Let's mark this.

13                      - - -

14           A THREE-PAGE OFFER LETTER FROM

15           MOUNT CARMEL DATED 2.7.14,

16           BATES-STAMPED JFC323 THROUGH 325,

17           WAS MARKED AS JC EXHIBIT 1.

18                      - - -

19 BY MR. ASENSIO:

20      Q.   Handing you what's been marked Plaintiff's

21 Exhibit 1, can you identify this?

22      A.   Yes.

23      Q.   It purports to be an offer letter from Mount

24 Carmel to you; is that correct?

1        A.   Yes.

2        Q.   All right.  And that's with regard to your

3    current employment?

4        A.   That's correct.

5        Q.   And I note in the first paragraph, it's a

6    full-time staff RN position?

7        A.   Correct.

8        Q.   How many hours will you be working in this

9    new job?

10        A.   36 per week.

11        Q.   Is that a three-12 shift?

12        A.   Yes.

13        Q.   Will you be working nights or days; do you

14    know?

15        A.   Nights.

16        Q.   Which is your preference?

17        A.   Correct.

18        Q.   And you will be working in the med./surg.

19    What does "CIMCU" stand for?

20        A.   Cardiac Intermediate Care Unit.

21        Q.   And is that a similar unit to what you worked

22    at OhioHealth on 7 Orange?

23        A.   They are both med./surg. positions.  Just

24    maybe a little higher acuity.

44

1       Q.   Higher acuity.  And when you --

2       A.   It's supposed to be, but --

3       Q.   When you say "higher acuity," what does that

4   mean?

5       A.   Patients aren't as ready to be discharged,

6   aren't as well off.

7       Q.   So they are sicker?

8       A.   They may be.

9       Q.   They may need more attention?

10      A.   They may, yeah.

11      Q.   Is that generally what's meant when I hear

12  the term "higher" or "lower acuity" as a medical

13  reference?

14      A.   That's my understanding.

15      Q.   $25.17 per hour, that will be your base

16  salary?

17      A.   Yes.

18      Q.   Will you receive a night-shift premium or any

19  other pay premium?

20      A.   Night shift and weekends.  I work weekends.

21      Q.   What will that be; if you know?

22      A.   I know it's a little different.  I think the

23  night is $5 an hour.  I don't recall what the night --

24  or what the weekend is.

1      Q.   Your three 12s that you will be working, will

2   those be weekdays, weekends, a mixture; do you know?

3      A.   It's going to be a mixture.

4      Q.   How will your compensation for this position

5   at Mount Carmel compare to your compensation when you

6   left OhioHealth?

7      A.   As far as the hourly rate?

8      Q.   Yeah.

9      A.   It's virtually the same.

10      Q.   And --

11      A.   I was part-time at OhioHealth.

12      Q.   So you will be working more hours at Mount

13   Carmel?

14      A.   Correct.

15      Q.   And this letter is dated the 7th of February,

16   which I think is a very recent offer; correct?

17      A.   Yes.

18      Q.   And are you currently actually working or

19   going through orientation?

20      A.   Orientation.

21      Q.   Benefits.  Do you have an idea what benefits

22   you will be entitled to?

23      A.   Yes.  It's going to be similar to OhioHealth.

24   There's going to be health insurance, basically full --

1  you know, dental, vision, 403B.

2       Q.   Will you have health insurance for your

3  domestic partner?

4       A.   I believe so.

5       Q.   Do you know who your supervisor will be?

6       A.   Yes.

7       Q.   Who?

8       A.   Brandy Shaeffer.

9       Q.   Other than your employment at OhioHealth,

10  have we covered your employment history?

11       A.   Ever since graduating from OSU, yes.

12       Q.   Okay.

13       A.   I mean, I delivered pizzas and busboy.

14       Q.   All right.

15            Talk to me a little bit about OhioHealth.

16  When were you hired by them?

17       A.   The recruiter called me sometime before

18  Thanksgiving of 2011 after I'd interviewed with Amy and

19  also her -- I don't recall her first name -- and

20  offered me the position and then sent a follow-up

21  letter similar to this.

22       Q.   This was an OhioHealth recruiter?

23       A.   Yes.

24       Q.   Had you already applied for a position there?

1       A.   I had.

2       Q.   What position did you apply for?  And when I

3  say that, I know you applied for a nursing position.

4  Was it specific to Amy's floor, the floor that you

5  ended up working on, or was it more a general

6  application?

7       A.   Yeah, there were open positions on that unit

8  so I applied for that unit, specifically.

9       Q.   Was there something about a med./surg. unit

10  that attracted you?

11       A.   Generally, that's the easiest way to get your

12  foot in the door.

13       Q.   Okay.

14       A.   But, you know ....

15       Q.   All right.  Do you recall what your rate of

16  pay was when you started, your base rate?

17       A.   It was like 23-something.

18       Q.   Did that increase during your employment at

19  OhioHealth?

20       A.   Yes.

21       Q.   Do you know what --

22       A.   Do you want specifically?

23       Q.   Do you know what it was when you ended?

24       A.   I received a merit increase in November of

1  2012.  And then there was like a -- I don't know what

2  they called it but it -- in February of 2013 --

3      Q.   A market increase?

4      A.   -- they made it across --

5           Yeah, a market increase.

6           Each one was somewhere around 60 to 80 cents

7  an hour.  I don't recall exact figures.  I don't have

8  that with me.

9      Q.   So your final wage rate would have been just

10 shy of $25; does that seem right?

11     A.   No, because I received an increase in

12 November -- a merit increase in November of 2013.

13     Q.   2013?

14     A.   Yes.

15     Q.   Okay.  And what was your final rate of pay?

16     A.   $25.35, something like that.  I don't

17 remember exactly.

18     Q.   Now, as a nurse at OhioHealth, you didn't

19 have a written employment contract; did you?

20     A.   No contract.

21     Q.   And you weren't hired for a specific period

22 of time?  It's not like you were hired for a one-year

23 term or a five-year term of something of that sort;

24 were you?

49

```
1        A.   No, I wasn't.

2        Q.   Did you receive a handbook, employee handbook

3   online or physically receive one during your

4   employment?

5        A.   I'm sure I did.

6        Q.   All right.  Let me hand you what we'll mark

7   as Plaintiff's Exhibit 2.

8                     - - -

9             A COVER PAGE OF ASSOCIATE HANDBOOK

10            AND "RECEIPT AND ACKNOWLEDGEMENT"

11            PAGE, BATES-STAMPED 000609 AND 613,

12            WERE MARKED AS JC EXHIBIT 2.

13                    - - -

14       Q.   I'm handing you what's marked as Plaintiff's

15  Exhibit 2.  It's a cover page and one page out of an

16  Associate Handbook.  Does that look familiar as a

17  document you might have seen during your employment?

18       A.   Yes.

19       Q.   And if you see on that second page, which is

20  actually Page 4 of the document, Bates-Stamped 613,

21  it's entitled "Receipt and Acknowledgment" and there

22  are directions down at the bottom to go online and to

23  review the handbook and sign an acknowledgment.  Do you

24  recall doing that when you started your employment?
```

50

1    A.    There were a number of things I remember

2  signing.  I'm sure this was among them.

3    Q.    Okay.  And you went ahead and did review the

4  handbook and take a look at it at the time you started?

5    A.    From my recollection, yes.

6          MR. ASENSIO:  Can we mark this as Exhibit 3.

7                        - - -

8          A SIX-PAGE "OFFICIAL TRANSCRIPT"

9          DATED 3/10/14, BATES-STAMPED 001784

10         THROUGH 789, WAS MARKED AS JC

11         EXHIBIT 3.

12                       - - -

13  BY MR. ASENSIO:

14   Q.    I'm handing you, sir, Plaintiff's Exhibit 3,

15  which is an "Official Transcript" with your name on it.

16  Would this have been a document that you saw during

17  your employment?  And just so we're clear --

18   A.    I don't know that I saw this exact document

19  but --

20   Q.    So we're clear, it may have been something

21  you might have seen online --

22   A.    Yes.

23   Q.    -- as opposed to an actual printed document?

24   A.    Correct.

51

 1      Q.    Did you, in fact, see this online?

 2      A.    There's a -- there's something called "Health

 3   Link" where -- it's an online where we take these

 4   classes.

 5           A lot of this was done during my orientation

 6   period and then just, we were assigned classes, certain

 7   classes which are on here, and we complete them on our

 8   own time, which generally was non-work hours -- or when

 9   I'm not on the floor --

10      Q.    Right.

11      A.    -- because we're taking care of patients when

12   we are on the floor.

13      Q.    So it looks to be kind of a history of the

14   different classes you would have taken --

15      A.    Yes.

16      Q.    -- and trainings you would have taken during

17   your employment at OhioHealth; is that fair?

18      A.    That would be a fair statement.

19      Q.    And it looks like you completed quite a

20   number of different orientations, trainings.  Take a

21   minute, look through it.  Any reason to dispute the

22   accuracy of this?

23      A.    Are you wanting me to look at each and every

24   line item and say, or just as a general?

52

1          Q.    As a general, unless you want -- unless you

2     are going to tell me that it doesn't look accurate to

3     you, --

4          A.    No.

5          Q.    -- then I am not going to go through each

6     one.

7          A.    It looks reasonable.

8          Q.    Is this what you recall generally in terms of

9     the types of training that you took?

10         A.    Yes.

11         Q.    No reason to dispute it; right?

12         A.    Not that I am aware of; but again, I haven't

13    looked specifically at the classes.

14         Q.    Fair enough.

15               All right.  Let me hand you what we'll mark

16    as Plaintiff's Exhibit 4.

17                          - - -

18               A CASAGRANDE/SAYERS E-MAIL DATED

19               11.17.11, BATES-STAMPED 000006, WAS

20               MARKED AS JC EXHIBIT 4.

21                          - - -

22         Q.    This appears to be an e-mail from you to Amy

23    Sayers dated November 17, 2011.

24         A.    Yes.

53

1      Q.    And as of that date, I don't believe you were

2  employed; is that right?

3      A.    That's correct.

4      Q.    And you reference an event where you were

5  shadowing with an individual named Tammy?

6      A.    Correct.

7      Q.    What was this that you were doing here?

8      A.    I had met with Amy maybe that same day or a

9  couple days before and she had asked me -- I don't know

10  what -- the exact circumstance, whether I'd already met

11  with the recruiter at that point, but she asked me to

12  come in and shadow with --

13      Q.    Is that part of the interview process, as you

14  understood it?

15      A.    I believe so, yeah.  It's fairly standard.

16      Q.    Gave you an opportunity to come in and

17  basically see what the floor was like?

18      A.    See if they think I'm okay with their group

19  and whether I would like that unit.

20      Q.    All right.  A chance to spend some time

21  together, see whether you are a good fit for the

22  floor, --

23      A.    Correct.

24      Q.    -- whether you are happy with the

54

```
 1    opportunity?

 2         A.   And then they're happy with me.

 3         Q.   Right.

 4              And I think you say at the end of that first

 5    paragraph, "I am definitely interested in becoming a

 6    member of the RN team on 7 Orange if you would have

 7    me"?

 8         A.   Yes.

 9         Q.   All right.  And this was, your understanding,

10    part of the normal interview process; right?

11         A.   That's the way I understood it.

12         Q.   All right.

13              So after that process, you were, in fact,

14    hired; right?

15         A.   Correct.

16         Q.   Then you went through orientation; right?

17         A.   Correct.

18         Q.   We'll mark this as Exhibit 5.

19                              - - -

20              A 42-PAGE DOCUMENT ENTITLED,

21              "GENERAL NURSING ORIENTATION

22              MANUAL," BATES-STAMPED 000117

23              THROUGH 160, WAS MARKED AS JC

24              EXHIBIT 5.
```

55

1                          - - -

2          Q.    Handing you, sir, what's been marked as

3     Plaintiff's Exhibit 5, have you seen this document

4     before?

5          A.    Yes.

6          Q.    It purports to be a "General Nursing

7     Orientation Manual" and you were listed as the Orientee

8     on the first page?

9          A.    Yes, that's correct.

10         Q.    With a hire date of 12/5/11?

11         A.    Correct.

12         Q.    Does that seem right for your hire date?

13         A.    Yes.

14         Q.    As I understand it, you go through a

15    precepting process as a new-hire; is that right?

16         A.    That is correct.

17         Q.    And how does that process work?

18         A.    I'm assigned, generally, to one experienced

19    nurse who has had training in precepting and who is

20    familiar with/helped to go about this process, and

21    basically they get me up to speed, so to speak, on

22    being able to take patients.  They analyze my nursing

23    skills, see where I need maybe some help, you know,

24    whether it be starting IVs -- a number of the things

56

1   are listed on here.  So then as things progress

2   week-to-week, then they check off and give you an

3   evaluation of how you are doing.

4        Q.   Do you know how long this process generally

5   takes, the orientation?

6        A.   I think it -- it's -- I don't recall the

7   exact, if there was an exact amount of time, but it was

8   like maybe 10 to 12 weeks --

9        Q.   Okay.

10       A.   -- from memory.  I don't recall.

11            That may have changed.  I know they've

12   changed their orientation process since then.

13       Q.   All right.

14       A.   And it depends, you know, if you've had

15   experience as a nurse before.  So some people will come

16   out of this more quickly than others.

17       Q.   Especially if you've had experience; right?

18       A.   Correct.

19       Q.   And this was your first nursing position;

20   right?

21       A.   It's my first medical position ever.  Yeah.

22       Q.   If you look on Page 2, right in the middle of

23   the page, it identifies kind of a scale:  Beginning,

24   Developing, Proficient, Performance Concern,

57

1    Non-applicable.  Do you see that?

2         A.   Yes.

3         Q.   And I note, as I look through, that in the

4    middle of most of the rest of the pages, there is an

5    area for the preceptor to kind of rate how you are

6    doing?

7         A.   Correct.

8         Q.   And it might be either B, D, P, PC or NA, in

9    those ratings for each skill that is identified on the

10   left-hand side of the page?

11        A.   Correct.

12        Q.   So what we can do is look through this, and

13   from time to time, you'll see for a period of time who

14   the preceptor was and what their rating was of your

15   various -- the skill level that they observed from you

16   that date; correct?

17        A.   That's correct.

18        Q.   I know you went through the orientation

19   process and precepting as a preceptee for your own

20   orientation.  Did you ever have an opportunity to be a

21   preceptor?

22        A.   No, I did not.

23        Q.   Did you ever have any involvement or role in

24   the orientation or precepting of any other nurse?

58

1        A.    No.

2        Q.    All right.  So is it fair to say that you

3   wouldn't have any knowledge of how your scores and your

4   orientation would have compared to others?

5        A.    That's correct.

6        Q.    And you successfully passed your orientation;

7   did you not?

8        A.    Yes, I did.

9        Q.    Any issues or concerns that would be relevant

10  to this lawsuit that would have stemmed from your

11  orientation?

12       A.    Not that I am aware of.

13            MR. ASENSIO:  Let's go ahead and mark this as

14  Exhibit 6.

15            THE WITNESS:  Take a bathroom break, please?

16            MR. ASENSIO:  Yeah, we can do that right now.

17            (Recess taken.)

18                        - - -

19            A DOCUMENT ENTITLED, "POLICY AND

20            PROCEDURE ACKNOWLEDGEMENT," DATED

21            4/6/12, BATES-STAMPED 000182, WAS

22            MARKED AS JC EXHIBIT 6.

23                        - - -

24  BY MR. ASENSIO:

59

```
 1        Q.    I'd asked you before we took a break if you

 2   could identify Plaintiff's Exhibit 6.  Have you seen

 3   that before?

 4        A.    Yes.  I signed it.

 5        Q.    Yeah.  And that is your signature --

 6        A.    That's correct.

 7        Q.    -- about two-thirds of the way down?

 8              One of the policies that's listed in here is

 9   the third one down, "Medication Administration" policy.

10   Do you see that?

11        A.    Yes, I do.

12        Q.    Let me hand you what we'll mark as Exhibit 7.

13                          - - -

14              AN 11-PAGE DOCUMENT ENTITLED,

15              "POLICY AND/OR PROCEDURE," RE:

16              MEDICATION ADMINISTRATION,

17              BATES-STAMPED 001790 THROUGH 1800,

18              WAS MARKED AS JC EXHIBIT 7.

19                          - - -

20        Q.    Plaintiff's Exhibit 7 is a Policy and

21   Procedure entitled "Medication Administration."  It

22   purports to be, I believe, the policy that was

23   referenced in 6.  Is that right?

24        A.    You're asking me?
```

60

1       Q.    Yeah.

2             And let me start with something else.  Let me

3   strike that.

4             Have you seen Plaintiff's Exhibit 7 before?

5       A.    Yes.

6       Q.    All right.  You saw that during your

7   employment with OhioHealth?

8       A.    Correct.

9       Q.    And I believe, if I understand Plaintiff's

10  Exhibit 7 correctly, it sets forth policies, procedures

11  that are to be used with the administration of

12  medication to patients; right?

13      A.    Correct.

14      Q.    And it's fair to say that's a pretty

15  important job duty of anyone in healthcare, including

16  RNs; correct?

17      A.    Yes.

18      Q.    Let me hand you another policy we'll mark as

19  8.

20                          - - -

21            A THREE-PAGE DOCUMENT ENTITLED,

22            "NURSING POLICY/PROCEDURE" RE:

23            NURSING MANAGEMENT OF PATIENT WITH

24            ALCOHOL WITHDRAWAL, BATES-STAMPED

61

```
 1              001801 THROUGH 1803, WAS MARKED AS

 2              JC EXHIBIT 8.

 3                            - - -

 4        Q.    This is another nursing policy/procedure

 5   entitled, "Nursing Management of Patient with Alcohol

 6   Withdrawal."  Have you seen this before?

 7        A.    I've seen it as on a protocol sheet.

 8        Q.    Help me out with that.  What does that mean?

 9        A.    Well, basically, there's doctor's orders and

10   it basically goes over all these items as far as:  The

11   doctor signs it and then the nurse medicates, informs

12   physician based on certain parameters which are in

13   here.

14        Q.    So those parameters that are in this Exhibit

15   8 would find their way into the doctor's orders, which

16   are the procedures, protocols you are to follow when

17   you are dealing with these issues?

18        A.    That's my understanding, yes.

19        Q.    Let's switch gears a little bit.

20              You had referenced, I believe, that on or

21   about July of 2012, you took a leave of absence from

22   your employment with OhioHealth.

23        A.    Yeah, somewhere --

24        Q.    Does that seem right?
```

62

1       A.    -- like end of July, beginning of August,

2   somewhere around there.

3       Q.    Do you recall what caused that?

4       A.    That was my anxiety.

5       Q.    And so I'm clear, the anxieties that you were

6   suffering from at the time, what was that related to?

7       A.    It was related to mainly the financial issues

8   that I was going through.

9       Q.    The loan issues?

10      A.    The loan issues.  That was the main thing.

11  Then probably the stress of being a new nurse, I'm

12  sure.

13      Q.    Was there stress in being a new nurse and

14  that being your first employment as a nurse?

15      A.    Yes, --

16      Q.    Okay.  Describe it --

17      A.    -- but I was able to manage it.  It's just,

18  when something is added on top of it, such as the

19  financial, something outside of that, that would cause

20  it to become not as manageable.

21      Q.    Did you seek medical care at that time?

22      A.    Yes.

23      Q.    From whom?

24      A.    My family physician.

63

1  Q. Dr. Dipietra?

2  A. Yes.

3  Q. Anyone else?

4  A. I know I had a hospital stay because I -- it

5 was also causing other physical things.  I had high

6 blood pressure.  I don't remember the term that they

7 call it but it's like my blood pressure would shoot up

8 and I couldn't control it so I -- that's caused me

9 hospital visits and --

10  Q. Which hospital?

11  A. I was -- I know, the first one, I went to

12 Riverside.  I was in the ER.  I think that was the week

13 of the 4th-of-July week.

14   Before that, Dr. Dipietra had given me pain

15 medication.  I was having some neck pain and he gave me

16 a medication which had a side effect of raising my

17 blood pressure, so that kind of initiated the problem.

18 I made Amy aware of that.  And it caused me to miss

19 work, too, which I informed Amy, and she just said,

20 "Keep track of all your, you know, doctor visits, get

21 doctors' excuses," just to cover myself.

22  Q. I am going to run through a number of forms

23 related to the leave of absence that you had at that

24 time, okay?

64

```
 1        A.    Uh-huh.

 2        Q.    We'll start with this.

 3              MR. ASENSIO:  Mark this as Plaintiff's

 4    Exhibit 9.

 5                         - - -

 6              A ONE-PAGE DOCUMENT ENTITLED,

 7              "AUTHORIZATION TO RELEASE MEDICAL

 8              RECORDS," DATED 7/20/12,

 9              BATES-STAMPED 001168, WAS MARKED AS

10              JC EXHIBIT 9.

11                         - - -

12        Q.    Can you identify that?

13        A.    Yes.

14        Q.    It looks like a form, an Authorization to

15    Release Medical Records which you would have completed

16    and signed on July 20th of 2012?

17        A.    Correct.

18        Q.    All right.  And it mentions at the top, "I

19    have applied for a medical leave, temporary disability

20    pay and/or Workers' Compensation pay because of my

21    medical condition."

22              At about this point in time, does this seem

23    like the right time --

24        A.    Yes.
```

                                                        65

1        Q.   -- in terms of timing that you would have

2   applied for the leave?

3        A.   Yes.

4        Q.   And from your earlier testimony I take it you

5   had been having some of these issues during the month

6   of July leading up to this; is that right?

7        A.   Correct.  It kind of started with the neck

8   pain, the medication I was given for that, which caused

9   blood pressure.  Then the financial issues.

10       Q.   And if I recall your prior testimony, it was

11  about this point in time when you were about to reach a

12  resolution of the financial issues; is that right?

13       A.   Yes.

14       Q.   Do you know, with regard to this date,

15  7/20/2012, July 20 of 2012, did you resolve the

16  financial issues before then or after that; if you

17  recall?

18       A.   I don't recall.

19       Q.   All right.  Let's move on.  I'll give you

20  what we'll mark as Plaintiff's Exhibit 10.

21                      - - -

22            A ONE-PAGE DOCUMENT ENTITLED,

23            "LEAVE OF ABSENCE APPLICATION,"

24            DATED 7/20/12, BATES-STAMPED

66

```
 1              001169, WAS MARKED AS JC EXHIBIT

 2              10.

 3                          - - -

 4      Q.   Have you seen this document before?

 5      A.   Yes, sir.

 6      Q.   Looks like your handwriting and your

 7  signature at the bottom, again dated July 20, 2012;

 8  correct?

 9      A.   Correct.

10      Q.   And if you look in the middle of the page

11  under the heading "Type of leave needed," there is a

12  box that's checked, "Continuous (unable to work) Begin

13  Date for LOA coverage:  July 20, 2012.  Return to work

14  date:  August 7, 2012"?

15      A.   Yes.

16      Q.   Does that seem right, about what the length

17  of your leave was?

18      A.   Yes.

19              MR. ASENSIO:  Mark this as 11.

20                          - - -

21              A ONE-PAGE DOCUMENT ENTITLED,

22              "FAMILY MEDICAL LEAVE MEDICAL

23              CERTIFICATION," DATED 7/23/12,

24              BATES-STAMPED 001170, WAS MARKED AS
```

```
 1            JC EXHIBIT 11.

 2                           - - -

 3       Q.    And this is another document related to that

 4   leave of absence.  Does it look familiar to you?

 5       A.    I didn't fill this out -- Well, let me see.

 6   That was the nurse practitioner at my doctor's office

 7   that --

 8       Q.    Tim Nuss?

 9       A.    Yeah.

10       Q.    Okay.  And this appears to be a certification

11   for Family Medical Leave, Associate Health and

12   Wellness, that was filled out on your behalf by Mr.

13   Nuss?

14       A.    Yes.

15       Q.    And if I am reading that correctly, "Patient

16   has severe anxiety," and is that OC -- or "associated

17   with" -- Is that what that means? -- "with panic

18   attacks"?

19       A.    Panic attacks.

20       Q.    Does that sound --

21       A.    Yeah, that sounds right.  I don't know if

22   that's what it exactly says.  I can't read his writing.

23       Q.    But does that sound like your diagnosis at

24   the time?
```

68

1      A.   Yes.

2      Q.   Mr. Nuss, did he work with Dr. Dipietra?

3      A.   Yes.

4      Q.   And at the time that you went on this leave

5  of absence, did you have any discussions with your

6  manager about why you needed the leave?

7      A.   Yes.

8      Q.   Tell me about those.  When did you have those

9  and what did you tell her?

10     A.   It was around that same time.  Like I said, I

11  mentioned to her that I took a medication that was

12  causing blood pressure, which made me have to go to the

13  hospital to relieve that.  I know I discussed with her

14  and then Christy Griske, who was the night clinical

15  nurse manager at the time, more or less the situation;

16  that I was having anxiety and having trouble, like,

17  making it through a shift without, you know, having

18  issues related to that.  And she suggested, I believe,

19  at the time, that I either take some leave or contact

20  the Employee Assistance Program.

21     Q.   Okay.  You went ahead and followed up on that

22  and took the leave of absence; correct?

23     A.   Correct.

24        MR. ASENSIO:  All right.  Mark this as

                                                                69

1    Exhibit 12.

2                         - - -

3              A TWO-PAGE ASSOCIATE HEALTH AND

4              WELLNESS/CASAGRANDE LETTER, DATED

5              7/24/12, BATES-STAMPED 001385 AND

6              1386, WAS MARKED AS JC EXHIBIT 12.

7                         - - -

8        Q.    This purports to be a letter to you from

9    Associate Health and Wellness regarding Family Medical

10   Leave.  Look familiar?

11       A.    Yes.

12       Q.    All right.  And it's dated July 24, 2012;

13   correct?

14       A.    Yes.

15       Q.    And if I understand this letter correctly,

16   it's denying you for a Family Medical Leave; is that

17   right?

18       A.    Yes.

19       Q.    If you look at the bottom of Page 1, there's

20   comments.  It says, "Comments:  FMLA denied.  Employed

21   less than one year with OhioHealth.  Is eligible for

22   short-term disability."

23             So if I understand that, you were denied with

24   regard to Family Medical Leave; correct?

1       A.   At that time, yes.

2       Q.   For this particular leave of absence; right?

3       A.   Yes.

4       Q.   Now, you were still on a leave of absence;

5  right?

6       A.   Yes.

7       Q.   Because as an employee of OhioHealth, you

8  were entitled to get a medical leave?

9       A.   Correct.

10       Q.   It just wasn't protected by the Family

11  Medical Leave Act; correct?

12       A.   That's correct.

13       Q.   And it says also, "Is eligible for short-term

14  disability"?

15       A.   Yes.

16       Q.   Would that be what I see in many documents

17  referred to as "TDP," Temporary Disability Pay; if you

18  know?

19       A.   I'm not aware of how they indicate it but I

20  indicate it as short-term disability.

21       Q.   Did you receive short-term disability during

22  this leave?

23       A.   Yes.

24       Q.   And do you recall about how much that was?

 1      A.   How much dollar amount?

 2      Q.   Yes, how it was calculated?

 3      A.   It was calculated, I think, 70 percent of my

 4  pay.

 5      Q.   All right.  And you received that for the

 6  period you were off, July 20 through April 7?

 7      A.   Right.  I think there was a waiting period,

 8  but essentially, yes.

 9      Q.   Now, if you look at Page 2 of this document,

10  it lists a number of different responsibilities down at

11  the bottom half of that document.  There's seven

12  enumerated items that it designates that an associate

13  is responsible for.  Do you see that?

14      A.   Yes.

15      Q.   And one of those, the last one, is to

16  "Provide Associate Health and Wellness with a fitness

17  for duty certification (Return-To-Work release), when

18  leave is taken for your own serious health condition."

19  Do you see that?

20      A.   Yes.

21      Q.   Am I correct, in order to return from a

22  leave, you have to supply a doctor's note indicating

23  you are ready and able to do that?

24      A.   I know that -- What I do know is that Tim had

72

1  written me off for that particular length of time.

2      Q.   Right.  Indicating you are able to return on

3  the 7th?

4      A.   He said he did not want me to be off any

5  longer than that.

6      Q.   My question is:  Was it your understanding

7  that when you return from the leave of absence, you

8  have to have a doctor's note indicating you are able to

9  return; giving you a date that you are eligible to

10  return to work?

11      A.   My understanding was:  This covered that,

12  this document.

13      Q.   All right.  And you are pointing to Exhibit

14  11; right?

15      A.   Yes.

16      Q.   And you are pointing, I think, to the middle

17  of the page, which indicates an "Estimated end date" of

18  8/7?

19      A.   Correct.

20      Q.   Okay.  Fair enough.

21          And that would have been your return to

22  work --

23      A.   It's my understanding it wasn't an estimated;

24  it was a hard number, hard date.

1      Q.   Well, you, in fact, returned on or about the

2  7th of August; correct?

3      A.   That's correct.

4      Q.   As Mr. Nuss had indicated you would be able

5  to do?

6      A.   Yes.

7      Q.   All right.

8           If I understand you correctly, your

9  contention is that what Mr. Nuss had certified you for

10  satisfied this requirement?

11      A.   That was my understanding.

12      Q.   Okay.

13      A.   I was not asked to provide anything else by

14  Associate Health and Wellness.

15      Q.   Okay.

16      A.   I figured if they wanted, they would ask.

17      Q.   Now, at the time your leave ended on August

18  7, did you return to work on 7 Orange?

19      A.   Yes.

20      Q.   And returned to your same position you held

21  before your leave?

22      A.   Yes.

23      Q.   And that was not a FMLA-qualified leave of

24  absence; correct?

74

1      A.    That's correct.

2      Q.    Let me hand you this.

3            MR. ASENSIO:  Mark this as 13.

4                          - - -

5            A FIVE-PAGE DOCUMENT RE:  LEAVE OF

6            ABSENCE POLICY, BATES-STAMPED

7            001804 THROUGH 1808, WAS MARKED AS

8            JC EXHIBIT 13.

9                          - - -

10     Q.    Can you identify this document?  Is this

11   something you've seen before?

12     A.    Yes.

13     Q.    Am I correct this is OhioHealth's leave of

14   absence policy?

15     A.    Yes, it is.  I don't think it was the one

16   that was in effect.  This says revised April 2013.

17     Q.    Okay.  Yeah, and as indicated, there might

18   have been a prior version that would have been in

19   effect in 2012?

20     A.    Right.  I'm not -- I don't know what the

21   changes would have been.

22     Q.    Fair enough.

23           But you would have seen a document like

24   this --

1        A.    Yes.

2        Q.    -- prior to this version?

3        A.    Correct.

4        Q.    You may have even seen this version during

5   your employment; correct?

6        A.    Correct.

7        Q.    And I understand there may be some

8   differences between the two.  We'd have to look at them

9   and compare them; right?

10       A.    Yes.

11       Q.    And just so I'm clear, and I think we kind of

12   hit on this, but as an employee of OhioHealth, if you

13   had a medical condition, you might be entitled to a

14   medical leave of absence; correct?  Was that your

15   understanding?

16       A.    Yes.  As opposed to FMLA?

17       Q.    That was going to be my next question.  So

18   you'd have a medical leave; correct?

19       A.    Correct.

20       Q.    Now, that medical leave could be Family

21   Medical Leave Act-qualified; right?

22       A.    Correct.

23       Q.    Both of those leaves give you time away from

24   work; correct?

76

1      A.   Correct.

2      Q.   And am I also correct that you may or may not

3   be entitled to disability pay depending upon whether

4   you qualify for short-term disability pay?

5      A.   Yes.

6      Q.   And the Family Medical Leave Act, do you have

7   an understanding of how much leave is required under

8   that act?

9      A.   Generally.  I believe it's 120 days.

10      Q.   Okay.  Let me ask this:  What is the

11   distinction or benefit, if any, that you believe exists

12   with having a leave qualified as a Family Medical Leave

13   as opposed to a medical leave?

14      A.   There are a number of protections for the

15   employee under the Family Medical Leave Act, one of

16   which is basically a job-protection clause.

17      Q.   Okay.  And how did you understand that to

18   work?

19      A.   That once I qualified for FMLA leave, that I

20   was entitled to job protection, my position or a

21   similar position, as long as I complied with the FMLA

22   requirements from my end upon my return from leave.

23      Q.   And if you had a medical leave that was not

24   FMLA-qualified, did you have such a protection or not?

77

1           By virtue of the act, you wouldn't have;

2    right?

3        A.   There was no job protections under just the

4    short-term disability.

5        Q.   Okay.  If you are on a medical leave that did

6    not qualify for FMLA, your job might be filled; is that

7    right?

8        A.   That's my understanding, yes.

9        Q.   And that was a major distinction between the

10   two; right?

11       A.   Correct.

12       Q.   Let me hand you what we'll mark as Exhibit

13   14.

14                     - - -

15           AN EIGHT-PAGE (AND TWO BLANK PAGES)

16           DOCUMENT RE: FAMILY MEDICAL LEAVE

17           ISSUED FEBRUARY 2003, REVISED APRIL

18           2013, BATES-STAMPED 001094 THROUGH

19           001101, WAS MARKED AS JC EXHIBIT

20           14.

21                     - - -

22       Q.   This purports to be a Family Medical Leave

23   policy.  Have you seen this before or a version of this

24   before?

78

1       A.   Yes.

2       Q.   Now, I note that this is indicated that it

3   was revised in April of 2013, similar to Plaintiff's

4   Exhibit 13.

5       A.   Correct.

6       Q.   So you may have seen a prior version of this;

7   correct?

8       A.   Yes.

9       Q.   All right.  But this policy in at least a

10  then-current version would have been a policy you would

11  have seen during your employment at OhioHealth;

12  correct?

13      A.   Yes.

14      Q.   Now, with regard to the leave you took in

15  July, even though that was not a FMLA-qualified leave,

16  you did return to the same position you held prior to

17  the leave; correct?

18      A.   Yes.

19      Q.   Any issues at all that are relevant to this

20  lawsuit with regard to how that leave was handled?

21      A.   No.

22      Q.   Am I correct that, at that time, in July and

23  August of 2012, you didn't technically qualify for

24  Family Medical Leave?

1       A.    That's correct.

2       Q.    And do you know why you didn't?

3       A.    Yes.

4       Q.    Why?

5       A.    Because I didn't meet the one year of

6  employment --

7       Q.    Okay.  You hadn't been there --

8       A.    -- and I don't think I met the 1250

9  hours-worked clause --

10       Q.    All right.

11       A.    -- but I don't know.  I didn't calculate

12  it --

13       Q.    May or may not have been the hours --

14       A.    -- because you have to -- you have to qualify

15  under both.

16       Q.    But you hadn't been there one year?

17       A.    Correct.

18       Q.    All right.  Let me hand you a document marked

19  as 15.

20                        - - -

21             A TWO-PAGE E-MAIL STRING BEGINNING

22             WITH A SAYERS/CASAGRANDE E-MAIL

23             DATED 8/3/12, BATES-STAMPED 001230

24             AND 1231, WAS MARKED AS JC EXHIBIT

80

1          15.

2                          - - -

3      Q.    Looks to be correspondence between you and

4    Ms. Sayers.  Take a look at that and let me know if you

5    can identify that?

6      A.    Yes.

7      Q.    All right.  And this appears to be

8    correspondence between the two of you as you are

9    approaching the end of your leave and getting ready to

10   return to work; is that right?

11     A.    Yes.

12     Q.    That's all I have on that.

13           When you returned from your leave on August

14   7, were you on any medication at that point?

15     A.    Yes.

16     Q.    What medication were you on?

17     A.    I believe I was on Prozac and I know there

18   was an anxiety medication that I was on.

19     Q.    Do you remember what it was?

20     A.    I'm trying to remember.

21     Q.    Certainly Dr. Dipietra's records would

22   reflect that; wouldn't they?

23     A.    Yes.

24     Q.    These medications were prescribed by him, I

81

1    take it?

2         A.   Yes.

3         Q.   And how long did you remain on medication

4    after August 7 when you returned?

5         A.   I remained on it until I went on medical

6    leave again --

7         Q.   All right.  So --

8         A.   -- in November.

9         Q.   -- from August 7 to the end of October, you

10   remained on medication?

11        A.   Yes.

12        Q.   Did you continue to take the Prozac during

13   that time period --

14        A.   Yes.

15        Q.   -- as well as the other medication that we

16   can't recall at this point?

17        A.   Yeah, it was Clonopin.

18        Q.   And what is Clonopin?

19        A.   It's an antianxiety medication.

20        Q.   Did either one of those have any side effects

21   on you, the Prozac or the other medication?

22        A.   Well, Clonopin can have a sedating effect.

23        Q.   What about the Prozac?

24        A.   It's mainly an SSRI so it just kind of makes

82

1    your mood better.

2         Q.    What's an "SSRI"?  What does that mean?

3         A.    I don't know the exact terminology, what it

4    stands for, but it's basically a mood-altering.

5         Q.    Okay.

6         A.    So it will give you better confidence and it

7    also helps reduce anxiety, too.

8         Q.    Now, after this leave of absence was

9    concluded in August of 2012, you went on a second leave

10   of absence later that year; right?

11        A.    Correct.

12        Q.    All right.  And what occasioned that leave?

13        A.    Again, my anxiety issues were not being

14   resolved mainly because I was -- I was having trouble

15   sleeping; so when you don't have sleep, it's hard to

16   function.

17        Q.    Why were you having trouble sleeping?

18        A.    I was worried about, again -- at that time, I

19   was worried if my job was going to be in jeopardy.

20        Q.    And what made you worry about that?

21        A.    Because I was missing days.

22        Q.    Missing days of work?

23        A.    Yes.

24        Q.    Was there a point in time when you started

1  missing work?

2      A.   Well, it would have been like the beginning

3  of July when I had the hospital visit and then there

4  was another time, I think, at the end of August that I

5  had another hospital visit.  I think I was in the ER

6  four times.

7      Q.   At the end of July?

8      A.   No.  From then until the end of that year.

9      Q.   Okay.  The first one, I think we covered one

10  during your leave.  What would the second one have

11  been?

12      A.   I had a fall at home.  I was carrying laundry

13  downstairs and I tripped and I fell down a flight of

14  stairs, so I like hit my head; caused, you know, damage

15  to my arms, and so they -- I went to Grant --

16      Q.   Okay.

17      A.   -- because I was having -- when I got up, I

18  was having trouble -- I thought I'd done something to

19  my head --

20      Q.   Right.

21      A.   -- so the squad -- my sister called the squad

22  and I went down to Grant.

23      Q.   When was that?

24      A.   That was the end of August, I believe.

84

1      Q.    And did that require an overnight stay?

2      A.    Yes.

3      Q.    Just one night?

4      A.    I don't know.  I think it was -- Yeah, I know

5  it was overnight.  I don't remember if it was more than

6  one.

7      Q.    Did you see Dr. Dipietra for that issue?

8      A.    Afterwards.

9      Q.    Right.

10      A.    (Affirmative nodding of head.)

11      Q.    When was the next hospital visit?

12      A.    I think that was the end of November.  I was

13  already on medical leave.

14      Q.    Okay.

15      A.    I had an anxiety attack at -- I was actually

16  at Kroger's so they called the squad; and my blood

17  pressure was elevated, so on, so forth, and I wanted to

18  go home and they insisted that I -- based on my high

19  blood pressure, that I go to the hospital.

20      Q.    And did you have an overnight stay at that

21  point?

22      A.    No.

23      Q.    Were you treated by Dr. Dipietra as a result

24  of that?

1      A.   Afterwards.

2      Q.   Right.

3           And you went to Grant; is that right?

4      A.   I came to Grant again.

5      Q.   And then I believe you said there was one

6  other stay, hospital stay?

7      A.   I don't remember.  I don't have a clear

8  memory because there was so much going on that time of

9  year.  Probably the time I was at Shepherd Hill.  That

10  would have been December.

11      Q.   During that period of time, you were off work

12  on a leave of absence; --

13      A.   Correct.

14      Q.   -- correct?

15      A.   (Affirmative nodding of head.)

16           MR. ASENSIO:  Okay.  Let's mark this as 16.

17                        - - -

18           A ONE-PAGE CACIOPPO/NUSS LETTER

19           DATED 11/5/12, AND A ONE-PAGE

20           ATTACHMENT, BATES-STAMPED 001177

21           AND 1178, WERE MARKED AS JC EXHIBIT

22           16.

23                        - - -

24  BY MR. ASENSIO:

86

1     Q.   This is a two-page document.  Looks like a

2   fax.  And if you look at Page 2, it looks like another

3   medical certification form from Mr. Nuss?

4     A.   Yes.

5     Q.   It's dated 11/6 of '12, and if you look at

6   the middle section, it's entitled "Return To Work and

7   Physical Capabilities."  Do you see that?

8     A.   I'm sorry.  Where?

9     Q.   The middle of Page 2.

10     A.   Yes.

11     Q.   He indicates that you are unable to work from

12   11/2 of 2012 to 11/22?

13     A.   Correct.

14     Q.   Says you can return to work with no

15   restrictions on 11/23?

16     A.   Yes.

17     Q.   And up top and at the upper half of the page,

18   if I'm reading this correctly, it says, "Patient was

19   treated at Grant ER 11/4/12 for alcohol withdrawal"?

20     A.   Yes.

21     Q.   Would that have been the issue that you

22   described for me at Kroger?

23     A.   No.

24     Q.   Okay.  What was this issue?

1     A.   Okay.  This was the one that I forgot about.

2  This was the week that I'd received the first

3  Performance Management Report from Amy.

4     Q.   Uh-huh.

5     A.   I don't remember what date that was, but it

6  was subsequent to that.  It increased my depression and

7  anxiety and I started just wanting to take sleep meds,

8  and since sleep meds weren't working, I would intensify

9  it by taking some alcohol with it.  So I ended up

10  missing -- basically, I don't remember that whole week.

11  I missed work on that Friday and Saturday, whatever

12  those dates were.  Probably the 2nd.

13     Q.   Okay.

14     A.   And there was a Friday and Saturday and I

15  didn't call because I was basically not able to.

16     Q.   Were you alone during that time period?

17     A.   Yes.

18     Q.   Your domestic partner wasn't there for you?

19     A.   He had gone back to Puerto Rico to visit his

20  family.

21     Q.   The sleep meds that you were taking, --

22     A.   Yes.

23     Q.   -- what sleep meds were those?

24     A.   They were over-the-counter.  I don't remember

88

1   the name.

2        Q.   All right.

3             How was it that you were found or discovered

4   or helped in this situation?

5        A.   I know that several people had tried to

6   contact me from work and weren't able to get hold of

7   me.  I had left my cell phone downstairs because I

8   just -- I don't know why I did, but I wasn't hearing my

9   cell phone.

10       Q.   Uh-huh.

11       A.   So I know -- I think Christy Griske actually

12  went to my sister's house.  She -- the way I

13  understand, from what she told me, is:  She came and

14  knocked on my door.  There was no answer.  They may

15  have called the police to do a safety check, the way --

16  this is what I understand from correspondence, was that

17  the police came; there was no answer; they didn't see

18  any signs so they left.

19            My understanding was:  Christy went to my

20  sister's house; talked to my brother-in-law, who didn't

21  know anything; and then my sister became concerned.

22  And I think it was:  My sister then became concerned

23  and then, somehow, they got into my house on that

24  Sunday.

89

1      Q.   And found you?

2      A.   Correct.

3      Q.   How long had you been non-responsive at home;

4  do you know?

5      A.   No.  It was the majority of that week,

6  because it was the weekend -- oh, it was that weekend

7  that I missed.  Like I said, I'm having trouble

8  remembering --

9      Q.   Sure.

10     A.   -- that period.

11     Q.   And your memory is somewhat impaired from

12  that time?

13     A.   I remember major things but not exact things.

14     Q.   Now, when you say that, Mr. Casagrande, do

15  you mean that in general or do you mean that with

16  regard to this specific time period, with regard to

17  your memory?

18     A.   I can't remember specific dates without

19  referring to a document.

20     Q.   Okay.

21     A.   Is that what you mean?

22     Q.   Yeah.  And that's fine, but you've said that

23  a couple of times and I just want to --

24     A.   Right.

90

1      Q.    -- for my purposes get a point of

2    clarification so I understand you.

3      A.    Okay.

4      Q.    And so what my question is:  Is it kind of a

5    general sense of "My memory is poor" --

6      A.    No.

7      Q.    -- or is it, "With this particular timeframe,

8    my memory suffers a little bit"?

9      A.    Correct.

10      Q.    Okay.  And I assume that has to do with the

11    fact that you were in that condition; correct?

12      A.    Correct.

13      Q.    Were you conscious during this time period,

14    or no?

15      A.    Sometimes.  I mean, like I said, I was taking

16    sleep meds.  I was trying to sleep.

17      Q.    When you were found by your sister, what

18    happened next?

19      A.    What I remember is that they -- I had a cop

20    standing at the end of my bed and medics.  They were

21    taking my blood -- you know vital signs.  My blood

22    pressure was low because I hadn't eaten anything.

23      Q.    Okay.

24      A.    So ....

 1      Q.   And what happened next?  Were you taken in --

 2      A.   Yeah.

 3      Q.   -- to the hospital at that point?

 4      A.   Correct.

 5      Q.   And how long did you stay in the hospital?

 6      A.   I don't know if there was an overnight or

 7   not.  I may have been treated and released.  I can't

 8   recall.

 9      Q.   Did you see Dr. Dipietra with regard to this

10   issue?

11      A.   Afterwards.

12      Q.   Do you recall who would have provided care

13   for you at the hospital?

14      A.   I was just in the ER.

15      Q.   At Grant?

16      A.   Yes.

17      Q.   Other than Dr. Dipietra, did you see --

18      A.   It's "Dipietra."

19      Q.   "Dipietra," I'm sorry.

20      A.   Yeah.

21      Q.   Other than Dr. Dipietra, did you see any

22   other health provider as a result of this issue?

23      A.   Between then and --

24      Q.   Between then and your return to work in March

92

1   of 2013.

2        A.   I went to Shepherd Hill --

3        Q.   Right.

4        A.   -- and then I -- they recommended that I see

5   a counsellor as to why my anxiety issues were getting

6   the better of me.

7        Q.   And did you?

8        A.   I attempted to.  And so I had like an

9   outpatient meeting with Neil Kennedy Center in Dublin.

10  I had an orient- -- just an orientation thing with them

11  and they were supposed to set up, you know, meetings

12  after that and they didn't get it done.

13            At that time, I was talking with Rose

14  actively and I was expressing my frustration with the

15  fact that I wasn't being able to get in to see a

16  professional about that issue, but by then it had kind

17  of resolved itself.

18       Q.   So you never ended up seeing --

19       A.   I went to EAP and saw the guy that I had seen

20  last summer there and we talked about things.

21       Q.   Who was that?

22       A.   Oh, my gosh.  I'm terrible at remembering

23  names.

24       Q.   This was the EAP offered through OhioHealth;

93

1  right?

2      A.   Yes.

3      Q.   And I take it from your testimony you'd seen

4  him in the summer of 2012 --

5      A.   Right.

6      Q.   -- and then you saw him again in the fall

7  after your second leave of absence; right?

8      A.   Correct.

9           And that was per Rose's recommendation that I

10  do that since I was having trouble getting in and

11  seeing someone else.

12      Q.   All right.  I have handed you 16.  Let me ask

13  you a couple more questions about it.  If you look at

14  Page 1, this appears to be correspondence from Rose

15  to -- is it Dr. Nuss or Mr. Nuss; do you know?  Is he a

16  physician?

17      A.   He's not a physician.

18      Q.   Okay.  So she has sent correspondence to him

19  including the second page which was the certification

20  we looked at, and she identifies herself as a Case

21  Manager in Associate Health and Wellness at your

22  workplace, and I take it you worked with her, --

23      A.   Correct.

24      Q.   -- as you described, during your leave of

94

1  absence?

2       A.   Yes.  Both leaves.

3       Q.   What was her role?

4       A.   She was my Case Manager.

5       Q.   So what would she do in that role for you?

6       A.   She would facilitate things such as this to

7  make sure paperwork was done to satisfy what she needed

8  to keep me on medical leave.  She was basically the

9  go-between and also she was very kind so she was --

10      Q.   She dealt with things --

11      A.   She's a wonderful person.

12      Q.   She dealt with things like your leave of

13  absence; --

14      A.   Yes.

15      Q.   -- correct?

16      A.   Correct.

17      Q.   Would have dealt with disability pay?

18      A.   Right.

19      Q.   Assisted you with the EAP, I think you

20  mentioned?

21      A.   She was aware of it.  I don't know -- I think

22  Amy was the one that had mentioned it.  That's where I

23  kind of got started with it, based on that summer.

24      Q.   Okay.  But it sounds like perhaps she was a

95

1    liaison for you --

2        A.   Correct.

3        Q.   -- that would help you --

4        A.   She helped facilitate things.

5            MR. MANSELL:  Let him finish his question.

6    BY MR. ASENSIO:

7        Q.   Yeah, let me finish my question.

8            -- would help you be aware of, and

9    facilitate, use of benefits that you might be entitled

10   to at OhioHealth?

11       A.   Correct.

12       Q.   Okay.

13       A.   I'm sorry.

14       Q.   Did you have any other Case Manager other

15   than Rose during that leave?

16       A.   There was a person by the name of Jean

17   Lefebvre --

18       Q.   Yeah.

19       A.   -- and she was -- I wasn't sure exactly what

20   her role was.  The way she described for me -- to me

21   was:  If they noticed that someone was having multiple,

22   like, hospital visits, then, you know, she was trying

23   to get -- manage that, like get to the bottom of:  Is

24   he getting the help that he needs.  That was my

96

1    understanding of what her role was, to --

2         Q.    Okay.

3         A.    So it was kind of like it was her and Rose

4    that were kind of on my case, so to speak.

5         Q.    And they were the two that would have

6    assisted you through the leave of absence with regard

7    to issues surrounding it?

8         A.    Yeah, but I don't think -- Rose was -- you

9    know, she was there from the beginning.  Jean came in

10   sometime the end of November, beginning of December

11   period.  I don't remember the exact dates.

12        Q.    All right.

13             MR. ASENSIO:  We'll mark this as 17.

14                          - - -

15             A TWO-PAGE ASSOCIATE HEALTH AND

16             WELLNESS/CASAGRANDE LETTER, DATED

17             11/5/12, BATES-STAMPED 001239 AND

18             1240, WAS MARKED AS JC EXHIBIT 17.

19                          - - -

20   BY MR. ASENSIO:

21        Q.    This purports to be correspondence to you

22   from Associate Health and Wellness dated 11/5/2012 --

23        A.    Yes.

24        Q.    -- and the subject line is:  "Denied Family

97

1      Medical Leave absence."  Do you see that in the middle

2      of the page?

3           A.   Yes.

4           Q.   This would have been a communication to you

5      similar to what we saw with the first leave of absence

6      that denied your -- denied your Family Medical Leave

7      request; correct?

8           A.   The one in August?

9           Q.   Yes.

10          A.   Correct.

11          Q.   And if you see down at the "Comments" section

12     at the bottom-third of the page, it says, "FMLA denied

13     - employed less than one year with OhioHealth.  Is

14     eligible for short-term law disability," the same

15     comment that we saw on the last one; correct?

16          A.   Correct.

17          Q.   So at least as of 11/5/2012, you were still

18     employed less than one year and therefore not eligible

19     for Family Medical Leave; correct?

20          A.   Yes.

21               This document doesn't comply with the law.

22          Q.   Why so?

23          A.   The criteria.  It specifically says in the

24     regulations that they have to indicate how many hours,

1  like if I was short on the hours.

2          First of all, it's incorrect.  I was eligible

3  as far as the 1250 hours, so that's -- that's an error.

4  I had my 1250 hours.

5      Q.  Where does it say you didn't have 1250 hours?

6      A.  It says, "Ineligible."

7          "Ineligible.  Associate has worked 1250 hours

8  in the previous 12 months."

9      Q.  I see.

10     A.  I had my 1250 hours.

11     Q.  Okay.

12     A.  Plus, the regulations clearly state that it's

13 supposed to indicate, if you are not eligible; the

14 amount is supposed to be indicated there, not that you

15 are just ineligible.

16         It's supposed to say specifics.  It's pretty

17 clear in the regulations.  So this is insufficient.

18     Q.  In your opinion; right?

19     A.  According to the regulation.

20     Q.  Okay.

21     A.  It's not my opinion.  It's the law.

22     Q.  You had not worked for a year at this point

23 in time; had you?

24     A.  That's correct.

99

1      Q.   And, therefore, irrespective of how many

2  hours you had worked, you weren't eligible for FMLA;

3  were you?

4      A.   At that time, I was not.

5      Q.   Okay.  Thank you.

6          You were, however, granted a medical leave;

7  am I correct?

8      A.   That's correct.

9      Q.   And in fact, you were given short-term

10  disability payments during that leave?

11      A.   Correct.

12          That's by policy.

13      Q.   Right.

14          MR. ASENSIO:  Okay.  Let's mark this as 18.

15                   - - -

16          A ONE-PAGE SAYERS/CASAGRANDE

17          LETTER, DATED 11/8/12, AND A

18          ONE-PAGE ATTACHMENT, BATES-STAMPED

19          000016 AND 0017, WERE MARKED AS JC

20          EXHIBIT 18.

21                   - - -

22  BY MR. ASENSIO:

23      Q.   Can you identify this document?

24      A.   Yes.

100

1     Q.   You've seen this before; haven't you?

2     A.   Yes.

3     Q.   It was sent to you by certified mail by

4  Ms. Sayers; is that right?

5     A.   Correct.

6        I did not receive it at that point.

7     Q.   If you look at Page 2, isn't that your

8  signature there?

9     A.   Oh, wait a minute.  Which one is this?

10        Oh, this is the November one.  Okay, yes.

11     Q.   You may be thinking of a later one.

12     A.   Yes.  I'm sorry.  I am.

13     Q.   This one, you did receive; correct?

14     A.   Correct.  I signed for it.

15     Q.   And this indicates, the second paragraph,

16  that you were not eligible for Family Medical Leave;

17  correct?

18     A.   Yes.

19     Q.   And that your job was not FML-protected?

20     A.   Correct.

21     Q.   And am I correct in understanding that that

22  meant that your job could be filled during your

23  absence?

24     A.   Yes.

101

1      Q.   And if you look at the next-to-last

2  paragraph, it says, "Due to our department's continued

3  service needs, we will be posting your position

4  effective November 8, 2012"?

5      A.   Yes.

6      Q.   All right.  So as of the date you received

7  this, you would have known that they intended to post

8  your position; correct?

9      A.   Yes.

10      Q.   At this point in time, am I correct that you

11  were still not qualified for FMLA?

12      A.   Correct.

13      Q.   Because you hadn't served one year?

14      A.   Correct.

15      Q.   Your one-year anniversary would have been

16  December 5 of 2012; correct?

17      A.   Yes.

18      Q.   And I'm correct that, as of December 5, 2012,

19  you became FMLA-eligible; right?

20      A.   That is correct.

21          That's not the position that OhioHealth took.

22      Q.   We'll get to that.

23          But that's your understanding; is it not:

24  That as of December 5, you were eligible for FMLA?

102

```
 1        A.    That's my understanding as of now, yes.

 2              MR. ASENSIO:  Mark this as 19.

 3                      - - -

 4              A TWO-PAGE ASSOCIATE HEALTH AND

 5              WELLNESS/CASAGRANDE LETTER, DATED

 6              11/27/12, BATES-STAMPED 001262 AND

 7              1263, WAS MARKED AS JC EXHIBIT 19.

 8                      - - -

 9   BY MR. ASENSIO:

10        Q.    This is another piece of correspondence to

11   you, sir, from Associate Health and Wellness, dated

12   11/27/2012.  Do you recall seeing this?

13        A.    Yes.

14        Q.    And this would be a letter advising you that

15   your Temporary Disability Pay will be paid out until

16   February 12 of 2013.  Do you see that sentence?

17        A.    That's how it reads, yes.

18        Q.    And if I am correct, is that the 70 percent

19   of your pay benefit that we talked about earlier?

20        A.    Yes.

21              MR. ASENSIO:  Let's go ahead and mark this as

22   20.

23                      - - -

24              A SEVEN-PAGE POLICY/PROCEDURE
```

1          ENTITLED, "TIME AWAY FROM WORK,"

2          BATES-STAMPED 001812 THROUGH 1818,

3          WAS MARKED AS JC EXHIBIT 20.

4                    - - -

5     BY MR. ASENSIO:

6          Q.   This is another OhioHealth policy, entitled,

7     "Time Away From Work."  Do you recall seeing this?

8          A.   Yes.

9          Q.   And if I can direct your attention to Page 5

10    of 7 in the policy, which is Bates-stamped 1816, there

11    is a Section C at the top, entitled, "Temporary

12    Disability Pay" or "TDP"; right?

13         A.   That's what it says, yes.

14         Q.   All right.  And do you know whether that was

15    the benefit that you were receiving at the time?

16         A.   I believe so, yes.

17         Q.   And if you look at Items 3 and 4, it, in

18    summary, would provide 70 percent of your base rate of

19    pay for the first 120 calendar days in a rolling

20    calendar year that you are unable to work?

21         A.   Correct.

22         Q.   And this is a benefit above and beyond FMLA;

23    is it not?

24         A.   It's a separate benefit.

104

1      Q.   Right.

2      A.   Does not correlate.

3      Q.   Because FMLA doesn't require paid leave;

4  correct?

5      A.   Correct.

6      Q.   Let me hand you what we'll mark as Exhibit

7  21.

8                      - - -

9           A ONE-PAGE SAYERS/CASAGRANDE

10          LETTER, DATED 12/11/12, AND A

11          ONE-PAGE ATTACHMENT, BATES-STAMPED

12          000556 AND 0557, WERE MARKED AS JC

13          EXHIBIT 21.

14                      - - -

15     Q.   Can you identify this document?

16     A.   Yes.

17     Q.   This purports to be a --

18          You've seen this before; correct?

19     A.   Yes, I have.

20     Q.   Now, this is a letter dated December 11,

21  2012, from Ms. Sayers to you, sent by certified mail,

22  but it looks from Page 2 that it was unclaimed and

23  returned.

24     A.   Yes.

1      Q.   So you would not have received this piece of

2  correspondence --

3      A.   That's right.

4      Q.   -- back in December; right?

5      A.   Correct.

6      Q.   When did you first see this?

7      A.   When it was remailed to me.

8      Q.   And do you know about when that was?

9      A.   I don't recall exactly.

10     Q.   Okay.  You can take --

11     A.   It was after -- I know it was after the

12  beginning of the year.

13     Q.   After the new year?

14     A.   Yeah.

15     Q.   If we compare this letter to Exhibit 18 --

16         Do you have 18 in front of you, as well?

17     A.   Yes.

18     Q.   They look almost identical except for the

19  next-to-last paragraph; am I right?

20     A.   Yes.

21     Q.   And, in fact, the difference being that where

22  18 had informed you that they were going to post your

23  position, Exhibit 21 informs you that they had filled

24  your position effective December 11; correct?

106

1          A.    Right.

2          Q.    All right.  Now, between the letter that you

3    received, Exhibit 18, on November 8, and December 11,

4    did you have any contact with Ms. Sayers; did you speak

5    with her on the phone at all?

6          A.    I don't recall.

7          Q.    And at that point in time, in December of

8    2012, did you have an understanding as to whether or

9    not your leave was FMLA-qualified at that point in

10   time?

11         A.    I'm sorry.  At what period?

12         Q.    December.

13         A.    After this?

14         Q.    Let's say December 11, as of that date.

15         A.    I had not received this letter.

16         Q.    I understand.

17         A.    I'm sorry.  Ask the question again.

18         Q.    Did you have an understanding, as of December

19   11, what your rights were under the Family Medical

20   Leave Act and when you would become Family Medical

21   Leave Act-qualified?

22         A.    I assumed I was not qualified --

23         Q.    Okay.  And that's my question, in essence.

24         A.    -- because that's what I'd been told.

1      Q.    That's what you had been told?

2      A.    Correct.

3      Q.    And you didn't find out that you, in fact,

4  were FMLA-eligible on your anniversary date until

5  sometime later?

6      A.    Correct.

7      Q.    And about when was that; do you recall?

8      A.    It was when my short-term disability was

9  starting to run out, mid -- or beginning of February.

10     Q.    Right.

11           And we just saw that that date was going to

12  be February 12 of 2013?

13     A.    Something around that time.

14     Q.    Somewhere around then?

15     A.    Yes.

16     Q.    What happened that made you aware at that

17  point that your FMLA was going to -- that you had a

18  FMLA right?

19     A.    I was concerned because my disability was

20  running out and I was applying for positions at

21  OhioHealth and had some interviews, but at some point,

22  that -- my money was going to run out, so I decided to

23  take a look at the law.

24     Q.    Okay.  Any particular reason that you thought

1  you needed to take a look at the Family Medical Leave

2  Act?

3      A.   It's just something that I do.

4      Q.   Okay.

5      A.   I'm like that.  I have tax experience.  I

6  look at regulations and, I don't know, I just wanted to

7  see the law for myself.

8      Q.   So you did this on your own?

9      A.   Correct.

10      Q.   At that point in time, had you retained

11  counsel?

12      A.   No.

13      Q.   Had you sought advice from any attorney or

14  any other person with regard to this issue?

15      A.   I did at --

16          Once I saw the regulation that indicated --

17  that was my specific situation:  Where I was on

18  non-FMLA leave but still qualified for FMLA protection,

19  I saw that specifically in a regulation, I called the

20  Department of Labor --

21      Q.   Okay.

22      A.   -- to -- because everyone that I talked to,

23  like friends, my partner, my sister -- I bounced it off

24  of them, they read, they had the same opinion that

109

1  OhioHealth did, which is that I didn't qualify, and I

2  looked at the law and I saw that I did.

3      Q.   Really?

4          So everyone was telling you you weren't

5  qualified?

6      A.   Including everyone in the disability

7  department at OhioHealth.

8      Q.   Right.  But in addition, your sister and your

9  partner?

10     A.   Yeah.

11     Q.   And then you decided to call the Department

12  of Labor to find out?

13     A.   Because I knew I was right.

14     Q.   Okay.  And what did they tell you?

15     A.   Said -- I gave him the fact pattern.  This

16  was all just verbal and on a no-name basis.  I didn't

17  tell them which company I worked for.

18     Q.   Right.

19     A.   And he said, based on the fact pattern, it

20  sounded like I qualified.

21     Q.   Now, at the time you went on this leave, your

22  leave was processed, as we've seen in terms of

23  paperwork, much the same way as your prior leave had

24  been back in July; correct?

110

1          It was processed to be a medical leave of

2     absence?

3          A.   Correct.

4          Q.   And you were denied FMLA -- It was denied as

5     a FMLA leave in both instances?

6          A.   Correct.

7          Q.   Now, are you aware whether Amy Sayers, as of

8     December 11, knew that you were FMLA-qualified?

9          A.   I would have no idea.  I assume she should

10    have known.

11         Q.   Well, I know that you were -- We know that.

12    -- as of December 5; correct?

13              As of December 5 --

14         A.   Correct.

15         Q.   -- when your one-year anniversary hit, you

16    had FMLA protection?

17         A.   Right.

18         Q.   But do you have any reason to believe that

19    Amy Sayers knew that as of December 11 when she wrote

20    you this letter?

21         A.   I would have no idea what she knows and does

22    not know.

23         Q.   We'd have to ask her?

24         A.   Correct.

1        Q.   Okay.

2        A.   I would hope, if she's signing a letter, that

3   she would know what the law is.  She's responsible for

4   what ....

5        Q.   Certainly.

6        A.   I relied on that.

7        Q.   But it's not out of the realm of possibility

8   that a mistake could be made; is it?

9        A.   I would hope not; not for something that is

10  so important:  My livelihood.

11       Q.   Okay.

12       A.   It's not a minor mistake; it's a major one.

13       Q.   Do you have any basis to believe that anyone

14  at OhioHealth was aware, as of December 11, that you

15  had qualified for FMLA leave but were being denied that

16  leave?

17       A.   They should be aware of what the law is at

18  that time.

19       Q.   I get that.  I'm asking --

20            My question is whether you, sitting here

21  today, have any facts that would lead you to believe

22  that a specific person, anyone at OhioHealth, knew that

23  you were qualified for the leave at the time that they

24  were denying it?

1     A.   The only fact that I can point to is that one

2   word that was specifically changed in the letter,

3   saying that I had to have been "working" for 12 months.

4   That word was changed --

5     Q.   And where is that, sir?

6     A.   -- from "employed."

7         Well, where is the ...?

8         THE WITNESS:  Do you have that?

9   BY MR. ASENSIO:

10     Q.   Which exhibit are you referring to?

11     A.   There was -- Where was that one letter?

12         Wasn't there another letter?

13         The letter that I had talked about the

14   1200 -- Yeah.

15         Oh, here it is in the first paragraph, the

16   last sentence:  "To be eligible for FML job protection,

17   you must have worked for OhioHealth for at least 12

18   months ..."

19         The word, "worked," does not comport with the

20   policy.

21         This is exact wording from the policy and

22   from the law.  That word was changed, and it changed

23   the meaning of the document.

24         And that's what I kept being told by everyone

113

1   in employee Health and Wellness; basically:  "Joe, you

2   have to be working at the time.  You weren't working."

3           And I said, "Am I employed?"

4           "Yes, you're employed."

5           So to answer your question, my contention is:

6   That word was changed intentionally.

7       Q.   All right.  Changed from what, so I

8   understand?

9       A.   "Employed."  The word, "worked," was changed

10   to --

11           The word, "employed," was changed to

12   "worked."

13      Q.   From the law?

14      A.   The law and the policy manual.  They both

15   were the same.

16           This is the only thing that's different.

17   This is the only word that's different.

18      Q.   Now, do you have -- do you believe that was

19   changed specific to this letter that was sent to you as

20   opposed to letters that -- similar letters that might

21   be sent to other employees?

22      A.   I question whether it was.

23      Q.   Okay.  Do you have any knowledge as to

24   whether this is a form letter that in some very similar

114

1   fashion might be sent to anyone who is on a FMLA leave?

2       A.  I see that there's a document, so it's -- it

3   looks like it's a copy of a document.  I don't know.

4       Q.  Okay.

5       A.  I just know what I read --

6       Q.  All right.

7       A.  -- and this -- it's not accurate so it misled

8   me.

9       Q.  All right.  Let's go ahead and move on to

10  what we'll mark as Exhibit 22.

11                       - - -

12          A ONE-PAGE CANYON MEDICAL

13          CENTER/CASAGRANDE FAX AND A

14          ONE-PAGE ATTACHMENT, BATES-STAMPED

15          001183 AND 1184, WERE MARKED AS JC

16          EXHIBIT 22.

17                       - - -

18      Q.  This purports to be a note from Dr. Dipietra.

19  A little difficult to read there on Page 2.  Appears to

20  be dated 12/12 of 2012.  Can you see that?

21      A.  Yes.

22      Q.  And I don't know if you can read his writing

23  but it looks to read that, "Joe will need an extension

24  of his current disability status at least through

115

```
 1   February."

 2        A.   Yes.

 3        Q.   Does that seem right to you?

 4        A.   Yes.

 5        Q.   And this would have been an extension of your

 6   leave of absence from the end of November to the end of

 7   February; is that right?

 8        A.   That was my understanding.

 9        Q.   Okay.  Any particular reason that you needed

10   the extension from the original length of time that Mr.

11   Nuss had provided?

12        A.   Because Tim was just estimating and I had

13   not -- I was still having issues --

14        Q.   Okay.

15        A.   -- medical issues.

16        Q.   All right.  We'll mark this as 23.

17                         - - -

18             A ONE-PAGE ASSOCIATE HEALTH AND

19             WELLNESS/CASAGRANDE LETTER, DATED

20             12/13/12, BATES-STAMPED 001272, WAS

21             MARKED AS JC EXHIBIT 23.

22                         - - -

23        Q.   This appears to be a notice dated 12/13 of

24   2012 to you granting the extension of a leave of
```

116

1    absence; correct?

2         A.   Yes.

3         Q.   And I see in the middle of the page, it has

4    an estimated return to work of March 1, 2013.  Do you

5    see that?

6         A.   Correct.

7         Q.   All right.  And you would have received this

8    while you were on your leave; correct?

9         A.   Yes.

10        Q.   All right.

11             This correspondence doesn't address whether

12   or not you are eligible for Family Medical Leave; does

13   it?

14        A.   It reiterates what the qualifications are --

15        Q.   Right.

16        A.   -- for FML, and again, it's a deficient

17   notification --

18        Q.   But it --

19        A.   -- and it also has the word, "employed,"

20   which is what the law reads, versus what ....

21        Q.   Does it address your situation, though;

22   whether you qualify for FMLA or not?

23        A.   What are you saying?

24             This does not say -- Let's see.

117

1            It talks about FMLA.

2       Q.   Right.

3            Does it address whether you qualify for FMLA

4   leave, --

5       A.   I'll have to read it again.

6       Q.   -- your circumstances?

7       A.   I don't know.  Let's see.

8            I can't tell whether it does or not.

9       Q.   Yeah, and I'm not trying to trick you.  I

10  didn't believe it did.  I just wanted to see if you and

11  I had the same understanding of that.

12      A.   I can't tell.

13      Q.   Okay.  Fair enough.

14           And you remained on a leave of absence

15  through February of 2013; correct?

16      A.   Correct.

17      Q.   Approximately?

18      A.   Yes.

19      Q.   All right.

20      A.   Not by choice.

21      Q.   What do you mean, "not by choice"?

22      A.   I was ready to return to work the beginning

23  of January.

24      Q.   All right.  And although you were on a leave

1   that your doctor had approved through the end of

2   February?

3        A.   He was estimating it.  He didn't know the

4   extent of my condition or how long it was going to

5   take.

6        Q.   Did he ever provide a release that indicated

7   that you'd be able to return to work in January?

8        A.   I did not ask for one at that time because --

9        Q.   Did he provide one?

10       A.   I did not ask for one.

11       Q.   I asked you whether he provided one.

12       A.   I did not ask for one.

13       Q.   Please answer my question.  My question is,

14   very simply:  Did your doctor ever give you a release

15   to return to work in January of 2013?

16       A.   He offered one.

17       Q.   Did he give you one?

18       A.   No.

19       Q.   And your contention is that Dr. Dipietra

20   offered you one, or offered to give you one?

21       A.   He -- I saw him twice in January.

22       Q.   Did he tell you he would sign a release for

23   you to return to work in January?

24       A.   He said, "What do you want me to do?"

1          And I said, "I do not have a position."

2          It's a Catch 22.

3     Q.   I need you to answer my question, okay?  My

4  question is, very simply:  Did he offer to sign a

5  release for you to return to work in January of 2013?

6     A.   I don't know what you mean by "offer."

7     Q.   He didn't sign one for you in 2013.  You've

8  testified to that.

9          Did he tell you he would sign a release for

10  you to return to work in January?

11     A.   I don't recall the exact conversation but I

12  know we talked about it.

13     Q.   Okay.  Now, tell me about the conversation

14  you had.

15     A.   I was already in discussions with OhioHealth

16  about applying for positions.  I'd already been told by

17  Rose that I needed a return-to-work authorization from

18  my doctor.  I told her that, once I get that, my

19  disability will be terminated.

20     Q.   Your disability pay?

21     A.   Pay.

22     Q.   Okay.

23     A.   That was what I was concerned about.  So,

24  Rose knew what the situation was, so she said, "Go

120

1    through the interview process, and then at the time, if

2    you are offered a position, get your doctor to write

3    you a return-to-work."

4        Q.    And that's what Rose told you?

5        A.    Yes.

6        Q.    When did she tell you that?

7        A.    She told me that on numerous occasions on the

8    phone; and they also mentioned it when we had that

9    meeting with her and Jean and Michael Kramb.  I

10   think -- I don't remember.  Was it January 18th?

11       Q.    January 18 sound about right?

12       A.    Yeah.

13       Q.    Tell me about that meeting.  How did that

14   meeting come about?

15       A.    Again, I'd been having weekly conversations

16   with Rose all through December.  Then beginning of

17   January, I said I wanted to start applying for

18   positions and --

19       Q.    Starting the beginning of January?

20       A.    Correct.

21           So that's when the discussions started with

22   bringing in someone from HR, and I had looked on the

23   job board and seen various positions, I wrote down

24   which ones.  They told me not to apply for any

121

1   specifically until they could look at what those

2   specific jobs entailed.  They wanted to see what the

3   job requirements were, because the job descriptions are

4   very generic.  They are, like, all basically the same,

5   so it doesn't really tell you much about the position.

6   It just tells you where it is.

7        Q.   Now, when you say "they," we've identified

8   Rose, you've identified Jean, and Michael Kramb; is

9   that right?

10       A.   Right.

11       Q.   Was he the one that was helping you,

12  principally, with the job-search?

13       A.   He was supposed to, yes.

14       Q.   And did he?

15       A.   He had told me sometime in February a couple

16  positions.  I thought he was not very timely on my

17  schedule, which is:  I need something before my

18  disability runs out.  I was ready to apply for these

19  jobs at the beginning of January.  I was told to hold

20  off by Rose, and I think that was from Michael.  I

21  don't know if Susan had some input on that.  I know she

22  came in at the very beginning of that meeting,

23  introduced herself.

24       Q.   You started applying for jobs at the

1  beginning of January; correct?

2      A.   I had a list of jobs that I wanted to start

3  applying for.  They told me, "Hold off.  We want HR to

4  review these."

5           Jean had even said, "There's some positions

6  I'm aware of."  She gave me one that I actually had an

7  interview for.  So they were trying to be helpful, but

8  they also were saying, "Don't apply for these."  I was

9  ready to go.  They said, "Hold off."

10     Q.   How did this meeting on the 18th come about?

11 Was this a meeting you requested or they requested?

12     A.   I requested it.  I know I was talking with

13 Rose at the beginning of January.  I think I even

14 forwarded her a letter that I had sent to my doctor

15 kind of updating my doctor on what was going on with

16 me, and so she had that.  I said, "I want to start

17 talking about returning to work."  So our meeting, she

18 said well -- she coordinated the meeting because she

19 wanted to have Jean involved and wanted to have someone

20 from HR.

21     Q.   Uh-huh.

22     A.   So the meeting was supposed to be on the

23 11th, I think.  That was -- whatever that Friday was

24 the week before we had it.  And the day before that,

123

1    Rose called and said that Jean couldn't make that, and

2    so again it was another week that went by where I

3    wasn't applying for jobs that I wanted to apply for.

4         Q.   Okay.  Was there a concern about what type of

5    nursing position you should be seeking at OhioHealth at

6    this time?

7         A.   I think that's what they thought.

8         Q.   All right.  And you'd had expressed to you by

9    Ms. Sayers, had you not, before you went on a leave of

10   absence, that you might be better suited for a

11   less-acute position?

12        A.   Correct.

13        Q.   Meaning a less stressful position within

14   OhioHealth?

15        A.   That was my understanding.

16        Q.   All right.  And did you take issue with that?

17        A.   At the time, I was not in -- I was having

18   anxiety issues.

19        Q.   Okay.

20        A.   So I had no experience in the medical field.

21   I had nothing to go by.  But once I felt better, I

22   didn't agree with that.

23        Q.   What was your position?

24        A.   I thought that my anxiety was related to

124

1  issues that had been resolved.  By the time, early

2  January, they had already been resolved.  I wasn't

3  having anxiety issues.

4        Q.  Okay.  Were you --

5        A.  That's what I told them.

6        Q.  At that point in time, in January, you

7  started looking for other jobs -- Right? -- within

8  OhioHealth?

9        A.  (Affirmative nodding of head.)

10       Q.  And in fact, even after you returned to your

11  former position working on 7 Orange, you continued to

12  look for jobs; didn't you?

13       A.  I'm not for sure how long I did.

14       Q.  But you did for some period of time?

15       A.  Yes.

16       Q.  And in fact, there are different pieces of

17  correspondence which we'll get to later today where you

18  indicate that you were interested in pursuing a

19  potential transfer?

20       A.  Correct.  That was because, at that time, I

21  knew Amy didn't want me in her department.

22       Q.  Well, actually, didn't you know that as of

23  October of 2012?

24       A.  That's what she told me.

125

1      Q.   Okay, she didn't want you --

2         That she didn't think that you would make it

3  in that department?

4      A.   Correct.

5      Q.   Okay.

6      A.   That was her opinion --

7      Q.   Right.

8      A.   -- based on what was going on medically with

9  me at the time.

10     Q.   Well, did she tell you that it was based on

11  your medical condition?

12        Yes or no?

13     A.   It was -- I don't know.

14     Q.   Did she tell you that?

15     A.   I don't recall if she did or not.  She was

16  aware of what was going on medically.

17     Q.   But she was also raising, in October of 2012,

18  performance issues with you; was she not?

19     A.   Correct, which I challenged.

20     Q.   Okay.  Fair enough.

21        But she was raising those with you at that

22  time; correct?

23     A.   Correct.

24        MR. ASENSIO:  Go ahead and mark this.

126

```
1                            - - -

2             A ONE-PAGE CASAGRANDE/TALEBI

3             E-MAIL, DATED 1/24/13,

4             BATES-STAMPED 001155, WAS MARKED AS

5             JC EXHIBIT 24.

6                            - - -

7   BY MR. ASENSIO:

8        Q.   This purports to be an e-mail from you to

9   Susie Talebi; correct?

10       A.   Yes.  I sent it to -- Correct.  Yes.

11       Q.   And it looks like it was forwarded to Michael

12  Kramb?

13       A.   Correct.

14       Q.   And it's dated the 24th of January, 2013?

15       A.   Yes.

16       Q.   And at least at this point, you've identified

17  three other RN positions that you had recognized and

18  you also mentioned that you would even look outside of

19  a nursing position and informed her about your business

20  experience?

21       A.   Right.

22       Q.   Okay.  Tell me about the meeting on the 18th.

23  What happened, best of your recollection, in that

24  meeting?
```

127

1      A.   I think mainly they wanted to get a sense --

2 like see me face-to-face.

3      Q.   Well, you called the meeting; didn't you?

4        Didn't you arrange to have the meeting take

5 place?

6      A.   I said I wanted to start applying for

7 positions --

8      Q.   Okay.

9      A.   -- and then they are the ones that said,

10 "Well, let's bring HR."

11        The way I understood it is: They wanted to

12 have the meeting face-to-face with me so that they

13 could bring everybody together, everybody know each

14 other, know who the people are that are going to help

15 me --

16      Q.   Okay.

17      A.   -- with this transition.

18      Q.   Did that seem like a good idea to you?

19      A.   Yes.

20      Q.   What happened in the meeting?

21      A.   I was just told to bring any positions that I

22 was interested in, which I did. I don't recall exact

23 specifics, other than we talked about the positions.

24        I know, again, we talked about Michael's

128

1    involvement with -- you know, since the postings --

2    like these postings were so generic, I didn't know

3    anything about the position, whether it would be

4    something I would like or not, so that was going to be

5    his function:  To get more information about these

6    positions to recommend to me, and I think he even

7    recommended -- de-recommended some positions to me, as

8    did Jean.

9         Q.   "De-recommended" meaning:  Recommended you

10   don't pursue them?

11        A.   Correct, --

12        Q.   Okay.

13        A.   -- based on their expertise.

14        Q.   Well, they were trying to help you; right?

15        A.   I assume.

16        Q.   All right.  Do you have any reason to doubt

17   the sincerity, that they were trying to help you?

18        A.   I believe, truly, Rose and Jean were.  I

19   don't know enough about Michael to know.

20        Q.   Had you dealt with Michael before then?

21        A.   No.

22        Q.   Then when you returned to work, did you have

23   any dealings with Michael afterwards?

24        A.   Yes.

129

1      Q.    When?

2      A.    Amy and I had a meeting with him, because

3    when I came back, I was challenging the performance

4    issues that -- right before I left.  I was questioning

5    the accuracy of them because I did not have a chance to

6    do that before I left because, basically, after I was

7    presented with that, I went home and started taking

8    sleep meds.

9      Q.    And Michael was involved in that?

10     A.    He was involved in that.

11     Q.    Any other dealings with him after that?

12     A.    I may have had a couple phone conversations

13   with him related to these, and it was mainly me getting

14   with him rather than him initiating with me.  I sent

15   him e-mails.

16     Q.    With the job searches; right?

17     A.    Yes.

18     Q.    Anything else about that meeting you recall?

19     A.    I know, again, Rose or someone said that,

20   "Again, Joe, you know that you are going to have to get

21   a return-to-work," but they didn't say we can't -- "You

22   can't apply for these positions until you have a

23   return-to-work."  So it was my understanding everyone

24   was on the same page.  They knew my situation.

1          Q.    Well, you could apply for those positions

2     whether you had a return-to-work slip or not; right?

3          A.    That's what I was told.  I wasn't told I

4     couldn't.

5          Q.    And, in fact, you did; right?

6          A.    Yes.

7          Q.    And you even applied for positions after you

8     returned to work in March?

9          A.    Based on my prior conversations with Amy --

10         Q.    Okay.

11         A.    -- that she didn't -- she thought it would be

12    best that I not be in her department.

13         Q.    Anything else you recall about that meeting?

14         A.    No.

15         Q.    All right.  Where was it?

16         A.    It was at the offices of the employee Health

17    and Wellness at Riverside.

18         Q.    How long did it last; do you recall?

19         A.    An hour.  I don't know.

20         Q.    Did your sister go with you to that meeting?

21         A.    Yes.

22         Q.    And any particular reason she went?

23         A.    She -- I was staying with her at the time.

24    She just wanted to be involved, --

1       Q.   Okay.

2       A.   -- know what's going on.

3       Q.   Was she providing care for you at the time?

4       A.   No.  I was just staying with -- staying with

5    them because I didn't want to go back to my house.

6       Q.   Why not?

7       A.   I just -- My partner was in Puerto Rico.  I

8    just needed to be around people, didn't want to be

9    alone, and she wanted me there.

10      Q.   Okay.  Did you affirmatively state during

11   that meeting that you were able to return to work?

12      A.   I don't know.

13           How would I know?  How would I remember that?

14      Q.   I'm asking you if you do remember having done

15   that?

16      A.   I don't recall.

17           I would not have attended the meeting if I

18   didn't think I was ready to return to work.  I didn't

19   see the need to affirmatively state it at that meeting.

20      Q.   Okay.  You realized that it would take at

21   least some period of time, though, to search for a

22   position, interview for a position, and get hired into

23   a position; correct?

24      A.   Correct.

1    Q.   Okay.

2    A.   That's assuming that I was in the same boat

3  as everybody else:  Applying for a job, not having a

4  position to return to; but, in fact, I did have a

5  position to return to.

6    Q.   As it turns out; right?

7         As it turned out, you had a position to

8  return to, meaning the position --

9    A.   In fact, at that time, I did.

10   Q.   Okay.

11   A.   So I don't know if they knew at the time or

12  not.  You would have to ask them.

13   Q.   Meaning that you were FMLA-eligible as of

14  December 5 of 2012?

15   A.   Right.

16   Q.   Was that issue raised or discussed in that

17  January 18 meeting?

18   A.   Whether I was FMLA-qualified?

19   Q.   Right.

20   A.   We did not talk about it because, again, I

21  was relying on the false letter that was presented to

22  me as being true.

23   Q.   In fact, everyone was relying on the

24  understanding that you weren't FMLA-eligible at that

133

```
 1   point; right?

 2        A.   Correct.

 3             MR. ASENSIO:  Let's mark this.

 4                      - - -

 5             A ONE-PAGE CACIOPPO/CASAGRANDE

 6             LETTER, DATED 2/15/13,

 7             BATES-STAMPED 001279, WAS MARKED AS

 8             JC EXHIBIT 25.

 9                      - - -

10        Q.   Handing you Exhibit 25.  It is a piece of

11   correspondence to you from Associate Health and

12   Wellness dated 2/15/13.  Do you recall receiving this?

13        A.   Yes.

14        Q.   And it approves an extension of your leave of

15   absence through April 20 of 2013?

16        A.   Right.

17        Q.   Why did you seek an extension of your leave

18   of absence?

19        A.   Rose, again, she said -- she reminded me that

20   my -- even though my disability pay was going to be

21   ending prior to March 1, that I didn't -- I would

22   technically not be employed after that date.

23        Q.   Okay.

24        A.   So they had a way of extending it.
```

134

1     Q.   Was it your understanding that you had a

2  maximum medical leave that you could get of 180 days?

3     A.   Yes.

4     Q.   And so what this was, was an extension of

5  that leave?

6     A.   Yes.

7     Q.   And in fact, OhioHealth extended it from

8  March 1 to April 20?

9     A.   Correct, because of the job -- we were doing

10  the job-search.

11     Q.   Doing the job-search.  Okay.

12          How many positions did you apply for?  Any

13  recollection?  And approximately.

14     A.   15, 20.  I don't recall.

15     Q.   How many interviews did you get?

16     A.   Three.

17     Q.   Any offers?

18     A.   No.

19     Q.   At the time you returned to work in March, to

20  your former position, did you have, kind of,

21  job-searches that were still outstanding, where you

22  hadn't heard back?

23     A.   Yes.

24     Q.   So it remained kind of something that was in

1    process all the way until you returned?

2        A.   Correct.

3             MR. ASENSIO:  Go ahead and mark this as 26.

4                        - - -

5             A TWO-PAGE E-MAIL STRING, BEGINNING

6             WITH A HEYDER/SAYERS E-MAIL DATED

7             2/15/13, AND A TWO-PAGE ATTACHMENT,

8             BATES-STAMPED 001405 THROUGH 1408,

9             WERE MARKED AS JC EXHIBIT 26.

10                       - - -

11   BY MR. ASENSIO:

12       Q.   This is a document that has a series of

13   e-mails.  And when we are doing these e-mails that are

14   a chain, I'm going to start at the back and move

15   forward.  So if I could direct your attention to Bates

16   Page Stamp 1407.  This looks to be an e-mail from you

17   to Rose dated 2/21?

18       A.   Yes.

19       Q.   And do you recall composing and sending this

20   e-mail?

21       A.   Yes.

22       Q.   And as you state in the first sentence, "I'm

23   writing this e-mail with regard to the telephone

24   conversation we had Wednesday morning," February 20,

1    "concerning the Family Medical Leave Act ..."

2            At this point, you had raised with Rose the

3    issue that you believed you had, in fact, qualified for

4    Family Medical Leave as of December 5, --

5        A.    Correct.

6        Q.    -- 2012; correct?

7        A.    Yes.

8        Q.    And this was your correspondence informing

9    her; correct?

10       A.    Right.  It's my written correspondence based

11   on the phone conversation we had the previous day.

12       Q.    And the phone call you had with Rose, was

13   that the first time you told anybody at OhioHealth

14   that, "Hey, I think I'm qualified for FMLA"?

15       A.    I believe so.

16       Q.    All right.

17       A.    Yeah.

18       Q.    That seems right to you; doesn't it?

19       A.    Yes.

20       Q.    And you've already told me how you went about

21   -- through the process of determining that you, in

22   fact, were FMLA-qualified:  You did some research on

23   your own; --

24       A.    Yes.

137

1     Q.   -- talked to some people; called up the

2  Department of Labor?

3     A.   Correct.

4     Q.   Now, directing your attention to the last

5  page, next-to-the-last paragraph, --

6     A.   Uh-huh.

7     Q.   -- next-to-the-last sentence, you say, "... I

8  believe it was incorrectly determined by OhioHealth

9  that I did not qualify, and therefore received an

10  incorrect notice of determination from OhioHealth which

11  I relied upon at the time."

12       How did you rely upon that?

13       And I assume you are talking about that

14  December 11 letter?

15     A.   Yes.

16     Q.   How did you rely on that?

17     A.   I relied on the fact that I had no job and I

18  was going to have to apply as anyone else for another

19  position, whether it be with OhioHealth or somewhere

20  else.  I was basically -- Even though I was getting

21  disability pay, I was essentially unemployed.

22     Q.   It was causing you to look for a job where

23  you otherwise wouldn't have had to?

24     A.   Correct.

138

1      Q.   Any other ways?

2      A.   I'm not sure what you're asking.

3      Q.   Well, were there any other ways that you

4  relied upon that incorrect letter other than the fact

5  that you were having to engage in a job-search which

6  you wouldn't otherwise have had to engage in?

7      A.   Yeah, I mean, my whole financial situation

8  was based on that, so ....

9      Q.   Well --

10      A.   You know, it's like what am I going to do?

11  Am I going to have to go on welfare, you know?  I don't

12  know.

13      Q.   With regard to --

14      A.   Again, it gave me an uneasy feeling.  I did

15  not feel secure that I had a job to return to.

16      Q.   Okay.

17      A.   Unemployment was high.  I was given no

18  assurances.  Michael said there was like -- they get

19  80,000 applications a year.  I'm one of 80,000.  That

20  makes me feel great.

21      Q.   Now, at the time, was it your desire to

22  return to 7 Orange?

23      A.   My desire was to return to some position in

24  OhioHealth.

139

1     Q.   Okay.  And that, I guess, is more to my

2  point:  Did you have a specific desire to go back to

3  your former job on 7 Orange or was your interest more

4  in making sure that you had a job-reinstatement right

5  at OhioHealth?

6     A.   I wanted a position, whether it be -- I

7  didn't care whether it was my old position or ....

8     Q.   Would you have preferred another position,

9  not on 7 Orange?

10     A.   Obviously, when you know your manager doesn't

11  think you should be there, that's not the most

12  preferable.  I felt I was, and once I came back, I felt

13  comfortable and I mentioned to her that I thought I

14  was.

15     Q.   Thought you were what?

16     A.   Comfortable.  I wasn't having any anxiety

17  issues.

18     Q.   Okay.

19     A.   I felt confident.

20     Q.   Did Rose follow up with you with regard to

21  your e-mail?

22     A.   I think she was sick, and from my

23  recollection, I got a call from one of her coworkers.

24     Q.   Saying what?

```
 1        A.   Saying that I -- I'm not qualified.

 2   Basically, that what I said was wrong.  She said, "I've

 3   been here 13 years.  We've never given" -- You know,

 4   "If we have to give you job protection, we'd have to

 5   give it to everybody," is what she said.

 6        Q.   Who contacted you?

 7             THE WITNESS:  Do you have the names -- list

 8   of names?

 9             I should have written them down.

10   BY MR. ASENSIO:

11        Q.   Do you have any recollection who called you?

12        A.   Someone in her department.

13             You got names?

14        Q.   No.  Just --

15             MR. MANSELL:  Joe, just answer the questions.

16   BY MR. ASENSIO:

17        Q.   If you don't recall, just tell me you don't

18   recall.

19        A.   I don't recall.

20        Q.   That's fair.

21        A.   I know who it is.  I just can't recall her

22   name off the top of my head.

23        Q.   Do you know when that phone call would have

24   occurred?
```

1        A.   I think it was on a Friday.

2             I was having lunch with my sister.  I

3   remember that.

4        Q.   Okay.

5        A.   And she said, "I wanted to get back to you on

6   this -- your letter to Rose.  She's out sick."  And she

7   said, "You don't qualify.  You have to be working."

8        Q.   All right.  And --

9        A.   And I said, "What" -- basically, "Show me

10  the" -- "Tell me what regulation shows that."

11            And she said, "The regulations are 400 pages

12  long.  I don't have time to go through that.  You

13  can" -- basically, for me to do it; and I did.

14       Q.   This would have been a telephone conference

15  you had after you sent the e-mail to Rose?

16       A.   Uh-huh.  (Affirmative nodding of head.)

17  Yeah.

18       Q.   And before you were reinstated to your

19  position?

20       A.   Correct.

21       Q.   With somebody whose name you can't remember;

22  right?

23       A.   If you give me some time, I'll give you the

24  name.

142

1      Q.   That's fine.

2      MR. ASENSIO:  Let's go ahead and mark this.

3      THE WITNESS:  I'll look it up.

4               - - -

5      A TWO-PAGE E-MAIL STRING, BEGINNING

6      WITH A KRAMB/CASAGRANDE E-MAIL

7      DATED 2/22/13, BATES-STAMPED 001146

8      AND 1147, WAS MARKED AS JC EXHIBIT

9      27.

10              - - -

11  BY MR. ASENSIO:

12      Q.   Can you identify this for me?

13      A.   Yes.

14      Q.   And what is this?

15      A.   This is a letter that I -- or an e-mail that

16  I sent to Michael Kramb kind of updating him on the

17  positions that I applied to and how those things were

18  going.

19      Q.   All right.

20      A.   Again, he was supposed to provide feedback to

21  me, suggestions, advice, which -- based on our meeting

22  that we had on the 18th of January.

23      Q.   Right.

24      If you look at your e-mail on Exhibit 26 to

143

1    Rose, it's dated the 21st at 12:30 a.m.

2        A.   Okay.

3        Q.   Do you see that?

4        A.   Yes.

5        Q.   It looks like, later that day, at about 2:30,

6    2:40 is when you sent this e-mail to Michael Kramb?

7        A.   All right.

8        Q.   Updating him on the status of your

9    job-search?

10       A.   Yes.

11       Q.   Was it still your desire to, at that point,

12   even though you now knew of, and had communicated with

13   OhioHealth about your FMLA rights, you were still

14   looking for other positions, as well; is that right?

15       A.   Correct, because what I had been told was:  I

16   didn't qualify for FMLA.

17       Q.   Okay.  It was unresolved, is the --

18       A.   Correct.

19       Q.   You didn't have agreement with OhioHealth

20   yet?

21       A.   Right.

22       Q.   All right.  That's fair.

23            Hand you this.

24       A.   I don't think I ever received agreement

144

1  until -- well, they never did say.  I never got a

2  letter saying that they -- that I did qualify, ever.

3      Q.   Rose called you and told you that you did;

4  didn't she?

5      A.   No.  She said I could have my job back.

6      Q.   Okay.

7           MR. ASENSIO:  Let's mark that.

8                       - - -

9           A ONE-PAGE CASAGRANDE/CACIOPPO FAX

10          COVER SHEET, DATED 2/27/13, AND A

11          ONE-PAGE ATTACHMENT, BATES-STAMPED

12          001191 AND 1192, WERE MARKED AS JC

13          EXHIBIT 28.

14                      - - -

15  BY MR. ASENSIO:

16      Q.   This looks to be a release to work from Dr.

17  Dipietra?

18      A.   Yes.

19      Q.   Dated 2/27/13 --

20      A.   Right.

21      Q.   -- that was sent to Rose.  You would have

22  sent that in to her; correct?

23      A.   That looks like -- Yes.  I sent it from my

24  sister's office.

1      Q.    And you had just gotten, recently, an

2   extension through April 20.  Why did you send in this

3   release to work as of the 27th?  Did anything happen in

4   terms of your medical condition that occasioned this?

5      A.    No.  I had -- By that time, I had spoken

6   with -- I think the day before, I had spoken with the

7   Department of Labor, the Wage and Hour -- or -- Is it

8   Wage and Hour?  I can't remember handles.  FMLA.  It

9   was the regional office in Cleveland.  I don't recall

10   the guy's name.  And when I gave him the fact pattern

11   of what I had been through, he said, "Your 120 days is

12   going to be running.  Go ahead and" -- "You'd better go

13   ahead and get your doctor to release you back to work."

14   Otherwise that time period would have run out for the

15   FMLA.  Whatever the FMLA period was, it was coming

16   close to that.  So the next day, I went in and got a

17   release from my doctor.

18      Q.    All right.  So somebody from the Department

19   of Labor advised you to go ahead and get a release and

20   present yourself to go back to work?

21      A.    Right.  Otherwise, yeah, I would have been

22   out of the time period of the FMLA.

23      Q.    Okay.  And am I right that this was the first

24   return-to-work that you had presented to OhioHealth

146

1   with regard to this leave that started back in

2   November?

3        A.   Yes.  Written.  But again, they were aware

4   that I was ready beginning of January.

5        Q.   And this is the first notice that OhioHealth

6   received from Dr. Dipietra indicating you were able to

7   return to work?

8        A.   Since ...?

9        Q.   November of 2012.

10       A.   When did he write that?  I thought --

11       Q.   2/27 of 13.

12       A.   No.  When did he write the prior one?  Wasn't

13   that early December?

14       Q.   May have been.  But this is the first notice

15   that we received at OhioHealth indicating that you were

16   able to return to work, from Dr. Dipietra?

17       A.   Correct.  But as I said, they were well-aware

18   I was able to return to work.

19       Q.   But they hadn't received anything from Dr.

20   Dipietra until --

21       A.   Again, it's a catch --

22       Q.   Let me finish my question.

23            They hadn't received anything from Dr.

24   Dipietra until this document on 2/27 of '13 indicating

147

1   that you were, in fact, able to return?

2        A.   That's correct.

3        Q.   We'll mark this as 29.  Let me hand you this.

4                        - - -

5             A TWO-PAGE E-MAIL STRING, BEGINNING

6             WITH A TALEBI/CACIOPPO, SAYERS

7             E-MAIL DATED 3/14/13, BATES-STAMPED

8             001131 AND 1132, WAS MARKED AS JC

9             EXHIBIT 29.

10                       - - -

11       Q.   This is another series of e-mails marked as

12  Plaintiff's Exhibit 29; and starting at the bottom,

13  this purports to be an e-mail from you to Rose dated

14  3/13, "Subject:  Yesterday's telephone conversation."

15  Do you see that?

16       A.   Yes.

17       Q.   And in it, you state, "Thank you for calling

18  me yesterday and informing me about my RN position

19  being reinstated on 7 Orange with Riverside ..."

20       A.   Yes.

21       Q.   Do you see that?

22       A.   (Affirmative nodding of head.)

23       Q.   So I presume you would have had a telephone

24  conversation with her on the 12th of March; is that

148

1   right?

2        A.   That sounds correct.

3        Q.   And in it, she told you that you were being

4   reinstated to your former position on 7 Orange?

5        A.   Right, with conditions.

6        Q.   What conditions?

7        A.   She wouldn't say.  That's why I wanted a

8   letter.

9        Q.   All right.  Tell me about that telephone

10  conversation you had with Rose.  Did she call you?

11       A.   She called me and I wasn't available at the

12  time to take the call and then I called her back that

13  afternoon.  When she -- I think at the time when she

14  called, she was -- it was a conference call with her

15  boss, Chris something-or-other, a woman.

16            When I called her back, it was just her, and

17  she said, "I've got good news for you.  You know, you

18  can have your position back."  And then she mentioned

19  some other things about somebody getting with me and

20  that there were going to be conditions.

21            So I asked for that in writing from her.

22  Like, to me, this was a job offer.  And when I started,

23  I had gotten an official letter saying my job -- "This

24  is an official job offer."  A telephone conversation,

149

1    to me, was not.  So I asked her to provide me a letter

2    basically going over the phone conversation we had,

3    basically, because again, I don't remember everything

4    that was discussed.  So to me, it's best to have

5    everything in writing.  And nothing was put in writing.

6        Q.   All right.

7        A.   And she subsequently sent back saying she was

8    not going to provide me that letter, which then made me

9    suspicious.

10       Q.   Well, you, in fact, were reinstated to your

11   position on 7 Orange as an RN; correct?

12       A.   With conditions, yes.

13       Q.   What conditions?

14       A.   The very first day I came back on the floor,

15   they brought out my Performance Management thing that I

16   had issues with from last fall when I was on medical

17   leave, and they stated, "This is still in effect."

18            And I said, "I had issues with that."

19            And they said, "Well, this is still in

20   force."

21            So basically, to me, it was a threat that the

22   next step would be a final warning.

23       Q.   Did anybody tell you that specifically?

24       A.   I believe that's what they did.

1      Q.   Who is "they"?

2      A.   Christy Griske and -- Who is our education

3   coordinator?  The education coordinator.

4   BY MR. ASENSIO:

5      Q.   Lindsey?

6      A.   Lindsey Castle.

7      Q.   I'm sorry.  What was that?

8      A.   Lindsey Castle.

9           And so that's what -- that's how I took it:

10   As a threat.  Because when I'd met with Amy the Monday

11   before, before my actual return to work, she asked me

12   to come in and she'd never mentioned anything about

13   conditions.

14      Q.   Amy didn't?

15      A.   She did not.

16           She said, "We want you to go to" -- it was

17   like a mini-orientation/reorientation called

18   "JumpStart," and I thought that was a good idea; and

19   then --

20      Q.   Was Amy positive, in your meeting with her,

21   about returning --

22      A.   I thought so.  I thought it was positive.

23      Q.   And just so I'm clear, you, in fact, came

24   back to the same position in terms of job title?

151

```
 1        A.    Correct.

 2        Q.    Same shift in terms of hours?

 3        A.    Correct.

 4        Q.    Same total hours on a weekly basis?

 5        A.    Correct.

 6        Q.    Same pay?

 7        A.    Correct.

 8        Q.    And same benefits?

 9        A.    Correct.

10        Q.    Working for the same manager?

11        A.    Correct.

12        Q.    In all respects, the identical job that you

13   had left when you left on your leave of absence;

14   correct?

15        A.    Technically.

16        Q.    Well, how wouldn't it have been?

17        A.    There were conditions.

18        Q.    All right.  And so your contention is that

19   there were conditions put on your return that dealt

20   with the fact that OhioHealth wanted to discuss with

21   you issues that they had had with your performance

22   prior to your leave?

23        A.    Correct, which I did not agree with.

24        Q.    I understand that you didn't agree with them,
```

152

1  but they wanted to discuss those issues with you and

2  that was what you felt were the conditions; right?

3      A.   Yeah, I guess I wasn't fully aware of what

4  other conditions because I -- I did not know if I was

5  under a probation or what.

6      Q.   Well, nobody ever put you under a probation;

7  did they?

8      A.   I was given a list of things that I had to do

9  and -- but it did not have a timeframe.

10      Q.   Goals?

11      A.   Yeah.

12          So I'm not sure that those were anything that

13  anyone else would have gotten.

14      Q.   We'll get to those this afternoon.

15          You got this call from Rose on the 13th --

16  or, I'm sorry -- on the 12th?

17      A.   Okay.

18      Q.   Do you recall when you started; what your

19  first day back would have been?

20      A.   I met with Amy, I think, on the 18th for an

21  hour or so, and then the 19th was when I did that

22  JumpStart.

23      Q.   All right.  So you were back --

24      A.   The Tuesday --

153

1     Q.   -- working on the 19th?

2     A.   Yeah, orientation.

3     Q.   Were you given an option of different jobs or

4 shifts to come back to?

5     A.   I was given the option of day shift,

6 full-time.  I think -- I don't remember what other

7 options I was given.  Again, that's something that

8 wasn't put in writing.

9     Q.   Okay.  But who spoke to you and gave you

10 those options?

11     A.   I think, initially, it was Rose.  That was

12 part of that telephone conversation we had which,

13 again, she didn't -- she wasn't willing to put in

14 writing.

15     Q.   Well, the option, as you understood it,

16 verbally, was that you could go full-time or part-time,

17 day or night?

18     A.   I don't know -- That's what I don't recall.

19         I know I was given the option of full-time,

20 days.  I don't recall -- I think it was all full-time.

21     Q.   Did you want full-time employment?

22     A.   No.

23     Q.   Why not?

24     A.   Because I wanted to work the same schedule

154

1  I'd had before I left.  I liked working the two 12-hour

2  shifts on the weekends, where I had the same days off

3  in between.

4        Q.   That wasn't appealing to you; you just wanted

5  to keep your part-time schedule?

6        A.   Correct.

7        Q.   And you wanted to continue working nights; is

8  that right?

9        A.   Yes.

10       Q.   And days were offered to you, but again, that

11  wasn't appealing; right?

12       A.   Correct.

13            Well, I wasn't even offered night.  I was

14  offered day, and I sent an e-mail back requesting that

15  I have my same schedule back that I had before.

16       Q.   And that's what you, in fact, got; isn't it?

17       A.   Yes.  But I was not offered that.

18            MR. ASENSIO:  Let's mark this.

19            I've got a couple more and then we can break

20  for lunch.

21            MR. MANSELL:  Okay.

22                          - - -

23            A 42-PAGE DOCUMENT ENTITLED,

24            "GENERAL NURSING ORIENTATION

155

1          MANUAL," BATES-STAMPED 000068

2          THROUGH 0116,  WAS MARKED AS JC

3          EXHIBIT 30.

4                        - - -

5   BY MR. ASENSIO:

6          Q.   This is another one of those orientation

7   manuals.  We marked it as Exhibit 30.  Does this look

8   familiar?

9          A.   If it's the JumpStart, yes.

10         Q.   Well, that's coming, so it's not the

11  JumpStart.  But I think you testified that you would

12  have gone through another orientation, which you

13  thought was a good idea?

14         A.   Correct.

15         Q.   And this has got your name on it, 7 Orange, a

16  Preceptor of Jen Frey, and under the "Hire/Start Date,

17  it states:  "Return from medical LOA and reoriented

18  3/19 through 3/29 ..."  Seem about right.

19         A.   Yes.

20         Q.   And this appears to be the same format that

21  we looked at previously with regard to the orientation

22  program you went through at the beginning of your

23  employment?

24         A.   Yes.

156

1      Q.   And it looks like you went through what maybe

2   best can be described as a refresher in terms of the

3   orientation?

4      A.   Yes.

5      Q.   I presume that's because you had been on an

6   extended leave?

7      A.   That's what was recommended by Amy --

8      Q.   All right.  And you --

9      A.   -- since I'd been off five months.

10     Q.   And as you stated, you thought that was a

11  good idea; right?

12     A.   Yes.

13     Q.   All right.  Now, the JumpStart.

14                    - - -

15          A FOUR-PAGE DOCUMENT ENTITLED,

16          "JUMPSTART ... NEW ASSOCIATE

17          ORIENTATION FOR THE STAFF RN,"

18          BATES-STAMPED 001311 THROUGH 1314,

19          WAS MARKED AS JC EXHIBIT 31.

20                    - - -

21     Q.   Does that look familiar, Mr. Casagrande?

22     A.   Yes.

23     Q.   This was a new program; wasn't it?

24     A.   It was like a pilot program.

1    Q.   Okay.  It was not a program that had been

2  available when you began your employment in 2011;

3  right?

4    A.   That's correct.

5    Q.   And so what was this?  What was the JumpStart

6  program?

7    A.   It was basically just orienting to the

8  hospital.  It was skills -- There were skills involved,

9  nursing skills; and then, also, they had -- which was

10  different:  They presented like live situations with

11  actors and you would come in as the nurse and they

12  videotaped you, and basically it was a critique on how

13  you -- you know, your nursing acumen, how you handled

14  the situation.

15    Q.   Okay.  Did you find it beneficial?

16    A.   Yes.

17    Q.   If I look on Page 2, it's got an agenda

18  for -- actually, if you look on Page 2 and Page 3,

19  looks like it's a four-day program with its agenda?

20    A.   Yes.

21    Q.   And you completed the program; is that right?

22    A.   Yes.

23    Q.   Does that look like a true and accurate

24  agenda of what you covered?

158

1    A.    Basically, yes.

2                        - - -

3          A ONE-PAGE DOCUMENT BEGINNING,

4          "JOSEPH CASAGRANDE GOALS," DATED

5          3/25/13, BATES-STAMPED 000166, WAS

6          MARKED AS JC EXHIBIT 32.

7                        - - -

8    Q.    Now, you had referenced conditions that you

9    came back to work on.  I think you referenced that

10   these were given to you, I believe, by Ms. Castle?

11   A.    Christy Griske and Lindsey Castle.

12   Q.    And is this the document that they gave you

13   and the conditions that they gave you?

14   A.    I believe that this -- Yes, I believe this is

15   correct.

16   Q.    And it's dated 3/25 of 2013; correct?

17   A.    I know that it was the Monday following the

18   18th.  So yes, that would have been the right date.

19   Q.    And this was in a meeting with Ms. Castle and

20   Ms. -- I'm sorry -- Griske?

21   A.    Griske.

22   Q.    Griske.  All right.

23         MR. ASENSIO:  Why don't we take lunch at this

24   point.  I'm at a good breaking spot.

159

1              MR. MANSELL:  Okay.

2                          - - -

3              Thereupon, at 12:07 p.m. a luncheon recess was

4      taken until 1:07 p.m.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

160

```
 1                          - - -

 2                               Tuesday Afternoon Session
                                 March 11, 2014
 3                               2:08 p.m.

 4                          - - -

 5              CROSS-EXAMINATION (CONT'D.)

 6  BY MR. ASENSIO:

 7      Q.   I think we'd finished up basically covering

 8  your second leave of absence and we had arrived at a

 9  time around the 18th or 19th of March when you returned

10  to work at OhioHealth at Riverside.

11              One quick question:  Do you recall sending

12  flowers to Rose?

13      A.   I do.

14      Q.   Was it to Rose and others, or just Rose?

15      A.   To the whole department --

16      Q.   All right.

17      A.   -- and Jean, and I think I put Michael's name

18  on it, too.

19      Q.   And that was shortly after you got

20  reinstated; is that right?

21      A.   I believe so, yes.

22      Q.   And it was kind of a thank you?

23      A.   Yeah, especially to Rose.

24      Q.   Okay.
```

```
 1          A.    She's a good person.

 2                        - - -

 3                A TWO-PAGE DOCUMENT ENTITLED,

 4                "STAFF EVALUATION," DATED 2/7/12,

 5                BATES-STAMPED 000066 AND 0067, WAS

 6                MARKED AS JC EXHIBIT 33.

 7                        - - -

 8          Q.    Handing you what we've marked as Plaintiff's

 9    Exhibit 33.  Does that look familiar?

10          A.    I'm trying to figure out -- Okay. -- based on

11    the date, what it is.

12          Q.    Well, it's --

13          A.    It looks like a 60-day evaluation or

14    something.

15          Q.    Yeah, that's what I was going to suggest to

16    you: --

17          A.    Yeah.

18          Q.    -- It might be about a 60-day evaluation.

19    Does that seem right?

20          A.    Uh-huh.

21          Q.    And it's signed by you and Amy Sayers at the

22    bottom of Page 2?

23          A.    Yes.

24          Q.    She dated it 2/7/12.  Does that sound like
```

162

1     about the right time?

2          A.   Yes.

3          Q.   Do you recall sitting down with her and

4     getting this evaluation?

5          A.   I don't recall the actual sitting-down, but I

6     signed it --

7          Q.   You probably did; right?

8          A.   -- so I probably did.

9          Q.   Okay.  Looking at the second page, about

10    two-thirds of the day down, under "Strengths and Goals

11    ... 60 days:  Joseph is currently taking a five-patient

12    assignment."

13               Do you know how that compared or how that met

14    or didn't meet expectations?  Do you have any insight

15    into that?

16         A.   That is the standard patient assignment.

17         Q.   For that floor?

18         A.   For that floor.

19         Q.   Okay.  And am I correct that would be a

20    measure of acuity, a loose measure?

21         A.   I'm not sure exactly how acuity is measured.

22    I think it more is basically on the condition of the

23    patient as opposed to how many.

24         Q.   Yeah.  Because obviously, the more sick they

163

1    are, the more needy they'll be?

2        A.   Right.

3             And so like in other departments, like ICU,

4    they are only going to have like maybe one or two

5    patients.

6        Q.   Fair enough.

7             Next sentence:  "He is struggling with time

8    management and organization."  Do you recall her

9    mentioning that to you --

10       A.   Yes.

11       Q.   -- in this evaluation?

12            Was that an issue that she discussed with you

13   periodically through your employment at OhioHealth?

14       A.   Yes.

15       Q.   And it goes on to state that the management

16   team has decided to provide an extra week of

17   orientation to ensure you are fully prepared to be on

18   your own and successfully complete orientation on

19   February 17.  Delivering great customer service to all

20   customers; has developed several nursing skills during

21   orientation.

22            I take it this was -- What was your take-away

23   from this evaluation?  Good evaluation?

24       A.   Yes, I think it was pretty normal.  That's

164

1    one of the standard issues when you become a nurse, is

2    time management, because you've got many things going

3    on.  So that's fairly common.

4         Q.   Lots of responsibilities, including taking

5    care of patients; correct?

6         A.   Charting, --

7         Q.   Charting, administering --

8         A.   -- med passes.

9         Q.   -- medications, and it will ebb and flow in

10   terms of the intensity with which you have work to do?

11        A.   Right.

12        Q.   Okay.  Let's go ahead and mark this as 34.

13                        - - -

14             A ONE-PAGE DOCUMENT ENTITLED,

15             "STAFF PERFORMANCE EVALUATION,"

16             12/5/11 TO 3/5/12, AND NINE PAGES

17             OF ATTACHMENTS, BATES-STAMPED

18             000052 THROUGH 0061, WERE MARKED AS

19             JC EXHIBIT 34.

20                        - - -

21        Q.   This is another Staff Performance Evaluation.

22   If you look at just about a quarter of the way down on

23   the first page, it looks like it's a 90-day evaluation.

24        A.   Yes.

1      Q.   With a "Balanced Scorecard" score, and at the

2   bottom right-hand corner, circled is "Acceptable."  I

3   take it that's given the total points of 1,060 which

4   were scored on the evaluation.  Is that your

5   understanding?

6      A.   Yes.

7      Q.   All right.  And do you recall sitting down

8   with Amy on or about March 5, 2012 to get this

9   evaluation?

10     A.   Yes, I do.

11     Q.   Now, this would have been for the period, it

12   says at the top, December 5 through March 5.  I take

13   it, though, you would have received this evaluation

14   upon your return to work?

15     A.   No.  This was before my --

16     Q.   Oh, 12.  I'm sorry.  I'm in the wrong year.

17   My fault.

18          All right.

19     A.   I had basically just come out of orientation

20   in February.

21     Q.   Exactly.  Yeah, so this was 90 days in.  I'm

22   in the wrong year.  And you sat down with her and

23   received this evaluation.  If I direct you to Page 4 of

24   the evaluation, there is a heading at the top, "Goal

166

1    Setting."

2         A.   Yes.

3         Q.   It lists "Employee Strengths" and then it

4    lists some "Development opportunities"; again, time

5    management, organizational skills is mentioned; is that

6    right?

7         A.   That's correct.

8         Q.   This is Bates Page 60.

9              Do you have any issue with this evaluation

10   you got back in March of 2012?

11             Did you dispute it at all?

12        A.   No.

13        Q.   I take it your answer would be the same for

14   the 60-day evaluation we looked at?

15        A.   That's correct.

16        Q.   No dispute with it, either?

17        A.   No dispute.

18             MR. ASENSIO:  Let's go ahead and mark this as

19   35.

20                        - - -

21             A SEVEN-PAGE DOCUMENT ENTITLED,

22             "2012 DECEMBER ASSOCIATE ANNUAL

23             REVIEW, 12/1/12 TO 4/30/13,"

24             BATES-STAMPED 000685 THROUGH 0691,

167

1          WAS MARKED AS JC EXHIBIT 35.

2                    - - -

3     Q.    Can you identify this document?

4     A.    It's an annual review for the period -- most

5  of which I was on disability leave -- starting December

6  1st of 2012, I was not physically there, up until --

7  actually returning to the floor would have been, what,

8  March 25th.  So it's less than a 30-day review.  But

9  the comments incorporate comments from prior to

10  December 1st, 2012.

11     Q.    Assuming you would have gotten an annual

12  review on or about your anniversary date, that would

13  have been sometime in early December of 2012; right?

14     A.    Yes.

15     Q.    And at that point in time, you note correctly

16  you weren't at work, you were on a leave of absence;

17  right?

18     A.    Correct.

19     Q.    And it's entitled under your name there,

20  "2012 December Associate Annual Review."  Then it has

21  the period, 12/1/12 to 4/30/13; correct?

22     A.    Yes.

23     Q.    And based on the comments here and based on

24  your recollection of receiving the evaluation, did it

168

1   cover a period of time of a year plus the additional

2   months that you had been working up until 4/30 of 2013?

3        A.   What period are you talking about?

4        Q.   The period that was covered in the

5   evaluation.  Did it cover the first year, your annual

6   review, plus this additional period of time, as best

7   you can recall?

8        A.   It makes comments based on prior to December

9   1st when I was having medical issues.

10       Q.   That's fair.

11            And under "Overall Score," you are rated as a

12  1.33; is that right?  On Page 1?

13       A.   I know there was various pieces to this

14  because there was a unit rating and --

15       Q.   Yeah.

16       A.   -- then individual.  I'm assuming that that

17  is correct.

18       Q.   Okay.  Yeah, on Page 1, it looks like there's

19  "Overall Score" about halfway down the page?

20       A.   Yeah.  It's kind of hard to figure this thing

21  out.  I don't think it's --

22       Q.   It's got an "Overall Assigned Rating" of 1;

23  "Overall Calculated Rating" of 1.33; and then it had

24  some "Comments"; correct?

169

1        A.   Yes.  Correct.

2        Q.   Then if you flip three pages in to Bates 687,

3   there are a number of ratings that are under the

4   heading, "OhioHealth Goals"?

5        A.   Right.

6        Q.   And if you look through those, it seems that

7   those might be ratings that are applied not just to you

8   but to the floor, to the group?

9        A.   That was my understanding.

10        Q.   All right.

11             Then if you turn another page and about

12   halfway down -- This is on Bates 688. -- there is a

13   heading, "OhioHealth Competencies," which, looking

14   through this section, looks to be individual ratings

15   again.  Was that your understanding?

16        A.   Yes.

17        Q.   And then if you look on the final page, 691,

18   under the heading, "Manager Final Feedback" and

19   "Signatures," it references "Electronic signature

20   confirmation" by you on the 22nd of April; a meeting

21   that was held on the 22nd of April; Manager final

22   feedback completed on the 22nd of April.  Does that all

23   seem about right?

24        A.   Yes.

1       Q.   Did you agree with this evaluation?

2       A.   At the time, I wasn't really expecting that I

3   was going to get this evaluation, having only been back

4   less than a month.  So it was a surprise to me that I'm

5   getting an annual evaluation.

6       Q.   Okay.

7       A.   As I stated, I had issues with comments

8   because they were related to instances when I was on

9   medical leave, my absences because of my medical

10   issues.  So most of these are what's on the warning

11   back in November.

12       Q.   Back before you went on your leave of

13   absence?

14       A.   Immediately before.

15       Q.   Okay.

16       A.   So --

17       Q.   So you had issues with those; is that

18   correct?

19       A.   I just had probably signed it because -- I

20   don't know why.  I mean, I just -- to be cooperative.

21       Q.   All right.  And irrespective of what you

22   signing it meant, I guess I'm just asking you:  Did you

23   have an issue with it; did you agree or disagree?

24            Sounds like you disagreed with parts of it?

171

1        A.   Yes.   I disagreed with the context.

2        Q.   What do you mean?

3        A.   I think I may have even mentioned the fact,

4   "You're giving me an evaluation based on five days that

5   I have been back on the floor."

6        Q.   Although you --

7        A.   Technically, this said December 1st.

8        Q.   Well, I guess you're reading it a little

9   differently than I did.  I was reading it as a 2012

10  December Annual Review and then I assumed that it was,

11  in addition, the period 12/1/12 to 4/30/13.  So that

12  was one of my questions earlier, was whether this

13  review encompassed that whole, you know, 15, 16-month

14  period, whatever it may have been.  Do you know?

15       A.   I'm going by what's stated on here.

16       Q.   Yeah, and --

17       A.   So the basis that I disagree with it is

18  because the comments are related to prior to that, when

19  I was having medical issues.

20       Q.   Do you recall whether Amy indicated to you,

21  at the time you discussed this, what period of time it

22  covered?

23       A.   I don't recall, because it happened -- she

24  asked me like when I was at the end of a shift, doing

172

1    charting, "Can you come back and we'll do your review,"

2    so I -- it was like unexpected.

3        Q.   And so I'm clear with the rating system, do

4    you recall, was it based on a zero through four system;

5    if you recall?

6        A.   Yeah, she had explained that their rating

7    system changed or something; this was new.

8        Q.   So if you look under the "Overall Score" in

9    the "Comments" section, it states:  "During the past

10   year, Joseph has received a written Performance

11   Management Record" -- what I think is referred to as a

12   "PMR -- "in his attendance and a written Performance

13   Management Record for performance concerns."  Skipping

14   the next sentence, it then states:  "Joseph continues

15   to struggle with time management and organization as

16   evident with staying hours past the end of his shift

17   sometimes to chart or finish up his work."

18            Was that an issue?

19       A.   It was presented to me as an issue.

20       Q.   Did you believe it to be an issue?

21       A.   Not totally.

22       Q.   In any part?

23       A.   I had a different attitude on how I wanted to

24   care for my patients.  I wanted to spend more time in

173

1    the room with them, so my charting came second.  I

2    would make notes and then I would do my charting later,

3    in a lot of circumstances, which is fairly normal.

4        Q.   Well, when you say it's different, different

5    from what?  Different from policy, different from

6    expectation?

7        A.   I don't -- What most people do.  They want to

8    get out of there when their shift is over.  They want

9    to give report and leave.

10        Q.   Uh-huh.

11        A.   To me, it doesn't matter.  I'm there for the

12    patient, Number 1.  If the patient needs me, I'm there

13    doing work for the patient.  So I think there was a

14    different philosophy between the way I want to do

15    nursing.  You can't do everything in that amount of

16    time and take good care of the patient, in my opinion.

17        Q.   All right.  And this is -- When you say the

18    way you want to do nursing, is that what you want to do

19    as a nurse as compared to what you were being asked by

20    OhioHealth to do?

21        A.   No.  They -- I was doing everything that I

22    was being asked to do.  They wanted me to do it within

23    a certain timeframe.

24        Q.   Sure.  And they wanted you to do it a certain

174

1    way -- Correct? -- by whatever their policies were?

2        A.   And I did.

3        Q.   All right.  But how did that differ from the

4    way you wanted to conduct nursing?

5        A.   You can't always anticipate what the

6    patients' needs are going to be.

7        Q.   Okay.

8        A.   So if you are trying to take care of the

9    patient, they are very -- OhioHealth is very keen on

10   patient satisfaction.

11       Q.   Uh-huh.

12       A.   If you are just running in and out of the

13   room, worried about "Am I going to get my charting done

14   so I can get out of here at 7:30?" then, to me, you are

15   not taking good care of the patient, which is your

16   Number 1.

17       Q.   Let me make sure I understand a couple of

18   things.

19            With charting, for example, you would agree

20   with me -- Wouldn't you? -- that it's very important to

21   have that done at the end of your shift?

22       A.   Yes.

23       Q.   All right.  And why is that?

24       A.   Because it's a record of what you have done.

1      Q.   And that allows whoever replaces you to know

2   exactly what's happened with regard to that patient;

3   correct?

4      A.   That's one of the ways.

5      Q.   Another way would be that you have to give an

6   end-of-shift report?

7      A.   Correct.

8      Q.   And it's very important that you give a very

9   thorough report there; is it not?

10      A.   Right.

11      Q.   And both of those are ways that you can

12   ensure continued good care for that patient; correct?

13      A.   Correct.

14      Q.   And if you look at this "Comments" section --

15      A.   Actual physical charting doesn't mean that

16   notes weren't being taken.

17      Q.   Okay.

18      A.   The physical charting is an electronic

19   document.

20      Q.   And is there a requirement on when that

21   charting has to be done?

22      A.   Whenever you can get it done, by the end of

23   your shift.  There's a -- what I was told is, you know,

24   if there's things missing, you know, we are a 24-hour

176

1   operation.  Sometimes they'll -- you may get a call,

2   "Hey, you forgot to do this."

3           I heard from another nurse she got called

4   back in because she forgot to do something and chart

5   something.  So --

6           Q.   Would that be covered by policy, to your

7   knowledge?

8           A.   I assume it would be.  I don't -- Yeah.

9           Q.   So when you look at the bottom of that

10  section on Page 1, the last full sentence reads:  "The

11  unit educator" -- which I presume is Lindsey Castle?

12          A.   Right.

13          Q.   -- "also coached Joseph recently on giving

14  proper handoffs at shift change."

15          Do you recall that being an issue that was

16  raised with you?

17          A.   I recall there being one incident when I

18  was ....

19          She normally does not take patients, or she

20  never has taken any of my patients except that one

21  time, and as I was trying to give report to her,

22  another person was coming up and talking with her at

23  the time and there was one -- I had not finished an

24  admission fully, which you are allowed to hand off part

177

1    of that, which I told her about.

2            She told me the next shift when I came in,

3    gave me the patient back, that I did not tell her that.

4            And I said, "I did, but you were in the

5    middle of a conversation with somebody else.  You

6    didn't hear me."

7            And then I think I asked Amy if I could

8    record my handoffs and she said no.

9        Q.   Okay.  Other than the one issue that you

10   talked about with Ms. Castle, do you recall that issue

11   being raised with you about having good handoffs, good

12   reports at the end of shift?  Do you recall other

13   instances?

14       A.   I think that was part of what was mentioned.

15   There was one nurse that mentioned that on the first

16   written warning.

17       Q.   All right.  If you look at 688, Bates Stamp

18   688, at the very bottom, under "Associate

19   Communication," the comment is:  "Joseph has struggled

20   throughout the past year with documentation not meeting

21   the required expectations/hospital policy."

22            Do you recall that being raised with you as

23   an issue?

24       A.   I don't agree with the comment.

178

1          Q.   Okay, and that's fine.  I understand that.

2     But you recall it being raised with you; do you not?

3          A.   Right.  There were a couple what I consider

4     to be minor things where this didn't get charted at

5     this specific time but I charted around it.  I forgot

6     this one time.

7               But again, it was all about patient safety,

8     and the patient was never in an unsafe, you know,

9     situation with me, ever.

10         Q.   If you look on the next page, 689, under

11    "Associate Financial Accountability," it references

12    "... numerous absences in the past year and currently

13    has a written Performance Management Record for his

14    attendance."

15              Would that have been one of the issues that

16    you were spoken to about just prior to your leave of

17    absence?

18         A.   Yes.

19         Q.   If you look at the next one, "Associate

20    Planning, Decision-Making, and Execution," the comment

21    there:  "Joseph struggles with time management and

22    organization.  Sometimes he is still on the unit

23    several hours after the end of his shift finishing

24    charting."

179

1          Do you recall that issue being raised with

2    you?

3          A.   Yes.

4          Q.   Do you recall that being a problem:  That you

5    were taking too much time after the end of your shift

6    to finish up charting?

7          A.   I didn't -- I knew that they were concerned

8    about it.  I'd seen other people be there as long as

9    me.  Again, my concern is the patient, --

10         Q.   Okay.

11         A.   -- patient care, you know, while I'm with --

12    while I'm responsible for that patient.

13         Once I hand them off, if there are things I

14    need to do, then I stay and do them.

15         Q.   Looking at the next page, 690, under

16    "Associate Teamwork."

17         A.   Uh-huh.

18         Q.   "Sometimes Joseph struggles to keep up with

19    his workload so he is not always to helps (sic) other

20    peers on the unit."

21         Do you recall that being an issue?

22         A.   No.

23         Q.   Okay.

24         A.   She didn't work my shift.

180

1    Q.   She didn't -- Did she? -- "she" being Amy?

2    A.   Correct.

3    Q.   So if I understand this right, Amy worked

4    days; right?

5    A.   And weekdays.

6    Q.   And weekdays.  Whereas you worked weekends

7    and nights?

8    A.   (Affirmative nodding of head.)

9    Q.   So you two would never work at the same time;

10   right?

11   A.   Not unless we crossed paths on a morning.

12   Q.   Which probably would have been --

13   A.   Sometimes -- Go ahead.

14   Q.   -- pretty rare; right?

15   A.   Correct.

16   Q.   So obviously Amy wasn't able to observe these

17   things firsthand; was she?

18        If she wasn't working on the same shift with

19   you, she couldn't have?

20   A.   I don't -- I don't know.

21   Q.   Well, I mean, if you are working and she's

22   off work, she couldn't have observed it firsthand;

23   right?

24   A.   I would assume not.

181

1      Q.   She's not there?

2      A.   The morning -- If she was there a morning

3  when I was handing off a patient, I -- I can't say she

4  was never there.

5      Q.   And that's fine.  But she was rarely there, I

6  said, I think?

7      A.   Right.

8      Q.   You agreed with me on that.  So it's very

9  unlikely that she would have observed these things

10  firsthand; right?

11      A.   Correct.

12      Q.   And in fact, she had to rely on what was

13  reported to her by others?

14      A.   I don't know where she got her information

15  from.

16      Q.   We would have to ask her, then; right?

17      A.   Yes.

18      Q.   What is "MEWS"?  Are you familiar with that

19  acronym, --

20      A.   Yeah.  Yes.

21      Q.   -- M-E-W-S?

22           What is that?

23      A.   It's just a scoring method where we look at a

24  patient's respirations, heart rate, their blood

1  pressure, things like that, and we score it depending

2  on what's -- you know, the nursing tech takes the vital

3  signs at the beginning of the shift, so if they score a

4  certain level, then there's protocol as to what the

5  nurse is supposed to do based on that score.

6       Q.   So it's a test of some sort that they -- or a

7  scoring system, and if they score at a certain level,

8  then there are things that you need to do for the

9  patient?

10      A.   More or less, you are supposed to --

11 depending on what the score is, maybe you monitor their

12 vital signs on a more-regular basis.

13      Q.   All right.  Do you keep up with the MEWS

14 score, then, for the patients, trying to -- keep up on

15 that score so you understand what the needs are going

16 to be and the protocols are that you should follow?

17      A.   Yes.

18      Q.   Do you recall being counselled by Ms. Castle

19 about that back in March of 2012; --

20      A.   Yes.

21      Q.   -- her sitting down with you and counselling

22 you about the importance of doing that and keeping up

23 with it?

24      A.   Right.  She said that I didn't -- There was

183

1   something that I didn't do, I know.  I don't recall the

2   exact.

3              Again, I asked for copies of everything,

4   specifically, after the fact but was not given any.

5        Q.   Okay.

6        A.   Most of it's verbal.

7        Q.   Okay.  And what I'm asking is whether it was

8   a verbal counselling; you know, nothing that you were

9   given in writing.  It wasn't disciplinary; was it?

10       A.   I'm not -- At the time, I was not familiar

11  with how they did their disciplinary.

12       Q.   All right.

13             MR. ASENSIO:  Let's go ahead and mark this as

14  the next one, 36.

15                       - - -

16             A FOUR-PAGE DOCUMENT ENTITLED,

17             "PERFORMANCE MANAGEMENT RECORD,"

18             DATED 10/10/12, BATES-STAMPED

19             000205 THROUGH 0208, WAS MARKED AS

20             JC EXHIBIT 36.

21                       - - -

22  BY MR. ASENSIO:

23       Q.   Can you identify this for me?

24       A.   Yes.

184

1        Q.    What is it?

2        A.    It's a PMR related to attendance.

3        Q.    And it's a verbal; right?

4        A.    Yes.

5        Q.    And then there is a section in there called

6    "Description of Behavior/Situation & Impact," and it

7    lists unscheduled occurrences; correct?

8        A.    Correct.

9        Q.    Okay.  Then the "Expected Outcome/Plan of

10   Action," states:  "According to the attendance policy,

11   you have exceeded the attendance expectations of a

12   full-time associate with eight unscheduled occurrences

13   in the past 12 months."

14            And then I see your signature, Ms. Sayers'

15   signature, and Ms. Griske's signature; and it looks

16   like it was presented to you and signed on the 10th of

17   October; is that right?

18       A.    Yes.

19       Q.    And if you look, the next couple of pages,

20   Bates 206 and 207, appear to be basically a listing of

21   your hours over a certain period of time; and then on

22   the final page, 208, are some handwritten notes signed

23   by Ms. Sayers?

24       A.    Yes.

1      Q.   And I take it this is from your meeting that

2   you had with her on the 10th of October?

3      A.   Yes.

4      Q.   If you look at the second sentence, it says,

5   "Joseph agreed that he is very overwhelmed at times on

6   the unit.  Joseph discussed some personal concerns he

7   is dealing with at this time."

8           Do you recall that conversation with them

9   back on the 10th of October?

10      A.   I don't recall specifically those words.

11      Q.   All right.  Do you recall indicating that you

12   were overwhelmed at times on the unit?

13      A.   I don't recall.

14      Q.   May have, may not have; just can't remember?

15      A.   I don't.  Yeah.

16      Q.   All right.  And when I ask that --

17      A.   I was not presented --

18      Q.   And when I ask that, here is what I'm trying

19   to get at:  Sometimes when you say "I don't" -- and I

20   don't mean you, but if a person says "I don't recall,"

21   they could mean "I didn't say that."  That's one way

22   that could be interpreted.  Another way that it can be

23   interpreted is, "I may have, I may not have; I just

24   don't remember."  And so I'm trying to get a

186

1    distinction there between -- If you don't remember,

2    that's fine?

3        A.   Again, words mean a lot.  I don't remember

4    those specific words.

5        Q.   Okay.

6        A.   I know I discussed my anxiety.

7        Q.   Would that be personal concerns that you had

8    at that time?

9        A.   Yes.

10       Q.   Any other personal concerns besides the

11   anxiety?

12       A.   I don't remember.

13       Q.   Okay.  And just so I'm clear, when you had

14   these discussions with Ms. Sayers and Ms. Griske, did

15   you present it like that:  That, you know, "I've got

16   some anxiety issues"?  Or did you go into detail about

17   what those were?

18       A.   Well, like I said, I kept them aware of all

19   of these absences.  I had doctors' excuses or hospital

20   excuses as the case may be, and I guess beginning

21   with -- probably the neck pain was the first thing that

22   I made Amy aware of when it caused a hospital stay.

23   That was the beginning of July, right at the end

24   there -- the end of June, beginning of July; and then

187

1    that issue -- then it became an anxiety issue that

2    caused .... And it just kind of went from there, the

3    anxiety and ....

4            But I thought I'd presented it in a way to

5    her that these were outside issues that were adding to

6    my stress and I didn't say -- I didn't think I

7    presented it in a way that the job was causing me;

8    because I was, I thought, performing well on the job.

9    I didn't have -- I came out of orientation in February.

10   I hadn't really gotten any complaint except for the

11   MEWS, that one little MEWS thing.  There was nothing

12   until this attendance.

13       Q.   In the remainder of the comments that she has

14   on Bates Page 208, she encourages you to use your EAP

15   resource?

16       A.   Right.

17       Q.   And states, "We provided Joseph with some

18   other less acute nursing situations, units, and

19   environments that he may be more comfortable in and

20   feel more successful in."

21           Sounds like she was discussing a transfer

22   with you.

23       A.   I was never presented with anything specific.

24       Q.   And then it goes on to state, "Joseph agreed

188

1   to go home and consider if this is the best environment

2   for him to be working in and to look for other

3   less-acute nursing opportunities to transfer to within

4   OhioHealth."

5          Do you recall that being discussed?

6      A.   Yes.

7      Q.   It sounds like there were some significant

8   issues at this time; that maybe it wasn't working out

9   on 7 Orange; is that fair?

10     A.   I would not agree with that.

11     Q.   Okay.

12     A.   In her mind, you would have to ask her that

13  question.

14     Q.   I understand.

15          You wouldn't agree -- If that were her

16  position, you wouldn't agree with it; right?

17     A.   Correct, for the reasons that I stated.

18     Q.   But you recall her raising that issue with

19  you during the meeting?

20     A.   Yes.

21                     - - -

22          A TWO-PAGE DOCUMENT ENTITLED,

23          "PERFORMANCE MANAGEMENT RECORD,"

24          DATED 10/24/12, BATES-STAMPED

189

```
 1          000209 AND 0210, WAS MARKED AS JC

 2          EXHIBIT 37.

 3                    - - -

 4   BY MR. ASENSIO:

 5       Q.   This is another PMR.  This one purports to be

 6   a written warning.  And it is dated 10/24, it looks

 7   like is when it was signed by you, Ms. Sayers and

 8   Ms. Griske.  Do you recall this issue?

 9       A.   Are you asking me?

10       Q.   Yes.

11       A.   Yes.

12       Q.   It cites "Previous Corrective Action" about a

13   third of the way down on Page 209?

14       A.   Yes.

15       Q.   Refers to that "Verbal coaching for MEWS

16   Documentation," which we talked about.

17            "Verbal coaching for Restraint Documentation"

18   back in March; and a "Verbal for Attendance."

19            And then it goes on to talk about, in the

20   next section, "Description of Behavior/Situation &

21   Impact," what appears to be documentation issues

22   concerning restraints; is that right?

23       A.   That's what's written.

24       Q.   And what was the issue, as you understood it,
```

190

1    that was being raised with you?

2        A.   They were saying that I had a patient that

3    was in restraints and I did not document on that

4    patient at all.

5             I also had another patient that was in

6    restraints who I did document on, but I didn't document

7    every situation in that Restraint Documentation area.

8    So I kind of charted around it.

9        Q.   And did you agree or disagree with this?

10       A.   And normally what happens is:  You are given

11   a chance to complete your charting as opposed to having

12   this (indicating.)

13       Q.   So instead of issuing you any discipline, you

14   believe you should have been just simply given an

15   opportunity to amend the charting?

16       A.   That is normally what happens.

17       Q.   And how would you know that?

18       A.   Because other -- when you discuss it with

19   other people, they say, "I was called in because I'd

20   forgot this charting."

21       Q.   And this references an issue on the 13th of

22   October and 14th of October; correct?

23       A.   Right.

24       Q.   And this was presented to you on the 24th;

191

1    right?

2        A.    That's the way it looks, yes.

3        Q.    In Item Number 2, what's the issue that's

4    being raised there with regard to --

5        A.    Can I get back to 1?

6        Q.    What do you want to add about 1?

7        A.    That this was part of when I came back,

8    the -- it says -- Where I did not document anything

9    from a day-shift nurse, those restraints were not on

10   the patient.  There was nothing to document.

11       Q.    Are you talking about the first patient or

12   the second patient?

13       A.    10/14:  "Day shift RN believes the restraints

14   were removed prior to start of his shift."

15       Q.    Okay.

16       A.    To me, it's not an issue.  "He removed" --

17   "He removed the restraints."  I did not get a patient

18   in restraint.

19              I had one patient in restraint.  They're

20   saying I had the second patient.  I never charted on

21   that patient.

22       Q.    Okay.

23       A.    That second patient was never restrained when

24   I got them.

192

1      Q.   I get you.

2      A.   They're saying I -- I can't chart something

3   that's not there.  They're saying I should have charted

4   something that wasn't there.

5      Q.   So you took an issue with the second one?

6      A.   Right.

7      Q.   Did you raise that issue at the time?

8      A.   They presented this to me.  They had me come

9   in.  In my anxiety, I was depressed.  I went home,

10   slept.  Took pain -- or sleep medications.

11      Q.   You didn't raise the issue with them at the

12   time?

13      A.   I may have.  I don't recall.

14      Q.   Okay.  Item 2 referencing admitting a new

15   patient on the unit.  Do you recall what this issue

16   concerned?

17      A.   Yes.

18           Can I add something to this?

19      Q.   Go ahead.

20      A.   This is what happens, is:  I'm not given any

21   preview to any of these things and I'm brought in to

22   recall specific instances that I may not have a

23   recollection of and I'm supposed to remember off the

24   top of my head what happened.  You're doing hundreds of

193

1    things per night and I'm supposed to remember specific

2    things on the spot.

3        Q.    It was a challenge; wasn't it?

4        A.    It was more than a challenge.

5        Q.    Okay.  And I know it's a challenge me asking

6    you these questions, you know, quite a bit of time

7    later --

8        A.    Right.

9        Q.    -- many months, if not years later, but I do

10   want to find out as best you can recollect --

11       A.    Yeah.

12       Q.    -- what you believe, --

13       A.    I remember being presented -- Oh, sorry.

14       Q.    -- what the issue concerned.

15            So with regard to Item 2 there, you know, and

16   having this in front of you, this purports to be

17   documentation with regard to a flu vaccine and whether

18   or not that was done appropriately.  Do you recall the

19   incident at all?

20       A.    Yes.

21       Q.    What do you recall about it?

22       A.    What I recall is:  I had done an admission on

23   a patient to that unit during my shift.  There's a

24   section on the admission charting where you check --

194

1   you ask the patient whether they've had a flu

2   vaccination or any kind of vaccination, you know,

3   pneumonia vaccination.

4          Q.    Right.

5          A.    And evidently, I -- evidently, I didn't check

6   it -- Let me see.  I don't remember what I didn't do.

7          Q.    It says on the second line, "... he did not

8   click on the Rx to Dispense box for the patient to

9   receive the vaccine the next morning."

10         A.    Right.  That's correct.

11         Q.    Does that ring a bell?

12         A.    That rings a bell.

13         Q.    Okay.

14         A.    I can only assume that -- the charting, the

15  way it was presented.

16         Q.    Item 3, a couple of different issues there.

17  If you read the first couple of sentences, it looks

18  like, on the weekend of the 19th and the 20th, you were

19  floated to another telemetry unit.

20         A.    Yes.

21         Q.    So would that have been a different unit than

22  7 Orange?

23         A.    Yes.

24         Q.    Do you recall where it was?

1      A.    I don't remember the floor number.  It was 2

2  or 3 Heart, is what they called it.

3      Q.    Did you know the folks you were working with

4  down there?

5      A.    No.

6      Q.    All right.

7      A.    That's the first time I'd ever floated.

8      Q.    And it goes on to state, "His nursing

9  colleagues on that unit said that they had to help him

10  a lot throughout his shift, and one of Joseph's

11  patients asked if he was really a nurse.  The patient

12  and his colleagues were very concerned since Joseph

13  appeared to not know what was happening with any of his

14  parents in his assignment."

15          Do you recall having some issues with this

16  assignment back on the 19th or 20th?

17      A.    Not to this degree; --

18      Q.    Okay.

19      A.    -- not the way it's written.

20          When I came to the unit, I had told them it

21  was the first time I'd ever floated.  They said, "If

22  you need any help, ask."  So whenever I needed help, I

23  asked.  At no time did anybody say, "You shouldn't be

24  asking that question," --

1      Q.   All right.

2      A.   -- challenging me that I didn't know what I

3  was doing.

4      Q.   You don't recall the specifics of this being

5  presented to you by the people on the unit?

6      A.   No.  I was never presented anything by anyone

7  on the unit; just by Amy when I got this.

8      Q.   The last section of this paragraph concerns

9  an alleged failure to start a nitro drip once it was

10  hooked up.  Specifically, it says, "... he never hooked

11  the nitro drip back up to the patient and never

12  restarted the drip at the ordered rate."

13          Do you recall that issue at all?

14      A.   I believe what I recall is that when the

15  patient was on -- when they were going to receive

16  IV-push Morphine, I had to physically disconnect the

17  nitro drip, pause it, give the push-Morphine for pain

18  medication, and then start it up again.  I know I had

19  to do that repeatedly during the night.

20          Myself, after I heard about this, I

21  questioned whether the patient may have removed it,

22  herself.  She was a very difficult patient.

23      Q.   But you're guessing when you ask that; right?

24      A.   I don't know.

197

```
 1        Q.   Right, you don't know.

 2        A.   I'm suspecting she was the one that

 3   supposedly made that comment.  She was a very nasty

 4   person.

 5             And if you asked the other four patients, I

 6   don't think they would have said that.

 7        Q.   The last sentence in this paragraph, "On the

 8   morning of October 21, 2012, Joseph's nursing peers on

 9   7 Orange stated that Joseph did not give much of a

10   report on his patients and could not answer questions

11   about his patients that he cared for on" the 20th.

12             Do you recall that at all?

13        A.   I recall being presented that and questioning

14   who -- who said that and what didn't I report, and I

15   was not given answers.

16        Q.   Any idea who that would have been?

17        A.   I have a guess.

18        Q.   Who?

19        A.   Kym Koehler.

20        Q.   Why Kym Koehler?

21        A.   Because that's who I suspect said it.

22        Q.   All right.  I mean, what gives you reason to

23   suspect it?

24        A.   Because I -- I just suspect it.  I mean, I'm
```

198

1   trying to remember who all I gave report to.  I know I

2   was having anxiety issues at that -- the end of my

3   shift --

4        Q.   Right.

5        A.   -- and I remember one of my co-nurses

6   noticing that and she said, "Let's go sit down and give

7   report."  Kym is not that type of personality.  She's

8   bam, bam, bam, bam.  "Get in here, you know, give me

9   the report.  I want to get going."  I would say less

10  compassionate to what's going on with her fellow

11  nurses.

12       Q.   And that's why you believe that she may have

13  been the one?

14       A.   Right.

15       Q.   If you look on Page 2, it looks like this was

16  presented to you at 1 o'clock on the 24th of October by

17  Ms. Sayers and Ms. Griske?

18       A.   Yes.

19       Q.   Now, I don't have a calendar on me, but when

20  would you have been next scheduled to work; do you

21  know?

22       A.   I think it was that weekend.

23       Q.   That weekend?

24       A.   I think.

1      Q.   And it was about another week later -- Wasn't

2    it? -- when your sister happened to find you at your

3    home?  It was early in November?

4      A.   I'd have to look at a calendar.  Let's see.

5    The 24th --

6      Q.   When we look at the leave of absence -- I can

7    pull it back up for you.

8      A.   October has 31 days, so -- and I think it was

9    November the 1st and the 2nd, which I didn't --

10     Q.   Yeah.

11     A.   -- I was scheduled for, so that would have

12   been the following weekend.

13     Q.   If you look back at 16, Plaintiff's Exhibit

14   16, which was the note from Mr. Nuss, --

15     A.   Yeah.

16     Q.   -- if you look on Page 2 of that, it

17   references that you were treated at Grant ER 11/4, and

18   he has marked you unable to work from 11/2 to 11/22.

19     A.   Okay.

20     Q.   So this would have been presented to you,

21   this PMR, on the 24th of October, about a week -- a

22   little over a week before --

23     A.   That sounds about right.

24     Q.   -- the issue that you had that caused the

200

1    leave of absence; right?

2         A.   That caused me to ask for the leave of

3    absence.

4         Q.   Right.  Fair enough.

5              Were you working on the 24th?  Was that a day

6    you worked?

7         A.   No.  I was called in, as I recall.

8         Q.   If you look at that comment on Page 2 of

9    Exhibit 37, Amy states, "Christy and I spoke with

10   Joseph today about owning the process of finding

11   another position inside or outside of OhioHealth where

12   he can be successful."

13             Do you recall her telling you that?

14        A.   Specifically -- I don't remember

15   specifically.

16        Q.   Do you recall her discussing with you again

17   the need that you maybe find an environment that's more

18   suited for you, in her opinion?

19        A.   Probably.

20        Q.   Did you walk away from this meeting feeling

21   that Amy wanted you to look for another job?

22        A.   Yes.

23        Q.   In fact, she told you that you should do

24   that; didn't she?

201

```
 1       A.    She wrote -- What she wrote is probably what

 2   she communicated.

 3       Q.    And that's a fair interpretation of that;

 4   isn't it?

 5       A.    Yes.

 6       Q.    We'll mark this as 38.

 7                        - - -

 8             A TWO-PAGE DOCUMENT ENTITLED,

 9             "PERFORMANCE MANAGEMENT RECORD,"

10             DATED 11/5/12, BATES-STAMPED 000211

11             AND 0212, WAS MARKED AS JC EXHIBIT

12             38.

13                        - - -

14   BY MR. ASENSIO:

15       Q.    This is another PMR, but unlike the other

16   ones, you didn't sign this one.  I'm not sure that

17   you've ever seen this one before.  Have you seen it

18   before?

19       A.    At some point, I believe I did, but it wasn't

20   at the time that it happened.

21       Q.    It purports to be a draft of a written PMR

22   and for attendance issues.  It's signed by Amy Sayers

23   11/5 of '12 on the first page.  On the second page, she

24   writes that you are no-call, no-show on 11/2 and 11/3.
```

1   "... never called back to review this written PMR the

2   week of October 29th."  Attempted phone calls

3   unsuccessful on the 30th and 2nd.  "Have talked with

4   Joseph on 11/5 (today) ... he will be going out of

5   medical leave ... for an unexpected period of time."

6            And again, this was never presented to you;

7   was it?

8        A.   Not physically.

9        Q.   Well, not at all; right?

10           I mean, did you ever -- did she ever give

11  this to you as a form of discipline?

12       A.   No.

13       Q.   And this would have been --

14           The no-call, no-show, I think you referenced

15  that when we spoke about the issue with the sleeping

16  meds and the alcohol; that you did no-call, no-show.

17  That's accurate -- Isn't it? -- for those two days of

18  work?

19       A.   Yes.

20       Q.   And I don't believe that anybody was able to

21  get ahold of you until your sister finally did?

22       A.   Right.

23       Q.   Okay.

24       A.   And then there were voice mails which I

203

1 listened to after-the-fact where Amy had attempted to

2 call me because she had asked me to come in, I assume,

3 for this purpose, and I wasn't getting any messages

4 because I wasn't answering my phone.

5   Q. Okay.  Then you went on the leave of absence?

6   A. Yes.

7   But I think in the phone call, she did refer

8 to:  "You had some more absence issues."  So that's

9 what I recall.

10   Q. Sure.  I mean, she would have called you

11 because you didn't show for work; right?  She didn't

12 know what happened to you until later?

13   A. Right.

14   Q. What do you recall about that phone call with

15 Amy on the 5th of November?  Do you have any

16 recollection of that?

17   A. Some.

18   Q. What do you recall?

19   A. I know my sister was with me and I knew I had

20 to call Amy and let her know what had happened because

21 there were all these calls from people at work, worried

22 about what had happened to me because no one was able

23 to get hold of me.  That was unlike me.  I was more

24 responsible.  If I missed a day, I would call off.  In

1    this case, I didn't.

2          Q.   Uh-huh.

3          A.   So I called Amy to explain what had happened.

4          Q.   And do you recall what either she said or you

5    said during the phone call?

6          A.   Yes.  I remember her saying, "We need to have

7    people that are more reliable on the floor," and I

8    remember apologizing.  There were probably other things

9    said.  I don't recall specifically.

10         Q.   Would your sister have been on the phone; do

11   you recall?

12         A.   I don't remember.  I know she was there.  I

13   don't know if she got on the phone.  I know she was

14   sitting right next to me.

15         Q.   Do you recall whether she would have

16   indicated to Amy that you had been struggling with some

17   mental-health issues?

18         A.   I don't think she used that word.

19              She knew I was having the anxiety issues.

20         Q.   Okay.

21         A.   I don't think that's a "mental health."

22         Q.   At this point in time, were you living with

23   your sister, at that point?

24         A.   No.

205

1      Q.   Had you moved out of your house at that

2  point?

3      A.   No, I was still at my house.

4      Q.   And your domestic partner was in Puerto Rico?

5      A.   I think, at that time, he was.  I --

6      Q.   How long did he stay in Puerto Rico?

7      A.   Like, it was over a month.  He came back the

8  end of January.

9      Q.   Had he broken up with you?

10     A.   No.

11     Q.   You weren't going through any relationship

12  issues with him?

13     A.   I think he was concerned about my anxiety

14  issues.  I know he was.

15     Q.   Why did he go to Puerto Rico?

16     A.   He hadn't -- He told me he hadn't been in a

17  number of years, which he hadn't.  I don't think he

18  wanted to --

19     Q.   But you weren't having -- Your testimony is:

20  You weren't having any relationship issues at the time?

21     A.   The only issue we had was with the financial

22  part related to his loans.

23     Q.   And that was earlier in the summer?

24     A.   Yeah.  But that had been resolved.  I mean,

1    that ....

2        Q.   During that call, did Amy tell you that since

3    you were going out on a medical leave, that your

4    position would be posted?  Do you recall her telling

5    you that?

6        A.   I don't remember.

7             I know Rose told me sometime near the end of

8    November, I believe, on a phone call to not be

9    surprised that my position would be filled.

10       Q.   Well, and you got the correspondence, the

11   first form letter that we saw from Amy that told you

12   the same thing, as well, at some point in November;

13   right?

14       A.   That's what it says.

15       Q.   Yeah.

16            In that phone call, which would have been on

17   November 5, do you have any recollection of her telling

18   you, though, specifically that your job would be

19   posted?

20       A.   Like I said, I remember her saying, "We need

21   to have people here that are -- will show up when they

22   are scheduled."  So I assumed I did not have a position

23   on that floor at that time.

24            The tone of the conversation was such that I

1  did not think I had a job there on that floor.  Does

2  that answer the question?

3      Q.  Okay.

4          After that phone call, you were on your leave

5  of absence and most of your contact with OhioHealth

6  would have been through Rose, Jean, or Michael Kramb;

7  correct?

8      A.  Right.

9      Q.  Did you have any further contact with Amy

10  after the 5th of November?

11      A.  Not that I recall.

12      Q.  Probably not any further contact with her

13  until maybe some point around March when you returned?

14      A.  Right.

15          I mean, I eventually received that letter.

16      Q.  I know you received the correspondence --

17      A.  Okay.

18      Q.  -- but I mean --

19      A.  Conversation?

20      Q.  -- conversation over the phone or in person?

21      A.  I don't recall any.

22      Q.  Okay.

23          All right.  When you returned to work, do you

24  recall an issue about a patient medicine box being left

1  open?

2       A.   Yes.

3       Q.   What was that all about?

4       A.   Again, it was over a weekend.  Chasidy Crist,

5  who was also a clinical nurse manager -- I think she

6  had just recently become clinical nurse manager for the

7  night shift.  She had -- on that day, she said that

8  there had been a UOR, which is an Unusual Occurrence

9  Report, reported that I had left -- or a room that I

10  was in, there was a med. box left open.

11      Q.   And a couple things just so we get it on the

12  record:  A UOR, Unusual Occurrence Report?

13      A.   Uh-huh.

14      Q.   And who fills those out?  What are those?

15      A.   The way I understand it -- I've never done

16  one myself. --

17      Q.   Okay.

18      A.   -- is:  Anyone can do it.  You can do it

19  either claiming your name or anonymously.  And it's

20  basically if someone sees something unusual -- which

21  med. boxes being left open is not unusual, but be that

22  as it may -- then they can use that system.  I think

23  you can either call an 800 number or get on the

24  computer and, you know, --

209

1     Q.   Report it?

2     A.   -- report what happened.  And then it's my

3 understanding that then goes to management to find out

4 what -- you know, what happened here; and then I don't

5 know what they do with it after that.

6     Q.   So they may follow up with it, depending on

7 what it is; right?

8     A.   Right.

9     Q.   So this was about a patient medication box.

10 What are those and where are those located?

11     A.   They are located in the patient's room; and

12 it's a box, basically, that nurses and -- generally,

13 it's just the nurses have a key to.  All the nurses on

14 the floor have a key to every med. box.  Pharmacy will

15 load medications in there at the beginning of the day.

16     Q.   For that patient?

17     A.   For that patient.

18     If there's any medications that are -- you

19 know, like Morphine or anything like that, they would

20 not be in that box.

21     Q.   Those come out of a Pyxis machine; don't

22 they?

23     A.   They come out of a Pyxis.

24     Q.   Right.

210

1     A.   So it's just basic medications, you know,

2  like their daily meds.

3     Q.   All right.  May even be stuff they brought

4  from home; right?

5     A.   No.

6     Q.   No?  Okay.

7     A.   Sometimes.  Very rarely.

8         If it's something that the doctor approved

9  for them, that maybe our pharmacy didn't have, they

10  approved us -- it being in their box.

11     Q.   The issue was:  This was allegedly left open

12  by you; is that the issue?

13     A.   That's the way it was reported, yes.

14     Q.   And they're, I take it, required to be under

15  lock-and-key?

16     A.   Yeah.

17     Q.   And did you take issue with this

18  particular --

19     A.   I didn't dispute that it may have happened.

20  I disputed the fact that someone saw me leave it open

21  and said -- and decided to run to a computer and file a

22  UOR.  And I said to that person, "I've probably closed

23  dozens of them, myself, for other people."

24     Q.   And again, this was something that was

211

1   presented to you as a counselling?

2       A.   Right.

3       Q.   All right.

4       A.   But my question was:  Did someone see me

5   leave it open?  Just all that was reported was:  It was

6   a med. box in my room.  So, did I leave it open?  I

7   wasn't disputing that I did.

8       Q.   Okay.

9       A.   I'm just meaning why someone saw the need to

10  write it up when it's not an unusual occurrence.  And I

11  presented a fix to it.

12      Q.   Do you recall having Lindsey Castle -- And

13  she was a clinical educator on the floor; is that

14  right?

15      A.   Yes.

16      Q.   What does that person do?

17      A.   They are just responsible, like, for making

18  sure, like, all the new people have all the education

19  that they need to be competent on the floor and --

20      Q.   A trainer, or ...?

21      A.   She does do some training.

22           It would be a better question to ask Amy.

23  I'm not sure what all her responsibilities are.

24      Q.   Do you recall having a coaching session with

1   her in about April of 2013 dealing with the importance

2   of having a well-documented report that is presented at

3   the end of shift?

4        A.   Let me think.

5             I don't think she told me specifically.  I

6   don't recall that specific incident.  I remember that

7   being on one of my PMRs afterwards and then me

8   questioning the specifics of it.

9        Q.   Okay.  This is another issue that I want to

10  raise with you.  I don't think you received a PMR for

11  it but it was an issue that involved medication

12  administration and it would have happened around the

13  end of April 2013.  The specific issue involved a

14  patient who, at some point, lost a wristband, the

15  identifying wristband, and I think the allegation was

16  that you had provided medicine to this patient despite

17  the fact that you couldn't go through the procedures

18  associated with patient identification through the

19  wristband as you normally would.  Do you recall the

20  issue?

21       A.   I recall the issue.

22       Q.   Okay.  And just to now back up and start

23  making sure I understand bits and pieces of this:

24  Patients come in --

213

1          And, you know, I've gone in and gotten a

2     wristband when I go in and I get services at the ER or

3     get admitted or something like that, and I assume

4     that's common with all patients; right?

5          A.   Yes.

6          Q.   And that wristband that you wear identifies

7     you as a patient; correct?

8          A.   It identifies you as that patient.  It's a

9     way of identifying you as that patient.

10         Q.   Fair enough.

11              But it has a bar code which will identify who

12    I am; it can be scanned; is that right?

13         A.   Correct.

14         Q.   And so by system, if you will, or policy,

15    there are certain processes and procedures, such as

16    medication, where what you are required to do is go in

17    and -- before you administer medications, you would go

18    in and scan that wristband, which would make sure that

19    you have the right patient and would also make sure

20    that, for billing purposes, you know, the

21    administration of that medication is going to get

22    allocated to the right person.  Many different uses

23    that could come out of going through that scanning

24    process with the bar code; is that right?

214

1      A.   The main purpose is the identification.

2      Q.   Okay.  And you're probably exactly right with

3  that from a patient-safety standpoint; right?

4      A.   Right.

5      Q.   And so the protocol, as I understand it, is

6  that you are supposed to go through and scan the

7  patient in order to administer medications?

8      A.   There's more than that -- more steps than

9  that.

10      Q.   Please tell me.

11      A.   There is something called the "5 Rights."

12  Before you give any medication, you are supposed to --

13  well, the rights are:  The right medication; the right

14  time; the right dose; the right route.  That's four.

15  When you scan the medication in the system, four of

16  those are done.  The 5th Right is:  The right patient.

17  The right patient is:  "Can you tell me your name and

18  date of birth?"  When they repeat back their name and

19  date of birth, that's the 5th Right.

20         You are also, then, supposed to scan that

21  patient to prove that you scanned the patient.  There

22  is an override if the wristband is not readable or is

23  not on the patient.  You can say -- I don't remember

24  the exact wording, but like:  Unable to scan wristband,

1    but the 5 Rights were done.

2         Q.   Okay.  And help me out.  The first one was

3    what?  The right medication?

4         A.   The right medication, the right time, the

5    right dose, and the right route.

6         Q.   What's "route"?

7         A.   Meaning oral, you know, whatever.

8         Q.   Got it.

9              And all those are pretty important; right?

10        A.   Yes.

11        Q.   And then, obviously, the last one, having the

12   right patient, is important as well; and those are the

13   five, kind of, checks that you go through?

14        A.   Right.

15             And in that case, four of them were done by

16   scanning, as per protocol.

17        Q.   And then with this specific issue, the

18   patient at some point lost --

19             Was it a female patient?

20        A.   Yes.

21        Q.   -- lost her wristband; right?

22        A.   I don't know what happened to it.  I have

23   suspicions.

24        Q.   Well, all right, we'll get to that; but at

216

1    some point, she didn't have a wristband; right?

2        A.   Yes.

3        Q.   And I think even at a point when you were

4    caring for the patient and you had to administer

5    medicine, the patient didn't have the wristband; right?

6        A.   At that specific time when I'd already

7    scanned the medication, done four of the five, I wanted

8    to get her wristband, it was not on her wrist.

9        Q.   Right.  So what did you do?

10       A.   So what I did was:  It was, like, right at

11   shift change.  I was trying to get all my, what they

12   call 6 a.m. meds passed.  I think it was a little bit

13   before 7.  And so this patient was right outside the

14   nurses' station.  There was a bunch of people because

15   the new nurses are coming on, the new unit clerk is

16   there.  I remember going to the doorway and I was going

17   to shout to Rene, "Hey, can you print a wristband for

18   this patient?"  She was having a conversation with

19   someone else.

20            Meantime, one of my nurses that I was giving

21   report to passed by -- or I saw her, and then I'd

22   already given the medications.  I was going to get the

23   wristband as soon as I updated that patient.

24            So then -- Do you want the whole thing or are

1  you done?

2      Q.   Yeah.

3           No, tell me.

4      A.   So then I was talking -- Her name was

5  Virginia and I was like one door down and --

6      Q.   Is Virginia an employee?

7      A.   She is a nurse.

8      Q.   Nurse?  Okay.

9      A.   Yeah.

10          I was just giving her a quick update on a

11  patient she'd had the day before so that I could

12  satisfy her so she could get going and then I could go

13  get the wristband, put it on the patient.

14          In the one minute it took to do that, my tech

15  comes running after me, saying, "Joe, did you know that

16  the patient in 14B's wristband is missing?"  And I

17  said, "Yes, I do."  And she said, "Well, what are you

18  going to do about it?"

19          And I was like -- both of us were -- Virginia

20  and I were kind of like taken back, and I said, "I'm

21  going to get another one here in a minute."

22          She spun around, huffed down the hall, and

23  again we looked at each other and I -- Virginia said,

24  "What's wrong with her?"  And I said, "I don't know."

1          Then I go home, because that was like the

2     third UOR in a row and -- I go home and I was talking

3     to my partner about it.  It's like, "Well, you know, I

4     haven't gotten a phone call yet from Amy."

5          Three hours later.

6          So, I suspected that --

7     Q.   That the tech filed --

8     A.   -- Brooke ran to a computer, filled out a

9     UOR.

10    Q.   Okay.  Now, I understand there's some

11    mitigating circumstances with this particular incident,

12    but generally the fact that a patient wouldn't have a

13    wristband is a pretty serious thing; right?

14    A.   Yes.  But the requirement is that you put it

15    on as quickly as possible if it's missing.

16    Q.   Sure.  You would go, like you started to do,

17    and you would go and get the wristband and put it back

18    on -- get a new wristband for the patient?

19    A.   So in the meantime when I was -- after I

20    talked to Virginia, I was heading back to the nurses'

21    station to get that printed, I think it was Brooke

22    said, "We already got it on her," or something like

23    that.  Somebody told me that.

24    Q.   Okay.

219

1       A.   And I'm thinking, "Well, how did you know

2   that that was the patient?" or -- you know, it's like

3   they are accusing me of not knowing the patient.  I'd

4   had the patient three days in a row.

5       Q.   Well, nobody had accused you yet; right?

6   This was still in the morning?

7       A.   No, but it was the whole situation.  Brooke

8   had no reason to be in that room at that time.  It was

9   just very suspicious.  It was my third one in a row in

10  like three days, of something that's not an issue

11  normally.

12      Q.   Now, you suspect that there might have been

13  some foul play, let's say, in getting rid of that

14  wristband; don't you?

15      A.   That's a possibility and I expressed that to

16  Amy.

17      Q.   What did you believe could have happened?

18      A.   That she removed it.

19      Q.   Brooke?

20      A.   Yes.

21      Q.   And what's Brooke's last name?

22      A.   Warren.

23      Q.   She's a tech?

24      A.   Yes.

220

1      Q.   Did you have any facts or evidence that would

2   lead you to believe that she had done that?

3      A.   It was also missing earlier in the night and

4   I replaced it.

5      Q.   So you'd replaced it once already?

6      A.   Yes.

7      Q.   And did Brooke work the same shift as you did

8   through the night?

9      A.   She had that patient with me, yes.

10     Q.   Through the night?

11     A.   Same shift.  Yes.

12     Q.   So why would Brooke have done that?  Why do

13   you believe she would have done that?

14     A.   She's very picky and choosey as to who she

15   likes and who she doesn't like.

16     Q.   But do you think that she would have

17   knowingly put a patient at risk like that?

18     A.   I would hope not --

19     Q.   Okay.

20     A.   -- but that was my suspicion.

21     Q.   Did you have any --

22          Other than having a suspicion, did you have

23   any other facts that led you to believe that she did

24   that?

1      A.   No.

2      Q.   Okay.

3      A.   But when I mentioned it to Amy, her immediate

4  response was:  "You don't have 100 percent proof of

5  that"; and I said, "I know, but I suspect it."

6      Q.   Okay.

7      A.   Because a patient's wristband doesn't

8  disappear completely twice during the night.

9           Second time, I looked all through the room

10  and it wasn't anywhere.  Nowhere.

11     Q.   Those things are tough to get off; aren't

12  they --

13     A.   Yeah.

14     Q.   -- as I recall?

15     A.   And she'd had it on all weekend.  It had

16  never been missing.

17     Q.   Now, even though there was a UOR with regard

18  to this issue, you didn't receive any discipline on

19  this; did you?

20     A.   Well, see, I -- again, I don't know how the

21  system works, --

22     Q.   Well, let me --

23     A.   -- whether that goes in my file or whether my

24  explanation was enough and then it disappears.

1        Q.   You didn't receive a PMR, though?

2        A.   I don't know if it's on -- Is it on any of

3    them?  Not for that, but it may be on, like, a whole

4    list of them.

5        Q.   We could look at the priors, but as far as

6    you know, did you receive a PMR for that?

7        A.   No.  But what I was told:  Amy was going on

8    vacation to Paris and the way they were presenting it

9    to me, her and Christy, it was -- first of all, it was

10   a phone call from both of them so I know once it's a

11   phone call from both of them, that it's a bad issue,

12   from my standpoint; she wants a witness to the

13   conversation on her end.

14            So what she told me was:  "Well, we'll let

15   you know a decision next week."  And she said, "I'm

16   turning it over to Susan Talebi and her boss, Lisa

17   Kinder."  So I knew -- I suspected, since I already --

18   I just suspected they were going to try to fire me.

19       Q.   And did they talk to you:  Lisa Kinder and --

20       A.   Yes.

21       Q.   Do you recall what the conversation was when

22   they talked to you?

23       A.   Yeah.  Lisa didn't have a firm grasp on what

24   was going on.  She thought I'd given the medication

223

1    without even scanning it, and she didn't know and so I

2    told her, I said, "I did all the 5 Rights."

3            I suspected what Amy's plan was going to be:

4    That she was going to turn it over to them and then

5    they were going to ax me.  So I tried to preempt that

6    by sending an e-mail to Amy, copying -- I don't know at

7    the time that Susan was involved directly but I copied

8    Lisa Kinder on that basically stating what had

9    happened --

10        Q.   And bottom line --

11        A.   -- and how I'd complied with the 5 Rights.

12        Q.   -- you weren't fired or disciplined for that;

13   right?

14        A.   Don't know.

15            Is a phone call threatening, basically, your

16   job a discipline?

17        Q.   You didn't receive a PMR and you weren't

18   fired for that; right?

19        A.   I was not fired for that.

20        Q.   Okay.  And in fact, isn't it true that after

21   they met with you, Lisa and --

22            Who was the other person?

23        A.   I think it was Christy Griske.

24        Q.   Christy Griske and Lisa Kinder?

224

1          A.   Yes.

2          Q.   Once they found out your side of the story,

3     they didn't take any discipline; did they?

4          A.   I didn't know what was going to happen.

5          Q.   All right, but they --

6          A.   They didn't -- I don't remember there being

7     any conclusion.

8               MR. ASENSIO:  Let's go ahead and mark this.

9                              - - -

10              A THREE-PAGE CASAGRANDE/SAYERS

11              E-MAIL DATED 4/23/13, BATES-STAMPED

12              000709 THROUGH 0711, WAS MARKED AS

13              JC EXHIBIT 39.

14                             - - -

15              THE WITNESS:  I have a feeling if I wouldn't

16    have sent that e-mail, that I would have gotten fired

17    because that's considered a Red Rule.

18         Q.   Yeah, it's considered a --

19              What are "Red Rules"?  Thanks for raising

20    that.

21         A.   I don't recall all of them but that's one of

22    them.  In other words, you have to do the 5 Rights.

23    Well, I explained that I had done the 5 Rights, so I

24    think that's why --

225

1      Q.   A Red Rule violation is a very serious

2  discipline issue; --

3      A.   Correct.

4      Q.   -- isn't it?

5      A.   Yes.

6      Q.   And one that would normally result in various

7  serious consequences, such as termination?

8      A.   Could be.

9      Q.   Could be.  Okay.

10        And that was your understanding of what a

11  "Red Rule violation" was?

12      A.   Right.

13        But I didn't consider it to be a Red Rule

14  violation.

15      Q.   No.  And in fact, you weren't disciplined for

16  it.  We haven't --

17      A.   No, but they wrote it up as -- I saw that

18  they were going to do it.

19      Q.   And they didn't do it, though; did they?

20        They didn't sit down with you and give it to

21  you?

22      A.   Well, you'd have to ask them why they didn't.

23  They were ready to do it.

24      Q.   Could it be because your explanation was a

226

1   good one?

2      A.   I don't know.  I was never -- I didn't know

3   until all of this started to happen that they'd even

4   written that up.

5      Q.   Okay.

6      A.   But now I do know that they were ready to do

7   it; right?

8       Yes.

9      Q.   Can you identify 39 for me?  Looks like it's

10   an e-mail from you to Amy?

11      A.   Yes.

12      Q.   And it would have been an e-mail that you

13   sent to her after your evaluation?

14      A.   No -- well --

15      Q.   Take a look at the first line.

16      A.   Is it related to the evaluation or --

17      Q.   No, just timing.

18       If you look at the first sentence:  "Hi Amy:

19   Thanks for taking extra time meeting with me yesterday

20   during my evaluation."

21      A.   Yes.

22      Q.   And you reference a UOR -- anonymous UOR for

23   April 21 with regard to not passing your 6 o'clock

24   meds?

1        A.    Correct.

2        Q.    Now, passing your 6 o'clock meds, that's an

3    hour before your shift ends; correct?

4        A.    Well, you can pass meds -- If they are

5    ordered at 6 o'clock, you have an hour before and an

6    hour after as a timeframe to --

7        Q.    To get them delivered --

8        A.    Right.

9        Q.    -- to the patients?

10        A.    Yes.

11        Q.    All right.  So what does it mean when

12    somebody says, "You've got to pass meds at 6?"  That

13    means you've got an hour before, an hour after to get

14    it done?

15        A.    Yes.  Well, yeah.  Sometimes the medication

16    is not on the floor, you know.

17        Q.    Okay.

18        A.    Yeah.

19        Q.    But you have a two-hour window to work with;

20    right?

21        A.    Yes.

22        Q.    And is that what that references?

23        A.    That is.

24        Q.    And 6 o'clock meds, I take it that's probably

228

1    a very common hour to have --

2        A.   Yes.

3        Q.   -- medicine that's prescribed for patients?

4        A.   Correct.

5        Q.   And you offer an explanation in this e-mail

6    about what you did; don't you?

7        A.   I said that that anonymous occurrence did not

8    occur; I did pass my meds.

9        Q.   Okay.

10       A.   So, in other words, "What's going on here?

11   Someone is filing these UORs."

12       Q.   If you look at Page 2, Bates Stamp 710, end

13   of the third paragraph --

14       A.   I'm sorry.  What page?

15       Q.   Page 710.  So it's the second page of this

16   document.

17       A.   Got it.

18       Q.   End of the third paragraph, your last

19   sentence:  "To me, it's that people are complaining

20   about me and writing up unusual" occurrences "about me

21   about passing stuff to day shift because I was

22   essentially given five admissions (Kym's words) during

23   my eight-hour shift."

24            Who did you think was complaining about you?

229

1   We've --

2       A.   I didn't know.

3       Q.   You didn't know?

4            Were you having relationship issues with

5   people you worked with at this point in time?

6       A.   No.

7       Q.   Was there anybody other than -- you know, you

8   identified a couple things with regard to Brooke.

9   Anybody --

10      A.   To my knowledge, that's --

11      Q.   Anybody other than Brooke that you had any

12  issues with at work?

13      A.   Not to my knowledge.  No one brought it to my

14  attention.  I was not told that anyone was having

15  issues with me.

16      Q.   In the next paragraph, about five or six

17  lines into it, you say, "I feel so good about how I

18  took care of this patient that all the other stuff

19  didn't matter although it is troubling to me and I am

20  confused and thinking that there are people that I

21  should be able to trust that are trying to attack me."

22           And was that just a general thought about the

23  UORs or did you have somebody in particular that you

24  thought was trying to attack you?

230

1    A.    That was -- I didn't know who was doing them

2    and for what purpose because there was --

3          First of all, this one was totally invalid.

4    The wristband, the med. box, they were all presented to

5    me as patient-safety issues.  They weren't.

6    Q.    And if you look at the paragraph at the

7    bottom of 710:  "Going back to last fall, I know Mark

8    was the one who wrote about the patient who he had

9    gotten the order for wrist restraints because I saw the

10   note attached to the written performance management

11   form."

12   A.    Right.

13   Q.    "Those restraints were not on the patient

14   when I took them ..."

15         That's what you explained to me a little

16   while ago; right?

17   A.    Yes.

18         See, what happens is:  You get called in

19   without any notice, you are presented with these things

20   and you are supposed to remember immediately, be able

21   to have an explanation.

22         To the best of my knowledge, I give

23   explanation but I usually follow it up with an e-mail

24   once I think about it more or go look at my records.

1      Q.   Do you recall that being an issue that was

2   raised with you on other occasions:  That you weren't

3   passing your medications at 6 o'clock?

4      A.   I know ....

5           I know that if I didn't get them done exactly

6   then, I stayed and did them.  So, in other words, I

7   didn't pass it on to the day nurse unless the med.

8   wasn't on -- unless the med. wasn't on the floor at the

9   time.

10      Q.   You'd stay beyond 7 o'clock?

11      A.   Yeah.

12      Q.   We've seen a couple comments that talk about

13   time management -- Okay? -- and I know that you may or

14   may not agree with that.

15           Also, seeing this issue about passing meds

16   within that two-hour timeframe when it's the 6 o'clock

17   meds, did you have difficulty --

18      A.   Where is it an issue?

19      Q.   It was an issue that was raised here.  Let me

20   just raise with you:  Did you have a concern about your

21   ability to perform the duties of this position in an

22   efficient manner, you know, or did you feel that it was

23   taking you too long to perform the duties?

24           Was that something you had any concern about?

232

 1        A.    Not -- not really, because like I said, I

 2   always -- the charting came last.

 3        Q.    Uh-huh.

 4        A.    And there were other people that -- it

 5   depended on the patient.  Like in this situation, I had

 6   five admissions.  I was not supposed to have received

 7   five admissions but I got five admissions and I worked

 8   an eight-hour shift.  I came in at 11 and I got five

 9   admissions.  And then I get a UOR saying "You didn't

10   pass your meds."  Well, guess what?  I had five

11   admissions.  How am I supposed to do that?

12        Q.    Okay.

13        A.    So the thing is:  You get accused.  You're

14   guilty before you can say anything.

15        Q.    Okay.  And I guess I'm just asking --

16        A.    It's frustrating.

17        Q.    -- whether you had any concern or doubt about

18   your ability to be efficient enough to get things done

19   in a timely manner?

20        A.    Well, I mean, I realized that I was staying,

21   but again, I -- it was purposeful.  I'm going to be

22   exact in what I'm doing.  I'm going to make sure I have

23   everything done that I need to have done.  And I wasn't

24   full-time so I wasn't running into overtime.  Plus,

233

1   that's what happens:  We have one nurse that she --

2   when she comes in, she wants to take all admissions, so

3   she'll be there till 11 or 12 the next day finishing

4   her stuff.  You do what you have to do to get it done.

5   You stay as long as you need to stay.

6           MR. MANSELL:  Take a quick break, Mike?

7           MR. ASENSIO:  Yeah, we can do that.

8           (Recess taken.)

9                       - - -

10          A THREE-PAGE E-MAIL STRING,

11          BEGINNING WITH A CASAGRANDE/SAYERS,

12          GRISKE E-MAIL DATED 4/29/13,

13          BATES-STAMPED 000745 THROUGH 0747

14          WAS MARKED AS JC EXHIBIT 40.

15                      - - -

16  BY MR. ASENSIO:

17      Q.   Let me direct your attention to Plaintiff's

18  Exhibit 40 and ask you if you can identify that for me.

19  It's another e-mail string.

20      A.   Yes.

21      Q.   And it looks to be, starting on the bottom of

22  the first page, 745, and going through the remainder,

23  it looks to be an e-mail from you to Amy and to Christy

24  regarding the three recent UORs?

234

1      A.   Yes.

2      Q.   So you start on Page 746 with the first one,

3  "4/18 Night Shift."  This is the medication box issue?

4      A.   Correct.

5      Q.   And I think you even referenced this e-mail a

6  few minutes ago, that you had sent one responding to

7  these issues?

8      A.   Right.

9      Q.   And you indicate that you are unaware that

10  this occurred, you know, leaving it open.  Do you see

11  that?

12      A.   I was unaware that it had occurred at the

13  time.

14      Q.   Sure.  Obviously, when you were told about

15  it, you then knew about it; right?

16      A.   I knew that --

17      Q.   It had been left open?

18      A.   Maybe it had happened, maybe it hadn't.

19      Q.   And so then the next one is 4/20, "Anonymous

20  UOR" regarding passing "... 6 a.m. medications for his

21  patients ..."  We just talked about that one?

22      A.   Right.

23      Q.   Then the next one, 4/23, "Patient did not

24  have an ID band ..." and we've talked about that one?

1    A.    Correct.

2    Q.    Then at the bottom, you've got a "Note" that

3   you reference.  You state:  "After arriving home on

4   April 24, I contacted my employment attorney Greg

5   Mansell who is wrapping up my settlement with

6   OhioHealth regarding my federal litigation filed in

7   District Court for denial of FMLA on my anniversary

8   date of 12/5/12."  The next sentence states:  "After

9   reviewing the above specific incidents and others,

10  Mr. Mansell said it sounded to him like retaliation,

11  also indicating that some type of negative employment

12  action would need to be taken by OhioHealth against me

13  before a retaliation lawsuit could be undertaken."

14         Do you see that?

15   A.    I see that.

16   Q.    When did you retain Mr. Mansell?

17   A.    Sometime in March --

18   Q.    All right.  Now --

19   A.    -- before I was offered my position back.

20   Q.    Okay.  You filed your Complaint, your

21  original Complaint, on March 14th.

22   A.    That's when it was filed in court.

23   Q.    That's when it was filed, right.  Does that

24  give you a frame of reference as to when you would have

236

1    retained him?

2        A.   It may have been the week or two prior to

3    that.

4        Q.   Okay.  Now, as of the date of this e-mail,

5    which is April 29, 2013, was Mr. Mansell advising you

6    as to how to respond to the disciplinary issues that

7    were being raised by Ms. Sayers?

8        A.   No.

9        Q.   Were you getting any advice or counsel from

10   him as to what to say or how to deal with these issues

11   at work?

12           MR. MANSELL:  Objection.  That's privileged.

13           MR. ASENSIO:  Well, we may be taking a

14   position that he's waived that.

15   BY MR. ASENSIO:

16       Q.   Were you getting any advice from him about

17   that?

18           THE WITNESS:  Are you objecting to me

19   answering?

20           MR. MANSELL:  Yeah, I think we're going to

21   have to settle the privilege issue.  I don't think he's

22   completely waived attorney-client privilege.

23           MR. ASENSIO:  Well, he references --

24           THE WITNESS:  I'll play Lois Learner.

1        MR. ASENSIO:  -- he references in this

2   paragraph what Mr. Mansell allegedly told him regarding

3   the actions at work and what would need to be done in

4   order to -- or what would need to happen in order for

5   him to have a retaliation claim against OhioHealth, and

6   what I'd like to know as a starting point is what --

7        THE WITNESS:  This is the starting point --

8   Go ahead.  Sorry.

9        MR. ASENSIO:  Let me finish this for the

10  record and then your attorney may have --

11       THE WITNESS:  I will.

12       MR. ASENSIO:  -- an objection, but I'd like

13  to know what the extent was of the conversations that

14  you had with him and advising him on how to deal with

15  these issues at work; and I want to know specifically

16  whether or not there was any advice being given on how

17  to structure, create, set up or posture a potential

18  retaliation claim against OhioHealth.

19       MR. MANSELL:  I mean, I don't think that

20  sentence says that at all.

21       MR. ASENSIO:  We are going to probably have a

22  disagreement about that.  Are you going to instruct him

23  not to answer?

24       MR. MANSELL:  Yes.

238

1           MR. ASENSIO:  All right.  I am going to go

2     ahead and I'm going to proceed.  We are going to finish

3     up the depo but that's an issue I may be raising with

4     the court.

5           MR. MANSELL:  Sure.

6           MR. ASENSIO:  And just so we're clear, you

7     know, I will come back to this issue not only as it

8     potentially relates -- not knowing where his testimony

9     could go, but not only as to where it potentially

10    relates to this conversation but assuming if a court

11    were to agree that the privilege has been waived, with

12    future conversations regarding advice you may have

13    given him with respect to his employment at OhioHealth

14    and how to handle these disciplinary situations and

15    create a retaliation claim.  Okay?

16          MR. MANSELL:  Okay.

17    BY MR. ASENSIO:

18       Q.  Now, we'll get back to a question that I'll

19    put to you.

20          Look on Page 1, if you could, Page 745.  You

21    had referenced, by the way, sending this e-mail

22    responding to the three UORs; right?

23       A.  Yes.

24       Q.  It then looks like you sent another message

239

1    on the same day a few hours later where you say that

2    you believe these things are more than coincidence;

3    that you are trying to protect your livelihood.  Do you

4    see that?

5        A.   I see that.

6        Q.   And you make some comments about different

7    things that are happening to you on the job.  At this

8    point in time, was it your belief that you were being

9    set up by your coworkers?

10       A.   Ever since I was told that my job was not

11   FMLA-protected and I found out that it was, I

12   suspected --

13       Q.   Your coworkers?

14       A.   -- that -- I suspected the Disability

15   Department.  Then, I suspected, once I started

16   receiving these UORs, that -- Because my history was:

17   Except for the medical issues, I had not received any

18   discipline.  Now, I'm starting to get these UORs for

19   anonymous things.

20       Q.   Okay.

21       A.   So yeah, my natural suspicion is:

22   Something's going on.  This isn't normal.  This -- I

23   don't believe it's a coincidence.

24       Q.   All right.  And you also state in here:  "I

1   have also ignored occasional homophobic comments by

2   coworkers and also references to my older age as to not

3   being able to keep up the pace at work related to my

4   age."

5        A.   Correct.

6        Q.   Who made comments of that nature to you?

7        A.   Do you want names?

8        Q.   Yeah.

9        A.   They weren't directly.  The homophobic were

10   in my presence.

11       Q.   Please tell me.

12       A.   Am I allowed to?

13            MR. MANSELL:  Yeah.  Go ahead.

14            THE WITNESS:  I'm trying to remember.

15            Rebecca.  I don't remember her last name.

16   Rebecca.  She's a tech.

17   BY MR. ASENSIO:

18       Q.   What did she say?

19       A.   "That's so gay."

20            She didn't say it to me.  She was doing

21   something at the nurses' station, but it was a

22   comment -- a negative comment.  Then --

23       Q.   Said to somebody else?

24       A.   Yeah.

241

1       Q.    Would there have been any witnesses to the

2    comment?

3       A.    Whoever she was saying it to, but I don't

4    recall who that was.

5       Q.    And do you recall when that would have been,

6    approximately?

7       A.    It was -- this was prior to me going on

8    medical leave.

9       Q.    So it would have been in 2012?

10      A.    Yeah.

11      Q.    Before the Halloween ...?

12      A.    Yeah.

13      Q.    All right.  Sometime before that.

14            What other homophobic --

15      A.    And then I remember -- He's not on the floor

16   anymore.  Mark -- Is that his name?  Mark.  He

17   transferred to another department.  This was -- again,

18   he used the word, "faggot"; not to me but in a

19   conversation.  "Don't be a faggot."

20      Q.    Were there any witnesses to that, that you

21   recall?

22      A.    I heard it.  I was at the nurses' station.

23      Q.    And --

24      A.    And then --

242

1      Q.   -- when would that have happened?

2      A.   Around that same time.  It would have been

3   that --

4      Q.   Before your leave of absence --

5      A.   Correct.

6      Q.   -- in 2012?

7      A.   Uh-huh.

8      Q.   Any other homophobic comments?

9      A.   There was one other, "That's so gay," and

10   that -- it was the second one.

11          I wish I had a list of people.

12          Anyway, she was talking to a coworker.  I,

13   again, was at the nurses' station.  She said it twice:

14   "That's so gay."  I turned around and I said, "Please

15   don't use that term," and they were --

16      Q.   Who was that?

17      A.   I'll remember.  Can I --

18      Q.   If you remember before we are done, that's

19   fine.

20      A.   I picture who it is but I don't remember her

21   name.

22      Q.   Do you recall who she was talking to?

23      A.   No.  It was another nurse.

24      Q.   When did this happen?

243

1      A.   It was after the two that I had just

2  mentioned.

3      Q.   Was it before your LOA?

4      A.   Yes.

5      Q.   All right.  So before November of 2012?

6      A.   Yes.

7      Q.   Did you report any of those?

8      A.   After I came back, I -- well, this

9  (indicating.)

10     Q.   Prior to the mention of it in this e-mail,

11  did you report it?

12     A.   No.

13     Q.   Okay.

14     A.   It says that I ignored them.

15     Q.   Yeah.  Yeah.

16     A.   That doesn't mean they didn't happen.

17     Q.   Right.

18          The references to older age as to not being

19  able to keep up the pace at work, --

20     A.   Yes.

21     Q.   -- who made those comments?

22     A.   Again, we are going back.

23          I'm trying to remember in what context.

24          I don't recall who it was that said that.

244

1   I'll think of it.  I can picture them but I can ....

2       Q.   Do you recall when it happened?

3       A.    It was probably around the time that I was --

4   you know, people would notice that I would be there

5   charting later.

6       Q.   Would this have been in 2013, then, after you

7   returned to work?

8       A.    Probably -- No, I think it was before I went

9   on medical leave.

10      Q.   Okay.

11      A.    But yeah, there were definitely comments

12  made, kind of sometimes joking, "Are you going to stay

13  for lunch?" this kind of thing.  Because, you know,

14  supposed to be out of there before that time.

15      Q.   Did any specifically reference your age?

16      A.    I recall that it was, yeah.

17      Q.   But you can't remember who?

18      A.    I picture them but I -- I'd have to look up

19  the roster again.  I didn't know I was going to be

20  asked this question.

21      Q.   And again, didn't report it prior to

22  mentioning it in this e-mail; right?

23      A.    No.

24      Q.   Now, you state in the last paragraph here:

245

1  "According to the memo that was given to me by Amy and

2  Christie (sic) back in October 2012" -- which I presume

3  is the PMR that we looked at -- "I have been owning the

4  task finding another RN position ..."

5      A.   Right.

6      Q.   Do you remember that verbiage?

7      A.   Yes.

8      Q.   "... hopefully within OhioHealth, because I

9  know based upon that memo from you both that I am not

10 welcome to remain on 7 Orange due to it not being a

11 'good fit' for me but I would appreciate the

12 opportunity to transfer or leave OhioHealth on better

13 and on my own terms as soon as possible without a gap

14 in employment."

15          At this point, were you still interviewing;

16 do you recall?

17     A.   I don't recall.  It would have been around

18 that time.

19     Q.   And to be fair, you say in the next sentence,

20 "I am continuing to apply for and interview for other

21 positions as I mentioned to Amy upon my return."

22     A.   Right.

23     Q.   All right.  So it sounds like you were

24 looking to leave 7 Orange, as well; right?

246

1          A.    Not by my choice.  I liked working there.  I

2    liked the people that I worked with.  I liked the

3    patients.

4          Q.    Even though you suspected the people that you

5    were working with of maybe sabotaging your work?

6          A.    I didn't know who it was.  I'm trying to get

7    the help of my manager to figure this out.  But as it

8    turns out, we all know.

9          Q.    Okay.

10          A.    Can I make a comment related to --

11                MR. MANSELL:  Wait for a question.

12    BY MR. ASENSIO:

13          Q.    Wait until there's a question.

14          A.    Okay.

15          Q.    Now, moving into May, do you recall having

16    counselings from Christy Griske with regard to

17    protocols for Heparin drips, with regard to charting,

18    MEWS score maintenance, those issues?

19          A.    I'm not sure who I talked to about it.

20          Q.    Okay.  But you recall those issues being

21    presented to you?

22          A.    I recall issues in that regard, yes.

23          Q.    Let me hand you what we'll mark as 41.

24                          - - -

247

```
 1              A TWO-PAGE E-MAIL STRING BEGINNING

 2              WITH A CASAGRANDE/SAYERS E-MAIL

 3              DATED 5/7/13, BATES-STAMPED 000748

 4              AND 0749, WAS MARKED AS JC EXHIBIT

 5              41.

 6                      - - -

 7     A.    Do I have the right one?

 8     Q.    You've got the right one.  I think you and I

 9   both do.  It should be -- looks like an e-mail from you

10   to Lisa Kinder and Chris Griske; is that right?

11     A.    Yes.

12     Q.    Can you identify what this is?

13     A.    Yeah.  This was, oh, a follow-up e-mail

14   because that -- this was for the meeting that Lisa

15   Kinder and I and Christy and I, together, had

16   concerning -- it was the wristband, mainly.

17     Q.    Right.  When Amy was on vacation?

18     A.    Yeah.

19     Q.    And so you had this meeting with them and

20   these are suggestions that you came up with; right?

21     A.    Yes.

22     Q.    On how to deal with, in Paragraph 1, the med.

23   box issue; right?

24     A.    Yes.
```

248

1      Q.   Number 2, timely notification to the nurse of

2  Heparin drip PTT lab result; right?

3      A.   Correct.

4      Q.   And then the third one is the missing ID

5  bracelet?

6      A.   Yes.

7      Q.   And in fact, you go on to discuss the 5

8  Rights in there, just like we had a discussion about

9  that a couple minutes ago?

10     A.   Correct.  And I suspect that's the reason why

11  I didn't get canned.

12     Q.   Didn't get disciplined; right?

13     A.   Yeah.

14     Q.   Okay.

15     A.   I was told this wasn't in our budget.

16     Q.   What wasn't?

17     A.   To put spring hinges on med. boxes.  "It's

18  not in our budget."  I said, "Oh, patient safety is not

19  in your budget?"  That's how it was presented to me:

20  As a patient-safety issue.

21          MR. MANSELL:  Only give responses when a

22  question is pending.

23          THE WITNESS:  Right.

24          MR. ASENSIO:  Go ahead and mark this as 42.

249

```
 1                        - - -

 2              A ONE-PAGE DOCUMENT ENTITLED,

 3              "PERFORMANCE MANAGEMENT RECORD,"

 4              DATED 7/1/13, BATES-STAMPED 000215,

 5              WAS MARKED AS JC EXHIBIT 42.

 6                        - - -

 7   BY MR. ASENSIO:

 8        Q.   Handing you what's been marked as Plaintiff's

 9   Exhibit 42, this purports to be a final written

10   warning.  Looks like it's signed by you, Amy and

11   Christy on July 1 of 2013 regarding three issues that

12   are in the description in the middle of the page.  Can

13   you recall having received this document?

14        A.   Yes.

15        Q.   All right.  You received this, I take it, in

16   a meeting with Ms. Sayers and Ms. Griske?

17        A.   Yes.

18        Q.   What do you recall about that meeting?

19        A.   Specifically what are you saying?

20        Q.   What happened?

21             Was it just the three of you there?

22        A.   Yes.

23        Q.   Do you recall where you met?

24        A.   In Amy's office.
```

250

1    Q.   And do you recall what happened?

2    A.   I recall that I was presented this.

3    Q.   What were you told?

4    A.   That it was a final warning.

5    Q.   All right.  Were the issues reviewed with

6  you?

7    A.   On that day?  They had already -- She had

8  already told me about it.  Like we had a meeting the

9  week before where she had two pages of things where she

10  had gone to people and asked for, quote, "dirt" on me.

11    Q.   Where Amy had gone to people and asked for

12  dirt on you?

13    A.   Yes.

14    Q.   And is that what Amy told you?

15    A.   That's not what Amy told me.  That's what the

16  people that -- my coworkers.

17    Q.   Who told you that?

18    A.   Tamara Fluty.

19    Q.   And who else?

20    A.   Mike Blankenship and Sherry Pappas.  They are

21  all charge nurses at night.

22    Q.   Sherry Pappas?

23    A.   Yes.

24    Q.   All right.  Tamara Fluty, what did she tell

1   you?

2        A.   She had told me that -- I don't know if it

3   was a phone call.  The way she described it, it was a

4   phone call from Amy asking about this weekend, because

5   it was on this weekend, and --

6        Q.   The weekend of the 15th and 16th?

7        A.   Right.

8             -- did she have any problems with me; and

9   what Tamara told -- again, this is hearsay, but Tamara

10  told me that she told Amy that she didn't have any

11  problems with me, and Amy -- what she told me was:  Amy

12  asked her three times; told her it's her duty to -- as

13  a charge nurse, to report problems.

14            I asked Tamara if she thought she was being

15  coerced and she said it sounded like it to her.

16       Q.   Okay.  And when did Tamara relay this to you?

17       A.   The following -- whenever I worked the next

18  time.

19       Q.   At the time?  So back in the summer of 2013?

20       A.   Yeah.

21       Q.   Is Tamara still working at Riverside?

22       A.   Yes.

23       Q.   All right.  Have you talked to her since then

24  about these issues?

252

1      A.   About that, specifically?

2      Q.   Yeah.

3      A.   Not that comment that she made, specifically.

4  But she's aware of what's been going on.

5      Q.   Have you shared it with her:  What's going on

6  in the case?

7      A.   Yes.

8      Q.   All right.  And have you had discussions with

9  her recently about what's going on in the case?

10     A.   What's "recent"?

11     Q.   Within the last year, year-and-a-half?

12     A.   Of course.

13     Q.   Okay.  Anyone else that you talked to about

14  what's going on in the case?

15     A.   Yes.

16     Q.   Who?

17     A.   Would have been Sherry Pappas.

18        If anyone asked me what was going on, I would

19  tell them --

20     Q.   Okay.

21     A.   -- what I knew.  They were curious.

22     Q.   Anyone else?

23     A.   (Negative shaking of head.)

24     Q.   Have you had ongoing dialogue with several of

1    your coworkers, you know, about the case since you left

2    your employment?

3        A.   Yes.

4        Q.   Have you shared with them at all discussions

5    that you've had with Mr. Mansell about your case?

6        A.   No.  He didn't want me to.

7             MR. MANSELL:  Don't testify to anything I

8    told you.

9    BY MR. ASENSIO:

10       Q.   All right.  Mike Blankenship, you identified

11   him.  What did he tell you back in June of 2013 about

12   discussions he had with Amy?

13       A.   It was the same shift that Tamara had told me

14   what was going on and that she had been approached,

15   because Sherry had told me that Amy asked her to write

16   up a memo --

17       Q.   All right.  We'll get to Sherry in a minute,

18   but what about Mike?

19       A.   So he was at the nurses' station and I asked

20   him -- after Tamara said she went to everybody, then I

21   asked if he had been asked and he said yes.

22       Q.   "... Tamara said she went to everybody ..."

23   meaning Amy had?

24       A.   Yes.

254

1          Q.    Okay.  Now, you had mentioned that Amy had

2    spoken to you previously about the issues that appear

3    in this PMR -- Right? -- the three issues?

4                This PMR was --

5          A.    That was -- Yes.

6          Q.    -- presented to you on July 1, --

7          A.    Right.

8          Q.    -- about two-and-a-half weeks or so after the

9    incidents occurred; right?

10         A.    Correct.

11         Q.    And in fact, she would have sat down and

12   talked to you along with Christy; --

13         A.    Yes.

14         Q.    -- is that right?

15         A.    Yes.

16         Q.    And they went through and got your side of

17   the story about these issues?

18         A.    From what I could recall at the time.

19         Q.    And then did they tell you they were going to

20   continue to investigate them?

21         A.    Yes.

22               And I asked for copies of what was on her

23   talking points.  She had a two-page talking points

24   typed up and I asked for a copy of it so I could

1    research my records, and I was denied --

2        Q.    Okay.

3        A.    -- and still have been to this date.

4        Q.    And then is it your recollection she told you

5    that she was going to investigate it after she talked

6    with you about those talking points?

7        A.    I don't recall exact wording but I didn't

8    expect -- I don't know that I knew that this meeting

9    was coming up, necessarily.  I can't say one way or

10   another.  Usually, these were like surprise situations.

11   But I -- I figured if she had two pages of stuff, that

12   something would happen, but I didn't know when.

13       Q.    All right.  Let's cover the issues that are

14   in this PMR.  The first item, it states, "Joseph did

15   not change a patient's Heparin drip until 0730 with the

16   oncoming nurse despite the PTT result being present in

17   the patient's medical record at 0116."

18             If true, that would have been a delay of six

19   hours; right?

20       A.    Yes.

21       Q.    Did you take issue with this?

22       A.    I took -- I'm not disputing that the Heparin

23   drip was not changed.  I'm disputing as to whether I

24   was aware -- or should have been aware that a lab was

256

1    drawn at that time.

2         Q.   And when would the lab have been drawn?

3         A.   I don't remember when it was ordered for.

4         Q.   Okay.

5         A.   It was not on my --

6         Q.   Talk to me about the Heparin drips.  And

7    you'll have to educate me a little bit on this.

8         A.   Okay.

9         Q.   So a Heparin drip was ordered for this

10   particular patient; right?

11        A.   Correct.

12        Q.   What is a "Heparin drip"?

13        A.   It's usually when the person has a clot, like

14   in their legs or something.  It's to prevent other

15   clots from forming.  So they are placed by the doctor

16   on a Heparin drip.

17        Q.   Is that a blood thinner?

18        A.   Yeah.

19        Q.   Okay.

20        A.   So what happens:  There's like a protocol of

21   orders.  The doctor decides, based on the -- based on

22   the patient's weight, you know, are they going -- do

23   they need a bolus, which means a big dose, of it at the

24   beginning.  It's all calculated and Pharmacy is

257

1   involved, based, like I said, on the patient's weight.

2          So the protocol is -- In this situation, this

3   patient came from the ER already on a Heparin drip.  So

4   after that until they are what's called "therapeutic,"

5   we are supposed to have lab -- blood-draws to see what

6   their blood level is -- the Heparin level is in their

7   blood and adjust that drip accordingly.

8       Q.   All right.  So this makes sense to a

9   layperson like myself:  They have the Heparin drip

10  because you want to prevent clotting, which means you

11  have to have a sufficient amount of Heparin in there to

12  thin it out to make sure it doesn't clot; is that fair?

13      A.   Yeah.

14      Q.   In very simple terms.

15          And then you have to have lab work done

16  periodically to make sure -- to find out what the

17  status is of the blood, does it have enough Heparin?

18      A.   Right.

19      Q.   And, you know, can we peel it back in terms

20  of the dosage or do we have to do more or whatever the

21  case may be; right?

22      A.   Yeah.  And depending on the reading, whatever

23  that -- a PTT reading is -- it's numeric -- is how you

24  adjust it, and there's like a whole protocol of how

258

1    many units to reduce it by or increase it by, whether

2    you need to give a bolus, this-and-that.

3            So it's -- basically, the doctor signs off on

4    that and then the nurse follows it.

5        Q.   And then there is a lab that's done at some

6    point; right?

7        A.   Correct.

8        Q.   And then the nurse would be responsible for

9    following up on the lab --

10       A.   Yes.

11       Q.   -- to determine how the drip should be

12   changed?

13       A.   Correct.

14       Q.   Okay.  And so the allegation here is, if I

15   understand this right, that a lab had been done, PTT

16   result; right?

17       A.   Yes.

18       Q.   Was present in the record, meaning that the

19   result was reported in the record at 0115 -- 0116, and

20   that the drip didn't change until 0730; right?

21       A.   That's correct.

22       Q.   That's the allegation?

23       A.   That's the allegation.

24       Q.   Well, in fact, that's what happened; right?

259

1    A.    That is what happened.

2    Q.    But your contention is that you didn't know

3    about the lab being done?

4    A.    What I had was:  My paper when I arrived on

5    the shift, it did not have a lab scheduled for that

6    time for -- it didn't have any labs for that time --

7    Q.    Okay.

8    A.    -- so I was going -- I was going based on

9    that.  So I wasn't looking for a lab.  I was looking

10   for a 5 a.m. lab the next morning.  That's when they

11   are generally drawn.  So the way --

12         And I actually had two patients on Heparin

13   drips that night --

14   Q.    Okay.

15   A.    -- and the one was changed.  The report I had

16   didn't call -- showed -- it didn't call for a lab draw

17   at that time.

18   Q.    Did you check the medical chart?

19   A.    Later, when I saw that it was late.  But I

20   wasn't looking for it.

21   Q.    Okay.

22   A.    And since it wasn't a critical reading --

23         Critical readings, the lab will call the

24   floor and specifically say, and you have to document

1    that it's critical.  So it's a critical reading.

2              It wasn't.  It wasn't, so the lab did not

3    call.  They just posted it.

4         Q.   But whether it was critical or not, if the

5    lab report had been there, you certainly -- you

6    wouldn't have sat on that for six hours?

7         A.   Not intentionally.

8         Q.   No.  You would have gone and changed it had

9    you known about it; right?

10        A.   Right.

11             And I said I had another one that same

12   night --

13        Q.   Right.

14        A.   -- which I did change.

15        Q.   Because that's the right protocol and that's

16   what should be done?

17        A.   Correct.

18        Q.   All right.  Number 2, "Joseph did not contact

19   a physician regarding a patient's low potassium result

20   that was present in the patient's medical record at

21   0116.  The patient had an arrhythmia due to the

22   electrolyte imbalance."

23             Do you recall that issue?

24        A.   I do.

1      Q.   What happened there?

2      A.   Same patient, same lab draw.

3      Q.   So the patient ended with an arrhythmia due

4   to an imbalance?

5      A.   She had a lot of comorbidities.  She had

6   other critical readings from the previous day which

7   would have been more indicative of her having an

8   arrhythmia.  The statement that she had an arrhythmia

9   due to that, you can't make that conclusion.

10   Certainly, a nurse can't conclude that.  Even the

11   doctors can't conclude it.  She had a low potassium the

12   morning before.

13      Q.   Okay.  But let's get back to the first

14   sentence, which states, "Joseph did not contact a

15   physician regarding a patient's low potassium

16   result ..."

17           I take it, if you didn't see the medical

18   record for the Heparin drip, you didn't see the medical

19   record for the low potassium result?

20      A.   It's the same blood draw.

21      Q.   Same record?

22      A.   Yeah.  Posts same place.

23      Q.   So you just missed this; right?

24      A.   Right.

1          I saw it sometime early in the morning.

2     Q.   Okay.  Item 3, "Joseph did not connect a

3  bicarbonate drip to a patient as ordered by the

4  physician and the drip ran onto the floor in the

5  patient's room."

6          Do you recall that issue?

7     A.   I recall being told that, but after-the-fact.

8  I was --

9          Again, I knew about the drips, like, right

10  after it happened.

11          I didn't get told about that running on the

12  floor until the time we had that meeting where she had

13  the two-page thing.

14     Q.   Okay.

15     A.   Does that make sense?

16     Q.   Yeah.  You didn't know about it during your

17  shift; right?

18     A.   I knew about the bicarb drip.  There's a

19  story behind that.

20     Q.   But you didn't know that it wasn't connected

21  and running on the floor --

22     A.   That's correct.

23     Q.   -- as it states here?

24          Okay.  But you had a patient who had a

1   bicarbonate drip --

2        A.   Correct.

3        Q.   -- that you had set up; right?

4        A.   I hadn't set it up.

5        Q.   All right.

6        A.   It was set up during the day shift.

7             And the next bag didn't scan.

8        Q.   What do you mean?

9        A.   The bicarb drip that the day shift had run

10   based on the doctor's orders had started.  That was the

11   first dose.  Eventually, it gets low and then you have

12   to replace it.

13       Q.   Right.

14       A.   There was already a bicarb bag in the med.

15   room, so when it was time to change, when that first

16   bag was getting low, I brought that bag in.  I was

17   going to change it.  You can use the same tubing

18   because it's running still.  I hung the bag up and

19   scanned it and it said "No" -- "No medication found for

20   this patient."  So Tamara was charging that night and I

21   was in the room.  I Vocera'ed -- that's a pager.  I

22   Vocera'ed her and asked about it.  I said, "I don't

23   want to give this because it's not scanning."  She

24   asked, "What does it say exactly?"  I said, "It looks

1  like the right thing but it's not scanning so I can't

2  give it to the patient.  I don't know what's in that

3  bag.  It's not scanning.  So there's something wrong."

4           So I thought I was protecting the patient by

5  not giving them that.

6       Q.   Okay.

7       A.   I could have connected that bag, overrode the

8  scan, connected it.  Then it would have never been

9  dripping on the floor.

10          Because what I had to do since there was such

11  a delay, we had to order -- Tamara said, "I'm going to

12  call Pharmacy, get another bag up here."  She

13  supposedly did.  Pharmacy usually, on weekends, is not

14  always efficient, timewise.  So that bag ran out and I

15  had to call Pharmacy back.

16          And then they finally brought the bag up.

17  That one didn't scan.

18          So there were two bags that did not scan.

19          Then I called Tamara again and I said, "What

20  do you want me to do?"  She said, "Well, I'm sure this

21  is okay."  So I overrode it.  By then, I knew I had to

22  put new tubing on it.  So I put the new tubing.  I

23  thought I'd connected that to the patient.  It was the

24  middle of the night.  Maybe I didn't -- you know,

1    didn't realize.  I thought I had.  And then I started

2    the pump.

3         Q.   All right.  You just weren't aware that the

4    bag wasn't hooked to the patient?

5         A.   Right.

6              But the way this is worded is that I

7    intentionally did not connect the bicarbonate drip that

8    was ordered by the physician.  It's like there's a

9    story to it.  I'm actually trying to protect the

10   patient.

11        Q.   All right.  Let me ask you about a couple

12   other issues.

13             Do you remember being placed, on Sunday, June

14   16, in a PSA assignment since there were extra nurses

15   scheduled that shift?

16        A.   Yes.

17        Q.   Do you remember being either angry or

18   reacting by pounding your fist on the nurses' table

19   with regard to that?

20        A.   No, not at all.

21        Q.   That didn't happen?

22        A.   That didn't happen.  I was adamant that

23   didn't happen.  I told them that every time that was

24   told to me.

266

1      Q.   Okay.

2      A.   And I asked to have the person that accused

3   me of that either tell me in person or have a written

4   statement, and I never got either.

5      Q.   Okay.  You were never disciplined for it?

6      A.   Yeah, I was.

7      Q.   With a PMR?

8      A.   Yes.

9      Q.   All right.

10         Do you recall an issue that same night where

11   you had a patient -- you went in to check on a patient

12   who was crying one night in the unit and she asked for

13   an IV and you allegedly told her, "I don't do IVs"?

14     A.   I recall that was in one of the things that

15   Amy went over in that two-page document that she

16   refused to give me.  I said, "I don't recall that ever

17   happening.  I would never tell a patient I don't do

18   IVs."

19         I asked her if she could follow up on that

20   specifically, and I didn't hear back.  By the time I

21   got the final warning, it was not on there.

22     Q.   Right.  Now, this final written warning that

23   we looked at that was given to you on 7/1/13, you ended

24   up appealing this; did you not?

267

```
 1       A.   Yes.

 2       Q.   And you took it through the several levels of

 3  the appeal process?

 4       A.   That's correct.

 5       Q.   Ultimately, it was upheld; correct?

 6       A.   Yes.

 7                      - - -

 8            A ONE-PAGE DOCUMENT ENTITLED,

 9            "PERFORMANCE MANAGEMENT RECORD,"

10            DATED 7/12/13, BATES-STAMPED

11            000216, WAS MARKED AS JC EXHIBIT

12            43.

13                      - - -

14       Q.   Item 43 is a written PMR for attendance.  Do

15  you recall receiving this?

16       A.   Yes.

17       Q.   And this would have been from Ms. Griske; is

18  that right?

19       A.   Yes.

20       Q.   As best I can tell, you refused to sign it;

21  correct?

22       A.   Correct.

23       Q.   And it looks like she dated it 7/12/13.  Does

24  that seem to be about the right date that this would
```

268

1  have been presented to you?

2      A.   Yes.

3      Q.   Whose signature is that below that; do you

4  know?

5      A.   I have no idea.

6      Q.   Neither do I.

7           Okay.  If you look at the description of the

8  behavior, it references an absence of July 8, 2013, and

9  no-call, no-show for a mandatory customer service

10  class.  Do you remember the issue --

11      A.   Yes.

12      Q.   -- that this involved?

13      A.   Yes.

14      Q.   Did you take issue with this discipline?

15      A.   Yes.

16      Q.   Why?

17      A.   Because it was being equated as if I had

18  missed a shift on the floor where they would have

19  had -- a nurse had to replace me.

20      Q.   You, in fact, did miss the mandatory customer

21  service class; right?

22      A.   No, I didn't.

23      Q.   Let me ask it this way:  You missed the class

24  that you were originally scheduled for; correct?

269

1      A.   Correct.

2      Q.   And then you made it up by going to another

3 class; correct?

4      A.   Two days later, yes.

5      Q.   Okay.

6      A.   On my own time.  This was all on my own time.

7      Q.   Let me give you what we'll mark as Exhibit

8 44.

9                    - - -

10          A ONE-PAGE E-MAIL STRING, BEGINNING

11          WITH A CASAGRANDE/SAYERS E-MAIL

12          DATED 7/16/13, BATES-STAMPED

13          000803, WAS MARKED AS JC EXHIBIT

14          44.

15                    - - -

16      Q.   Can you identify that document?

17      A.   Yes.

18      Q.   This is an e-mail from you to Amy with regard

19 to this issue; correct?

20      A.   There's actually two e-mails.

21      Q.   You're right.  There's one at the bottom, a

22 short one, and then a longer one up top; right?

23      A.   Correct.

24      Q.   And the one at the bottom simply says, "I

1    rescheduled the class with Lindsey for Thursday at 1 to

2    3 ...  She said to notify you also.  Thanks.  Joe";

3    right?

4         A.   Yes.

5         Q.   You would have sent that on July 9th at 9:58

6    a.m.?

7         A.   Correct.

8         Q.   Okay.

9         A.   That was the morning after the class.

10        Q.   The morning after the class that you were

11   originally scheduled for?

12        A.   That I was originally scheduled.

13        Q.   Right.

14             Now, about the middle of the page, in that

15   paragraph that begins with "Amy ..." there is a

16   sentence that begins, "I'm aware that at least one

17   other nurse was similarly 'written up' for rescheduling

18   the class."

19        A.   Yes.

20        Q.   Do you know who that was?

21        A.   Tamara.

22        Q.   And how do you know she was written up?

23        A.   She told me.  Other people told me.

24        Q.   Anybody else who was written up for missing

271

```
 1    this class or rescheduling it?

 2         A.   I don't know.  I was told we were the only

 3    two but I'm not sure.

 4         Q.   Mike Blankenship, is he still there?

 5         A.   I don't know.  He was there when I --

 6         Q.   When you --

 7         A.   -- left.

 8         Q.   Last time you were there?

 9         A.   Yeah.

10         Q.   How about Sherry Pappas?

11         A.   What about her?

12         Q.   Still there?  Still employed at --

13         A.   As far as I know.

14         Q.   And with regard to the issue that we talked

15    about a little while ago, I never did ask you about

16    her.  This was back with regard to the issue about Amy

17    looking for dirt on you.

18         A.   Uh-huh.

19         Q.   What did Sherry tell you about her

20    conversations with Amy?

21         A.   This goes back to those Heparin drips that --

22         Q.   Right, --

23         A.   -- actually --

24         Q.   -- which resulted in that PMR on July 1?
```

1       A.   Ultimately.

2       Q.   Yeah.

3       A.   It was the same patients but it was a

4  different night.

5       Q.   Okay.

6       A.   The evening before, I had those two same

7  patients.  The one was admitted to the floor with the

8  Heparin drip running.  The second one had been -- was

9  on the floor but the doctor hadn't written new orders

10  yet.  Sherry was charging, charge nurse.  I had told

11  her that I had never started a Heparin drip before and

12  could she help me with it --

13       Q.   Okay.

14       A.   -- because I wanted to make sure everything

15  was correct.

16            So it wasn't until the next morning that

17  we -- that I found out from the day charge nurse that

18  they weren't -- the drips weren't set up correctly on

19  both.  And like I said, Sherry -- on Heparin drips, you

20  are supposed to have a witness that's checking

21  everything.

22       Q.   Well, the issue with the Heparin drip, if I

23  understood it right, was that it wasn't adjusted as a

24  result of the lab work that was done after 1 o'clock in

273

1  the morning; it wasn't adjusted until 7:30?

2      A.   Which issue are you talking about?  The first

3  night or the second night?

4      Q.   The one that you got the PMR for.

5      A.   Correct.  That was the second night for the

6  one patient.

7      Q.   So did Amy call Sherry about the first-night

8  issue --

9      A.   Yes, --

10     Q.   -- with just setting it up and whether it was

11 set up correctly?

12     A.   -- the first night is the way I understand,

13 because she was asked to write up what had happened, a

14 scenario of what happened that first night, why they

15 were -- basically, the drip rates were set up

16 incorrectly.

17     Q.   But you, ultimately, weren't disciplined for

18 that; were you?

19     A.   I don't know if that was part of the prior --

20     Q.   Take a look at the PMR, July 1.

21     A.   They don't have dates.  Some of the prior

22 stuff doesn't have dates.

23     Q.   Well, look at the one that we looked at,

24 okay?

                                                    274

1         A.    It's my understanding that I was not

2    disciplined because Sherry was involved and they -- Amy

3    didn't want to write her up.  That was what --

4         Q.    Who told you that?

5         A.    I don't -- I concluded that, myself, and

6    that's the way Sherry felt, because what I was told

7    by -- and again, Kym Koehler was the day shift in

8    charge.  She was the one that found the one error --

9    well, her nurse came to her and -- found the one error.

10   Then came to me.  Sherry had already left.  She was off

11   the floor.  She went home.  I was still charting.  Kym

12   comes to me and said there was an error on -- it was

13   Room 5, and she started to tell me what it was.  And

14   I'm more of a visual person.  Because there's a pump,

15   there's charting, there's orders.  She's trying to tell

16   me what happened and it took me like three times to

17   understand what she was saying:  That the weight that

18   was put in the pump didn't agree to the weight that was

19   on the order, and somehow then what was put in, the

20   charting didn't agree.

21         So she said, "Joe, I'm going to have to write

22   this up as a med. order" -- "a med. error," and I said,

23   "I understand."

24         So I said right then and there, I said,

275

1    "Well, you may want to check Room 14 because Sherry and

2    I did that one, too."  She went in.  She found out that

3    that one was started at the wrong rate.

4          Q.   In any event --

5          A.   Then I asked -- I'm sorry.

6          Q.   No.  Go ahead.

7          A.   Then I asked Kym, I said, "Well, what's going

8    to happen?"  She said, "well, both of you are going to

9    be" -- I don't know.  Whatever they do for a med.

10   error.  So I don't know if there's a writeup or ....

11          So as far as I know, Sherry was never written

12   up for anything, and when I --

13          Q.   Neither were you --

14          A.   -- when I asked, nobody would tell me.

15          Q.   And neither were you on that issue; right?

16          A.   No, because, what I said.

17          Q.   All right.  Because you felt that --

18          A.   They wanted to wait until the next night --

19          Q.   You felt they wanted --

20          A.   -- until it was just me.  Yes.

21          Q.   -- they wanted to protect Sherry; right?

22          A.   That's the way I felt.

23          Q.   Okay.

24          A.   That's the way she thought, too.  She was

1   told --

2           I said, "What do you feel is the reason why

3   you were asked to do this and that I wasn't asked to

4   write up a statement," and that's what she told me.  By

5   then, people knew.

6                        - - -

7           A TWO-PAGE DOCUMENT ENTITLED,

8           "PERFORMANCE MANAGEMENT RECORD,"

9           DATED 7/18/13, BATES-STAMPED 000219

10          AND 0220, WAS MARKED AS JC EXHIBIT

11          45.

12                        - - -

13      Q.   Handing you what's been marked as Exhibit 45,

14  this is a verbal PMR.  It's dated 7/18, signed by Amy,

15  signed by Christy, and "Refused to sign" under your

16  "Associate Signature."  And this references a verbal

17  corrective action for that alleged incident at the

18  nurses' desk regarding the PSA assignment that we

19  discussed a few minutes ago?

20      A.   Right.

21      Q.   Okay.  And as you correctly pointed out, you

22  did receive a verbal for it; right?

23      A.   Yes.

24           She tried to include it on the final warning.

277

1    She presented it in that two-page-document meeting that

2    I referred to and then tried to put it on the final

3    warning and I argued that I've never had customer

4    service issues.

5        Q.    When did you argue that?

6        A.    The day that I got the final warning.

7        Q.    All right.  But the final warning doesn't

8    reference it?

9        A.    She printed another copy taking it off.

10       Q.    Okay.  So your testimony is:  When it was

11   originally presented, this was part of it?

12       A.    Yes.

13       Q.    And then she took it off, and she took it off

14   in response to the issue you raised about never having

15   had any customer service issues?

16       A.    That's the way she explained it to me.

17       Q.    Okay.

18       A.    But I said I still didn't agree with it.  I

19   said, "This never happened."

20       Q.    And then gave it to you two weeks later?

21       A.    Right.

22       Q.    Can it have been that she wanted to research

23   whether or not it, in fact, occurred?

24       A.    You would have to ask her that question, but

278

1   she had all the facts.  She told me everything like

2   even a week or whatever it was before the final

3   warning, what she had been told or -- and I asked for

4   written proof or Kym to come in and tell me to my face,

5   and she wouldn't do it.

6          MR. ASENSIO:  Mark this as 46.

7                     - - -

8          A TWO-PAGE DOCUMENT ENTITLED,

9          "PERFORMANCE MANAGEMENT RECORD,"

10         DATED 9/20/13, BATES-STAMPED 000221

11         AND 0222, WAS MARKED AS JC EXHIBIT

12         46.

13                    - - -

14   BY MR. ASENSIO:

15      Q.  This purports to be another PMR

16   fact-gathering suspension that, based on Page 2, would

17   have been presented -- it's signed by Amy Sayers on

18   9/20 of '13 and it states under your signature,

19   "Provided Joe with a copy on 9/20/13"?

20      A.  Yes.

21      Q.  Was this done in a face-to-face meeting with

22   you?

23      A.  This was presented to me, yes, in a

24   face-to-face.

1      Q.   On the 20th of September?

2      A.   That's my recollection.  Yes.

3      Q.   And if you look on Page 2, with the comments,

4  it's got a date, 9/12/2013, 3:10, (Reading)  Susie

5  Talebi and I attempted to contact Joseph on the phone

6  to discuss the concerns listed above.  No answer.  Left

7  on Joseph's message that he is now on a fact-finding

8  suspension, not to return to work until further notice

9  or discuss the situation with his peers.

10          Do you recall getting that message at home?

11     A.   Yes.

12     Q.   All right.  Does that seem like about the

13  right date:  The 12th of September?

14     A.   Let's see.  I was scheduled to work that

15  Thursday.  I don't know what date that was.  I think

16  that was the date.  I was taking a nap when she called.

17  I saw that the call came in when I woke up and I heard

18  the message, which was basically what she's telling

19  here.

20          Then I saw there was another voice mail,

21  which I didn't know was there, from the prior day where

22  she had asked me to come in this day --

23     Q.   For this meeting?

24     A.   -- during the day to discuss issues, which

280

1 she didn't tell me exactly what they were.  She said

2 while I was gone, there were several UORs and she

3 mentioned Chasidy Crist's name.

4        Q.    On Page 1, Bates Page 221, under "Description

5 of Behavior/Situation & Impact," it references,

6 "Multiple medication administration safety concerns

7 occurred recently when" you were "working on 7 Orange"

8 from 8/30 to 9/9.

9             Is it your understanding that these incidents

10 were UORs that were reported?

11       A.    I asked but was never told.

12       Q.    The first one states, "Joseph refused to

13 follow the Pharmacy's hospital policy to sign the"

14 Riverside "Pharmacy Controlled Substance Record of

15 Administration form for a medication he had

16 administered to a patient."

17             This was something that you were asked to do

18 by Christy Griske; right?

19       A.    No, it was Chasidy Crist.

20       Q.    I'm sorry.  You're right.  Chasidy --

21       A.    Crist.

22       Q.    -- Crist.  All right.

23             And did you, in fact, refuse to do that?

24       A.    No.

1      Q.    What happened?

2      A.    It was a Monday morning.  I'd worked that

3  weekend, Friday, Saturday and Sunday night.  I'm

4  passing my 6 a.m. meds.  I get a page from either the

5  unit clerk or the in charge saying, "Joe, Chasidy wants

6  to talk to you in her office" -- "in Amy's office."

7  Amy was gone.  And so I kind of stopped what I was

8  doing just to see -- you know, I'm curious, what's it

9  about.

10          So I go in and then she presents a form.  It

11  was like a controlled medication form, which I had

12  never seen the form before.  Usually, all of our

13  controlled meds are in the Pyxis.  We don't sign for

14  them.  We just do our computer thing to get them out.

15  It was for a patient that she said I had, like, more

16  than a month prior and she wanted me to sign the form

17  saying that I had given this patient whatever

18  medication that was.  It was a -- like a Level 5.  It

19  was a -- almost barely -- not even on the controlled

20  substance list, but that's neither here nor there.

21          So I explained to her that I had never seen

22  the form before.  I don't remember the patient.  I

23  would like to be able to look at my records at home.

24  And she said -- she said, "When do you work next?"  And

1   I said "Thursday," which would have been that 12th.

2   And she said, "That's okay."  She said, "Go ahead and

3   do that."  And I thought we were done.

4          In the meantime, she started talking about

5   meds in what they call a narc box, where a patient

6   brings in their own narcotics and then we find they

7   have them, you know, in their purse or whatever, and

8   then we kind of record that and put them in a locked

9   box.  So I'm confused because I don't know what she's

10  talking about.  So I didn't even have a code for the

11  narc box.  I couldn't get in it.  So I'm thinking, "Is

12  she accusing me of giving a narcotic to a patient?"  I

13  don't know what she's doing and I'm not going to sign

14  something that I don't remember.

15     Q.   So you told her that you needed to go check

16  your records at home?

17     A.   Yes.

18     Q.   What records did you have at home?

19     A.   I keep -- Like what I'll do is, I'll mark

20  out --

21          What we get is a nurse -- it's just a nurse

22  document but it has like patient information, name on

23  it, but before I take it off the property, I will mark

24  through the name and any identifying thing, but it

283

1  shows like -- it's called an SBAR -- S-B-A-R -- and it

2  has like their labs and just information related that

3  we need to know as a nurse to help take care of that

4  patient.

5      Q.  Had anyone ever authorized you being able to

6  take any information like that home?

7      A.  It was my understanding that if it wasn't --

8  it didn't have patient identification on it and it was

9  for our -- It even says at the bottom of the document

10 that it's for the nurse purposes.

11     Q.  All right.

12     A.  It's not, like, part of the medical records.

13     Q.  Had anyone ever authorized you, though, to

14 take that, specifically, off OhioHealth property?

15     A.  No.

16     Q.  And I understand the concern, I think, you

17 are alluding to with patient information --

18     A.  Right.

19     Q.  -- with patient's HIPPA rights; right?

20     A.  Yes.

21     Q.  And you understand that patients do have

22 certain rights to confidentiality with regard to their

23 medical information?

24     A.  Absolutely.

284

1      Q.   And in addition, you would understand, I

2   presume, that these records, medical records in

3   general, are the property of the hospital?

4      A.   If it's going to be in their medical record,

5   it is.  If it's just a worksheet, I don't believe it

6   is.

7      Q.   Let me go on.  Let me reverse this for you.

8           You are not claiming that you've got a right

9   to any documents that you come across during your

10  employment at OhioHealth regarding patient care; are

11  you?

12     A.   To any documents?

13     Q.   Any documents.

14     A.   No.

15     Q.   Do you have any of those documents at home

16  with you today?

17     A.   I gave copies to --

18     Q.   Did you produce those to your lawyer --

19     A.   Yes.

20     Q.   -- as part of this lawsuit?

21     A.   Yes.

22          MR. ASENSIO:  If you could check on that,

23  Greg, I'd appreciate it.

24          MR. MANSELL:  Yeah.

285

1  BY MR. ASENSIO:

2      Q.   Do you recall, when you approached Ms.

3  Crist -- Chasidy? --

4      A.   Yes.

5      Q.   -- that she asked you to sign this form, and

6  do you recall approaching her at the time you were

7  leaving your shift at about 9:15 on the 9th of

8  September and telling her that you don't trust anyone,

9  that's why you don't want to sign the paper?

10     A.   No, that's not what I said.

11     Q.   Did you tell her, "I don't know if you know

12  about my lawsuit but I don't trust people"?

13     A.   I didn't say the word, "lawsuit."

14         MR. MANSELL:  Joe, let him get the question

15  out.

16         THE WITNESS:  I'm sorry.

17         No.

18  BY MR. ASENSIO:

19     Q.   You didn't say either one of those things?

20     A.   I did not say those words that way.

21     Q.   What did you say?

22     A.   I saw her in the hallway.  I was leaving.

23  She was coming out of her office.  And I said,

24  "Chasidy, I'm sorry that I wasn't able to sign that

286

1   paper that you wanted me to."  I said, "Do you know

2   what's going on?"  And she said, "I don't want to

3   know," and turned and walked away.

4        Q.   Okay.

5        A.   So I sent a letter telling her the reason and

6   it had nothing to do with the lawsuit.

7             MR. ASENSIO:  We'll mark this as 47.

8                         - - -

9             A THREE-PAGE E-MAIL STRING,

10            BEGINNING WITH A CASAGRANDE/SAYERS,

11            KINDER E-MAIL DATED 9/16/13,

12            BATES-STAMPED 000930 THROUGH 0932,

13            WAS MARKED AS JC EXHIBIT 47.

14                        - - -

15       Q.   Handing you what's been marked as Plaintiff's

16  Exhibit 47.  Is this the letter that you sent her?

17  It's dated at the bottom September 16, 2013 --

18       A.   Yes.

19       Q.   -- almost 1 o'clock in the afternoon?

20       A.   Right.

21       Q.   And if you look on Page 2, 931 Bates Stamp,

22  and running through 932, the next page, you go on to

23  explain yourself with regard to this particular issue;

24  correct?

1       A.    Correct.

2             Well, I explained it before.  Right.

3       Q.    Right.

4             Down at the bottom of the page, about six

5    lines up or so, you state, "I do show in my notes that

6    for patient CB ..."

7             What does "CB" stand for?

8       A.    That was the patient's initials.

9             I had written -- Chasidy had the form.  It

10   had the full patient's name on it.  I wrote it down.

11   She said that I could take that home and then find out

12   from my records if I had given that medication on that

13   date at that time.

14      Q.    Your records as you described them to me just

15   a minute ago; right?

16      A.    Right.  I write my meds and what times they

17   are due and other notes that I get from, like, the day

18   nurse.

19      Q.    And you keep those at home?

20      A.    Yeah.  I take them home after all the patient

21   identification information is off of them.

22      Q.    And is that your normal practice?

23            Have you been doing that throughout your

24   tenure with OhioHealth?

288

1       A.   No, I hadn't been doing it all the time.

2       Q.   Was there a period of time that you did do

3    it?

4       A.   After I started getting accused of things.

5       Q.   So did you do it in 2012 at all?

6       A.   I don't recall having done it.

7       Q.   But you did in 2013?

8       A.   Yes.

9       Q.   Well, again, if you could make sure that you

10   forward all of those records to your lawyer, I'd

11   appreciate it.

12      A.   I did.

13      Q.   All right.  I am going to ask you a few

14   questions about Plaintiff's Exhibit 46.  We've talked

15   about Item 1.  Anything else about Item 1 that you feel

16   is relevant or have we covered that?

17      A.   Right.  And then it ....

18      Q.   We've covered Item 1; right?

19      A.   We've covered it, yeah.

20      Q.   Ultimately, Item 1 was not part of the final

21   PMR that you received; was it?

22      A.   No, it was not.

23      Q.   Item 2, "Joseph was administering a Heparin

24   drip and a Cardizem drip in a patient's same IV site,

289

1    despite the fact that the two medications are not

2    compatible and should have been administered in two

3    separate IV sites."

4            As I understand it, this issue was

5    investigated and there's differing authority on whether

6    or not they are compatible or not compatible; is that

7    correct?

8        A.   I'm not aware that there's differing

9    authority.

10       Q.   Okay.  But at any rate, this issue was not

11   part of the final PMR; was it?

12       A.   Correct.

13       Q.   It was dropped after investigation?

14       A.   Right, with no reason given.

15       Q.   Okay.  But it wasn't part of --

16       A.   That's correct.

17       Q.   -- a disciplinary basis against you?

18       A.   This is discipline.  This document is.

19       Q.   This is a notice of a fact-gathering

20   suspension.

21       A.   But I was suspended from work --

22       Q.   Right.

23       A.   -- so to me, that's discipline.

24       Q.   Okay.  And then, ultimately, it was not part

290

1   of your final termination record; was it?

2       A.   That's correct.

3       Q.   Item 3, "Joseph waited five hours to address

4   a patient's Heparin drip PTT result that was not

5   therapeutic.  This led to the patient having another

6   unnecessary PTT drawn to make correct adjustments in

7   the patient's Heparin drip late."

8            Do you recall this issue?

9       A.   Yes.

10      Q.   All right.  What happened with this issue?

11      A.   That statement is totally incorrect.

12      Q.   What happened?

13      A.   Pharmacy -- not Pharmacy.

14           An order was written to have that blood draw

15  done at 10 p.m., 2200.  It's my understanding that

16  phlebotomy misread that and took it at 8 p.m., two

17  hours early.  That is not in accordance with --

18      Q.   With policy?

19      A.   -- the protocol.

20      Q.   What is the protocol?

21      A.   Six hours after the change -- the last change

22  is made.  They took it four hours after.  So the

23  results, I wasn't expecting to see the results --

24           Again, it's one of these situations where I'm

1    expecting a lab to be drawn at 10 p.m.  It's going to

2    take them time to collect it, the lab to process it, so

3    I wouldn't be looking for that until sometime between

4    11 p.m. and midnight.  That's when I saw that they had

5    drawn it, but they had drawn it at like 8.  So I

6    ordered a stat lab and we adjusted the rate after the

7    stat lab came back because the lab that was drawn

8    was -- couldn't use that.

9         Q.   Okay.

10        A.   So this is an incorrect statement.

11        Q.   Item 4, "Joseph took care of a detoxing

12   patient who was on the Ativan CIWA protocol," which is

13   the alcohol withdrawal detox; right?

14        A.   Yes.

15        Q.   "Joseph administered a total of 39 milligrams

16   of Ativan to the patient during his shift and did not

17   correctly follow several sections of the hospital's

18   pre-printed CIWA protocol."

19             Protocol is what we looked at at the

20   beginning; isn't it?

21        A.   What do you mean, "... looked at at the

22   beginning"?

23        Q.   The policy that we looked at at the very

24   beginning of the deposition here.

1       A.   It's a specific form for CIWA.

2       Q.   And so what happened with regard to this

3  issue?

4       A.   What happened was that I did follow the CIWA

5  protocol.

6            When I had this meeting on the 20th with Amy,

7  she incorrectly told me that I should have been giving

8  the patient four milligrams of Ativan every 15 minutes

9  regardless of his consciousness level, and by not doing

10 that, violated protocol.

11           I explained to her that's not how protocol

12 reads.  You give it if it's necessary.  I'm not going

13 to give a patient that's knocked out more Ativan.

14 Also --

15      Q.   Was this over the phone or was this in person

16 when you had this explained to you by Amy?

17      A.   Which?  No, on --

18      Q.   This discussion.

19      A.   -- the date we had this 9/20 meeting.

20      Q.   So it was on the 9/20 meeting?

21      A.   Right.

22      Q.   Who else would have been at that meeting?

23      A.   Susan Talebi.

24      Q.   So Susie Talebi and Amy were there with you?

1       A.   Yes.

2       Q.   All right.

3       A.   Prior to that, I had asked to be sent a copy

4   of this so I could prepare for that meeting, and I was

5   denied receiving it, which again, is what she does.

6       Q.   Do you have any reason to believe she treats

7   you differently in that regard than any other employee?

8            Do you know?

9       A.   You would have to ask her.

10      Q.   I would; right?  Because you're not involved

11  in the discipline.  You never were an observer of her

12  meting out discipline to other employees?

13      A.   I've seen what's happened to other people

14  before me.

15      Q.   My question is:  Have you participated in

16  that disciplinary process where you were in meetings

17  where she was giving discipline to other employees?

18      A.   No.

19      Q.   All right.  So how that process was done and

20  what was provided to employees, I would have to ask

21  her; wouldn't I?

22      A.   I would say so.

23      Q.   Okay.

24      A.   In regards to the Cardizem, I asked -- I did

294

1    not start that drip and I asked about the day nurse who

2    gave me the patient, whether that -- whether she was

3    written up, and she told me, "I can't tell you that."

4        Q.   And, ultimately, you weren't disciplined for

5    that?

6        A.   Yes, I was.

7        Q.   Well, it's part of your fact-finding

8    suspension but --

9        A.   I was suspended without pay.

10       Q.   It was not part of your termination?

11       A.   It led to that.  That's a process.

12            MR. ASENSIO:  Let's mark this.

13                         - - -

14            A TWO-PAGE DOCUMENT ENTITLED,

15            "PERFORMANCE MANAGEMENT RECORD,"

16            DATED 10/11/13, WAS MARKED AS JC

17            EXHIBIT 48.

18                         - - -

19            THE WITNESS:  The other thing on the CIWA --

20            MR. ASENSIO:  I don't have a question to you

21   right now.

22            THE WITNESS:  Oh, okay.

23   BY MR. ASENSIO:

24       Q.   Handing you what's been marked as Plaintiff's

295

1  Exhibit 48, this is a PMR that's marked "Termination."

2  It is signed by Amy and Susie 10/11 of '13 and it lists

3  two items in the "Description of Behavior" about

4  two-thirds of the way down the page.  Are you with me?

5       A.   Yes.

6       Q.   The first one is the Heparin-drip issue --

7       A.   Correct.

8       Q.   -- that we saw on Exhibit 46, the

9  fact-gathering suspension; correct?

10      A.   Yes.

11      Q.   And the second one is the detoxing patient on

12  the Ativan?

13      A.   Yes.

14      Q.   Which is Item 4 on that Plaintiff's Exhibit

15  46; correct?

16      A.   Correct.

17      Q.   Those were the only two issues that were left

18  after they had investigated it; right?

19      A.   Right.

20           It was actually the same night.  I had both

21  those patients the same night.  Not that it matters,

22  but ....

23      Q.   But, ultimately, for the termination PMR,

24  those are the only two issues that are listed?

1      A.   The termination PMR, correct.

2      Q.   Now, I note that, on the termination notice,

3 it says, under "Associate Signature:  Provided via

4 certified mail."

5           Let me go ahead and give you another exhibit.

6                        - - -

7           A ONE-PAGE SAYERS/CASAGRANDE

8           LETTER, DATED 10/11/13, WAS MARKED

9           AS JC EXHIBIT 49.

10                       - - -

11     Q.   Do you recall if you had received this letter

12 along with that PMR via certified mail?

13     A.   Yes.

14     Q.   And it notified you of your termination;

15 correct?

16     A.   Yes.

17     Q.   And did you decide to go ahead and appeal the

18 termination through the Problem Review process?

19     A.   Yes.

20          MR. ASENSIO:  Let's mark this as Exhibit 50.

21                       - - -

22          A FOUR-PAGE E-MAIL STRING,

23          BEGINNING WITH A CASAGRANDE/SAYERS

24          E-MAIL DATED 9/23/13, BATES-STAMPED

297

1          000960 THROUGH 0963, WAS MARKED AS

2          JC EXHIBIT 50.

3                          - - -

4    BY MR. ASENSIO:

5          Q.    Now, you had testified that you had asked Amy

6    for information with regard to some of the issues that

7    led to your termination; correct?

8          A.    Yes.

9          Q.    Handing you what's been marked as Exhibit 50,

10   this looks like an e-mail between you and Amy.

11         A.    Correct.

12         Q.    And if you look at the second page of this

13   exhibit, which is Bates 961, and it runs for three

14   pages through 963 --

15         A.    Yes.

16         Q.    -- it looks like you've asked for answers to

17   questions and there's different fonts, different types

18   in here.  It looks like it was cut-and-paste, and if

19   I'm reading this correctly, it looks like, based on the

20   first page, that what happened is:  Amy went back and

21   as she replied to your e-mail in certain sections, she

22   responded to the questions that you were raising;

23   correct?

24         A.    Repeat the question.

298

1      Q.    Look towards the bottom of the first page,

2   960.

3      A.    Uh-huh.  Yes.

4      Q.    Do you see where it states, September 23 at

5   2:57, A. Sayers, OhioHealth, wrote, "Hi Joe, Please see

6   the information below.  My answers are in red to your

7   questions"?

8      A.    Yes.

9      Q.    Now, we don't have the benefit of having this

10  in color but I'm presuming that what she did is:  In

11  red, she responded, in the next two or three pages, to

12  the different questions that you had raised?

13     A.    Correct.

14     Q.    Okay.

15     A.    This was actually two e-mails on my part.

16     Q.    Okay.  So if I look on Page 961 under Item 1,

17  it states, "The form was sent to me from pharmacy

18  requesting the nurse to complete the information and

19  sign the form."  That's her response; right?

20     A.    Yes, that was her response, or someone's

21  response.

22     Q.    But presumably Amy's.

23           And then you respond to her underneath that

24  with a paragraph that begins, "Sorry ..."; right?

299

1      A.   Yes.

2      Q.   And if we look at Item 2, it appears that her

3  response to your questions in Item 2 is the paragraph,

4  "Your documentation started at 2043 on 8/30/13 ...";

5  correct?

6      A.   Yes.

7      Q.   And then you responded in the next paragraph

8  with a paragraph that begins, "Sorry ..."?

9      A.   Yes.

10      Q.   Item 3, it looks like her response towards

11  the top of Page 962 is, "This situation occurred on the

12  evening of 8/31/13 into the morning of 9/1/13."

13           And then it looks like it's your response,

14  "Please reread my entire question and adequately

15  respond to each part"; is that right?

16      A.   That's correct.  Yes.

17      Q.   Then Item 4, it looks like the first section

18  is your questions with regard to Item 4.  Her response

19  appears to be the paragraph that begins towards the

20  bottom of 962, starting, "I have reviewed your nursing

21  documentation ..."?

22      A.   Yes.

23      Q.   And then your response to her is the

24  paragraph beginning underneath that, "Sorry ..."?

300

1     A.   Yes.

2     Q.   All right.

3          Let's identify this.  Got a couple more

4     policies I want to just ask you if you can identify for

5     me.  Have you seen this exhibit before?

6                          - - -

7          A SIX-PAGE DOCUMENT ENTITLED,

8          "HUMAN RESOURCES POLICY AND

9          PROCEDURE ... TITLE:  PERFORMANCE

10         MANAGEMENT," REVISED FEBRUARY 2012,

11         BATES-STAMPED 000329 THROUGH 0334,

12         WAS MARKED AS JC EXHIBIT 51.

13                         - - -

14    Q.   It purports to be a Performance Management

15    policy for OhioHealth.

16    A.   Yes, I have seen it.

17    Q.   And you were familiar with it during your

18    employment?

19    A.   Correct.

20    Q.   You can set it aside.

21         MR. ASENSIO:  Mark this as 52.

22                         - - -

23         A THREE-PAGE DOCUMENT ENTITLED,

24         "HUMAN RESOURCES POLICY AND

```
 1              PROCEDURE ... TITLE:  PROBLEM

 2              REVIEW," REVISED JULY 2013,

 3              BATES-STAMPED 001809 THROUGH 1811,

 4              WAS MARKED AS JC EXHIBIT 52.

 5                        - - -

 6   BY MR. ASENSIO:

 7        Q.   This purports to be a Problem Review policy?

 8        A.   Correct.

 9        Q.   And had you seen this before, during your

10   employment?

11        A.   Yes.

12        Q.   All right.  You can set that aside.

13             Now, suffice it to say there was quite a bit

14   of correspondence between yourself and other folks at

15   OhioHealth regarding the appeals of your two final

16   written warnings -- the final written warning and the

17   termination; correct?

18        A.   That would be a correct statement.

19        Q.   I'm not going to go through that.  Those are

20   all e-mail correspondence -- Correct? -- basically?

21        A.   From my side, yes.

22        Q.   As I understand the Problem Review process,

23   it would first go -- the first level would go to whom?

24        A.   It's my understanding that I have -- the
```

302

1  first level was:  I can -- like in the final warning,

2  I'm able to appeal that with Amy.

3      Q.   Okay.  And then from Amy, where does it go?

4      A.   Then it goes to her supervisor.  At that

5  time, it was Lisa Kinder.

6      Q.   Who is the CNO -- Right? -- Chief --

7      A.   No.

8      Q.   Okay.  No, that's right.

9      A.   I don't remember her title, but she was under

10  the CNO at the time.

11      Q.   And then from there, does it go to the CNO?

12      A.   Then it goes to the CNO, and then it goes to

13  committee.

14      Q.   And is there an appeal after it goes to

15  committee?

16      A.   However the committee votes, it goes to the

17  President.  Not Obama, but ....

18      Q.   That would be the president of the hospital?

19      A.   Yes.

20      Q.   Dr. Markovich?

21      A.   Yes.

22      Q.   Okay.

23                        - - -

24              A TWO-PAGE DOCUMENT FROM JOE

303

```
1              CASAGRANDE, DATED 9/24/13,

2              BATES-STAMPED JFC257 AND 258, WAS

3              MARKED AS JC EXHIBIT 53.

4                          - - -

5    Q.   Have you seen this document before?

6    A.   Yes.

7    Q.   That's marked, it looks like, "CNO Appeal" at

8  the top of it?

9    A.   Correct.

10   Q.   Which would have been the appeal to Lisa

11 Gossett; correct?

12   A.   Which?  Let's see.

13   Q.   Wasn't she the CNO?

14   A.   This is 9/24.  This was on the final warning

15 appeal.

16   Q.   Yes.

17   A.   Lisa Gossett was there.  She was

18 transitioning into the CNO position, and there was also

19 another CNO there that was transitioning out.  So I met

20 with two CNOs, basically.

21   Q.   And was this something you presented to the

22 CNO in that level of the appeal for your final written

23 warning?

24   A.   Yes.  This was in addition to the document
```

1  they had already, which was all the stuff that you just

2  went through.

3      Q.   Okay.

4      A.   So they had all that.  They didn't have this

5  (indicating).

6           I was told to make -- present a statement.

7      Q.   If you look at the bottom of this page,

8  there's a paragraph that begins, "As the weeks went on,

9  several of my coworkers indicated to me that my manager

10  has approached them asking them to write up negative

11  comments about me."

12           Is that the situation we discussed previously

13  with Tamara, Mike and Sherry?

14      A.   Yes.

15      Q.   Any others?

16      A.   No one that came to me and said that they

17  were approached directly.

18      Q.   Okay.

19      A.   But, yes.

20      Q.   On the next page, about four lines down,

21  there is a sentence that starts, "As I've indicated

22  several times in my correspondence, I feel that I am

23  being targeted for termination and have indicated the

24  fact that this is also a violation of the FMLA.  Other

1    coworkers have shared with me that they know what's

2    going on but do not have the power to speak up or do

3    anything about it for fear of retribution."

4            Who would that be?  Who are you referring to?

5    A.    Tamara, specifically.  People say they don't

6    want to get involved.  Mike Blankenship.

7    Q.    Towards the bottom, you state, "I feel like

8    through no fault of my own I was put in a position of

9    having to take medical leave and then being denied my

10   position back and when presenting to OhioHealth the

11   fact that indeed my position was protected, that I'm

12   being retaliated against ..."

13           Do you see that?

14   A.    Yes.

15                     - - -

16           A TWO-PAGE DOCUMENT FROM JOE

17           CASAGRANDE ENTITLED, "MEMO

18           10/18/2013 - APPEAL TO COMMITTEE,"

19           BATES-STAMPED JFC259 AND 260, WAS

20           MARKED AS JC EXHIBIT 54.

21                     - - -

22   Q.    This is a similar document.  It's dated

23   10/18/2013, "Appeal to Committee."  I take it this

24   would have been the next step after the appeal to

1  Ms. Gossett and the CNO?

2      A.  Yes.

3      Q.  And was this something you presented to the

4  committee?

5      A.  Yes, it is.

6      Q.  And then, ultimately, the committee upheld

7  your final written warning; correct?

8      A.  That's what I was told.

9      Q.  Okay.

10      A.  I was told they -- that Dr. Markovich upheld

11  it.  I don't know how the committee voted.  Each had a

12  vote.

13                      - - -

14           A ONE-PAGE MARKOVICH/CASAGRANDE

15           LETTER, DATED 10/29/13,

16           BATES-STAMPED JFC313, WAS MARKED AS

17           JC EXHIBIT 55.

18                      - - -

19      Q.  Handing you what's been marked as Exhibit 55,

20  this is a letter to you from Dr. Markovich; correct?

21      A.  I did not receive it directly from him.

22      Q.  Who did you receive it from?

23      A.  Susan Talebi.

24      Q.  How did you receive it from Susie Talebi?

307

1      A.   Attached to an e-mail.

2      Q.   Oh, she -- Okay.  So she forwarded it to you

3  via e-mail?

4      A.   Yes.

5      Q.   All right.

6           And this appears to be signed by him; does it

7  not?

8      A.   I don't know that's his signature.

9      Q.   All right.  Well, certainly, it's indicated

10  that that's his signature; correct?

11      A.   Correct.

12      Q.   You don't have any reason to doubt that

13  that's his signature; do you?

14      A.   I would not know.

15      Q.   Okay.  And in this document, it tells you

16  that the committee voted to recommend upholding the

17  final written Performance Management Record; correct?

18      A.   That's what it says, yes.

19      Q.   And then he goes on to say that he supports

20  the recommendations made by the Appeal Committee and

21  upholds the Final Written Performance Management

22  Record?  That's in Paragraph 2.  Correct?

23      A.   Right.

24      Q.   In Paragraph 3, he does not reach a

1  conclusion with regard to the Written Performance

2  Management Record for attendance; is that correct?

3       A.   That's what's stated, yes.

4       Q.   Because you had appealed both, I believe,

5  both those issues?

6       A.   Right.  I tried to appeal both.

7       Q.   Okay.

8       A.   I never received an answer on attendance --

9       Q.   Okay.

10      A.   -- from anyone.

11      Q.   Now, you also appealed the termination;

12  correct?

13      A.   I appealed both the fact-gathering suspension

14  PMR and the termination PMR concurrently.

15           MR. ASENSIO:  Let's go ahead and mark this.

16                       - - -

17           AN 11-PAGE E-MAIL STRING, BEGINNING

18           WITH A CASAGRANDE/SAYERS E-MAIL

19           DATED 11/2/13, BATES-STAMPED 001594

20           THROUGH 1604, WAS MARKED AS JC

21           EXHIBIT 56.

22                       - - -

23      Q.   This purports to be a series of e-mails

24  principally between yourself and Ms. Talebi regarding

309

1    your appeal of the fact-finding suspension and

2    termination; is that right?

3         A.   Yes.

4         Q.   Now, similar to the appeal that you had for

5    your final written warning, the fact-finding suspension

6    and termination would have gone to the Chief Nursing

7    Officer; correct?  That's one of the levels of the

8    appeals process?

9         A.   It "would have gone."  Lisa was gone by then,

10   Lisa Kinder.

11        Q.   Well, after Kinder, it would have gone to

12   Lisa Gossett; correct?

13        A.   Correct.

14                    - - -

15             A ONE-PAGE GOSSETT/CASAGRANDE

16             LETTER, DATED 11/13/13,

17             BATES-STAMPED JFC315, WAS MARKED AS

18             JC EXHIBIT 57.

19                    - - -

20        Q.   So handing you what's been marked as Exhibit

21   57, this is a letter dated November 13 to you from Lisa

22   Gossett concurring with the decision to terminate your

23   employment; correct?

24        A.   That was, yes, what she said.

310

```
 1        Q.   And then the next step after this level of
 2   the appeal would have been to present your appeal to a
 3   committee; correct?
 4        A.   Correct.
 5        Q.   Now, in fact, that never happened; did it?
 6        A.   No, it did not.
 7        Q.   And it never happened because a decision was
 8   made to terminate your appeal?
 9        A.   Correct.
10                         - - -
11             A SEVEN-PAGE E-MAIL STRING,
12             BEGINNING WITH A TALEBI/CASAGRANDE
13             E-MAIL DATED 12/18/13,
14             BATES-STAMPED 001819 THROUGH 1825,
15             WAS MARKED AS JC EXHIBIT 58.
16                         - - -
17        Q.   All right.  Handing you what's been marked as
18   Plaintiff's Exhibit 58, this again is a series of
19   e-mails between yourself and Ms. Talebi, and directing
20   your attention to the second page, Bates-Stamped 1820,
21   December 18 at 10:27 a.m., Susan Talebi wrote, "Joe:
22   Since we have been unable to come to an agreement on a
23   date and time for the Committee Meeting in the Problem
24   Appeal process for your termination, OhioHealth has
```

1  decided to discontinue the appeal process with you."

2        Do you see that?

3    A.  I see that.

4    Q.  All right.  And that was your notification

5  that the appeal was being terminated; correct?

6    A.  Yes.

7        Also my grievance.  I'd filed a grievance.

8    Q.  With the Office of Ethics and Compliance?

9    A.  Yes.

10    Q.  All right.  And that was also similarly

11  terminated; correct?

12    A.  Yes.  I don't know if it was in this

13  document.

14    Q.  I am going to hand you a copy of your Second

15  Amended Complaint.  This is not marked.  You have seen

16  this before, I take it?

17    A.  Yes.

18    Q.  And I assume you saw the original Complaint

19  that was filed on your behalf back on March 12th of

20  2013; correct?

21    A.  I recall getting a copy of that, yes.

22    Q.  There are two counts that you raise in this

23  Complaint.  The first appears on Page 4.  It's

24  entitled, "Violation of the Family Medical Leave Act."

1    And if you look at Paragraph 29, it alleges Defendants

2    unlawfully interfered with Plaintiff's rights under the

3    Family Medical Leave Act by denying FMLA protection

4    after Plaintiff became an eligible employee on December

5    5, 2012.

6         A.   I'm sorry.  What page are you on?

7         Q.   Page 5.

8         A.   Okay.

9         Q.   Do you see Paragraph 29?

10        A.   Yes.

11             Do I have the right document?

12        Q.   Yeah.  Paragraph 29, right there at the top.

13             Now, we spent a lot of time today talking

14   about a lot of the facts underlying your lawsuit and we

15   spent a lot of time talking about issues surrounding

16   your claimed FMLA leave for the leave of absence that

17   you had in late 2012 and early 2013, and we spent a lot

18   of time talking about the issues -- disciplinary issues

19   that ultimately resulted in your termination in 2013.

20   What I'd like to ask you is:  With regard to both these

21   counts, I want to make sure that I've fully covered

22   everything that it is factually that you are alleging

23   forms a basis for bringing both of these claims against

24   OhioHealth and Ms. Sayers, okay?  Does that make sense?

313

1      A.   It makes sense.  I'm not sure everything has

2  been covered.

3      Q.   Well, that's what I'm going to ask you.

4           So with regard to Paragraph 29 and your

5  allegation that Defendants unlawfully interfered with

6  your rights under the Family Medical Leave Act by

7  denying you protection after you became an eligible

8  employee on December 5, 2012, have we fully covered all

9  the facts that you believe form the basis of that

10 claim?

11     A.   I'm not an attorney.

12     Q.   I'm not asking you for a legal conclusion.  I

13 just want to know if, factually, we've covered

14 everything that you believe supports your allegation?

15     A.   I believe so.

16     Q.   In Paragraph 32, you allege that Defendants

17 lacked good faith and/or reasonable grounds to believe

18 that it had not violated the Family Medical Leave Act.

19 Did anyone from OhioHealth ever explain to you what

20 happened with regard to the failure to -- notice that

21 you were eligible for Family Medical Leave as of

22 December 5, 2012?

23     A.   Did anyone explain to me?

24     Q.   Yeah.  Did anybody ever tell you what

314

1   happened?

2       A.   Specifically?

3       Q.   Or vaguely.  In any way whatsoever.

4       A.   I'm trying to remember.

5            I don't recall.

6       Q.   Okay.  You don't recall whether anybody told

7   you that it was a simple mistake?

8       A.   I do recall in the meeting that Susan and I

9   had with Lisa Kinder when I brought up the letter, the

10  December 11th letter that Amy signed, Susan said that

11  she didn't know what she was signing, and I said,

12  "Well, that's her problem."

13      Q.   Okay.  You have no reason to doubt that; do

14  you?

15      A.   I have every reason to doubt that.

16      Q.   Do you have any facts that would lead you to

17  conclude that she intentionally denied you FMLA?

18      A.   I have circumstances.

19      Q.   Would we have to ask Amy to find out what she

20  was thinking at the time she wrote that letter?

21      A.   Yes.

22      Q.   Now, at some point after you were reinstated

23  in March of 2013, you received a check from OhioHealth;

24  did you not?

                                                                          315

1          A.   That's correct.

2          Q.   And it would have been from Mr. Hale, who is

3    in payroll?

4          A.   Correct.

5          Q.   And it was a check that was for lost wages

6    for the period of time of February 27 through March 18

7    of 2013?

8          A.   That's what the letter said.

9          Q.   Okay.  And you did receive that check?

10         A.   I received it.

11         Q.   You did not cash it; right?

12         A.   I did not accept it.  Right.

13         Q.   Did not return it, did not cash it; correct?

14         A.   I did not return it.

15              I was sent a letter in September saying it's

16   90 days.  I did not respond to that until January.

17         Q.   Okay.  Count II.  Let's go to the second

18   count in the Complaint.  In Paragraph 36, you allege

19   that Defendants violated the Family Medical Leave Act

20   by terminating Plaintiff from his position in

21   retaliation for attempting to exercise and/or

22   exercising his rights under the Family Medical Leave

23   Act.  Do you see that at the bottom of Page 5?

24         A.   I do, yes.

316

1      Q.   Have we covered all the facts that you

2  believe form the basis of your claim that you were

3  retaliated against by Defendants for exercising rights

4  under FMLA?

5      A.   Probably not.

6      Q.   What have we missed?

7      A.   I'm not an attorney but I'm sure my attorney

8  will provide that.

9      Q.   Well, I'm not asking you --

10       I want to know what you think, factually, we

11  have missed in the hours we've spent together today.

12      A.   I could not tell you.

13      Q.   All right.  Do you think we have covered it

14  factually?

15      A.   I honestly don't know.

16      Q.   Can you think of anything, sitting here

17  today, that we haven't covered, that you think is

18  relevant to your claim that you were retaliated

19  against?

20      A.   We didn't talk about my grievance.

21      Q.   All right.  Let's talk about that.  This is a

22  grievance with the Office of Ethics and Compliance?

23      A.   Correct.

24      Q.   And what did it allege?

1    A.   It alleged that there were false statements

2    made on the fact-gathering suspension PMR and the

3    termination PMR.

4         Q.   All right.  And false statements by whom?

5         A.   By Amy Sayers.

6              And that, also, by that being canceled by

7    Susan Talebi unilaterally, that was also a violation of

8    ethics.

9         Q.   All right.

10        A.   She had an obligation to present that.

11        Q.   So your contention is that those two issues

12   should have been raised and investigated as a grievance

13   under the Office of Ethics and Compliance?

14        A.   Absolutely.

15        Q.   When you filed your grievance, did you file

16   it with them directly?

17        A.   I filed -- I sent a letter to -- an e-mail to

18   Susan Talebi asking her what the process was and she

19   indicated she would forward it to Ethics and

20   Compliance; and later, approximately a month later, she

21   told me she did not do that and she was terminating

22   both.

23        Q.   Did you ever have any understanding at all as

24   to what the Office of Ethics and Compliance did with

318

1    your grievance, if anything?

2         A.    I assume, based on what Susan told me, they

3    never received it.

4         Q.    Other than your grievance with regard to the

5    Ethics and Compliance complaint, any other allegations

6    or facts that we failed to cover in support of your

7    retaliation claim?

8         A.    I'm not aware of any, but there could be

9    some.

10             MR. ASENSIO:   Give me a minute.  Let's take a

11   short break.

12             (Recess taken.)

13   BY MR. ASENSIO:

14        Q.    Sir, we had sent interrogatories to you

15   through counsel as part of the discovery process, and

16   in one of the interrogatories, we had asked you to give

17   us the identity of individuals with knowledge or

18   information regarding the allegations in your

19   Complaint, and there were some people that you named

20   off that I want to make sure I understand what they

21   might know or what you think they might know.

22        A.    Okay.

23        Q.    And so the first one was Ms. Toni Carroll,

24   your sister.

```
 1        A.    Correct.

 2        Q.    Other than what we've covered so far today,

 3   is there anything else that she would have knowledge of

 4   with regard to your claims against OhioHealth and

 5   Ms. Sayers?

 6        A.    No.

 7        Q.    Mr. David Retamar; is that right?

 8        A.    Yes.

 9        Q.    What knowledge would he have about your

10   claims against OhioHealth?

11        A.    We live together so he knows what's going on.

12        Q.    Okay.  But he wasn't involved in any of the

13   issues that regarded your FMLA leave or your employment

14   with OhioHealth?

15        A.    In what regard?

16        Q.    Well, he wasn't employed by OhioHealth --

17        A.    No.

18        Q.    -- so I assume he didn't have any direct

19   knowledge or involvement in those issues; right?

20        A.    Correct.

21        Q.    You would have shared with him and talked

22   with him about what was going on in the workplace?

23        A.    Yeah.  Got his opinion.

24        Q.    Okay.  Chris Brewer.  Who is Chris Brewer?
```

1       A.   She is a nurse on -- the night nurse on the

2  unit that I worked on.

3       Q.   What knowledge would Chris Brewer have?

4       A.   Again, it's usually when people would ask me

5  what's going on because they knew things -- you know,

6  things get talked about.

7       Q.   And what discussions did you have with

8  Ms. Brewer?

9       A.   I think it was over the UORs, the initial

10  UORs that I'd been getting.  She indicated, "Oh, they

11  won't do anything about that for six months.  Don't

12  worry about it."  I said, "No, they're pulling me in

13  right away," and she was surprised.

14       Q.   Anything else with Ms. Brewer?

15       A.   That's all I recall.

16       Q.   How about Ms. Daniels, Tiffany Daniels?

17       A.   She again -- she shared with me that Christy

18  Griske was running around all excited.  She's --

19  Tiffany's like a charge nurse during the day.  And the

20  words to the effect that Christy was excited because

21  they found a draw needle on the floor in a room that

22  I'd had a patient for, and Tiffany thought -- and they

23  were going to try to attach it to me, write up

24  something on me, was what she had told me.

1      Q.   That never happened, though; did it?

2      A.   I never heard anything about it.  I don't

3   know if it's on any of the stuff that I was not given

4   access to.

5      Q.   Well, we certainly didn't discuss it today --

6   Did we? -- as part of the issues we discussed?

7      A.   No.

8      Q.   Anything else with Ms. Daniels?

9      A.   That's all I recall.

10      Q.   How about Ms. Fluty?  Anything other than

11   what we've talked about so far with Ms. Fluty?

12      A.   I'd asked her to be a reference for me.

13      Q.   For employment?

14      A.   Yes.

15           She agreed.

16      Q.   Have you asked her to testify in this matter?

17      A.   I have not.

18      Q.   Have you asked anyone to testify in your

19   behalf in this matter?

20      A.   I have not asked anyone.  That's up to my

21   attorney.

22      Q.   Anything else with regard to Ms. Fluty?

23      A.   Anything else?  What do you mean?

24      Q.   Any other facts --

322

1      A.   She is a friend.  I mean --

2      Q.   No.  Any other facts that she would have that

3   would be relevant to this lawsuit, that we haven't

4   discussed?

5      A.   Facts.  I don't believe so.  There may be.

6      Q.   Okay.  Heather Glasmeier?

7      A.   Yes.

8      Q.   What would Heather Glasmeier have knowledge

9   about with regard to your claims?

10     A.   She was -- she was -- she's a day-shift

11   nurse.  She was at the nurses' station when I paged

12   Tamara, who was charging, to ask for assistance with --

13   Tamara had a patient, too, and I was trying to get two

14   patients up to the bathroom at the same time.  One of

15   them was Tamara's patient.  I was working with mine.  I

16   asked for help.  The --

17     Q.   Is that relevant to your claims?

18     A.   The tech was Brooke.  She was standing at the

19   nurses' station, not working, and that was her patient

20   that she should have been taking care of, and I guess

21   Tamara made some comment to her, "Well, just tell

22   him" -- or, "He can take care of that," and then Brooke

23   made it a point to come into the room to tell me that

24   I'm a nurse and I can handle that --

323

1    Q.   Okay.

2    A.   -- her job.

3    Q.   Anything else with regard to Ms. Glasmeier?

4    A.   She overheard that, reported it to Amy, and

5    she told me that the response was a blank stare.

6    Q.   Okay.  Any other facts regarding

7    Ms. Glasmeier's knowledge of your claims?

8    A.   Just maybe whatever rumor mill was at that

9    time, she may have picked up.

10   Q.   All right.  But you don't have any specific

11   recollection today?

12   A.   No.

13   Q.   How about Debbie Gullett?  What knowledge

14   would she have relevant to your claims?

15   A.   She again -- again, people on my floor knew

16   what was going on by word of mouth, not just mine.  She

17   would ask me -- I remember one time, "Why are you still

18   here?" you know.  And, "What's going on?"  And I would

19   tell her what was going on.

20        But ever since Amy told me specifically not

21   to discuss the case with -- or discuss the

22   fact-gathering suspension with my peers, I did not.

23   Q.   Any other facts that Ms. Gullett would have?

24   A.   No.  I don't believe so.

1        Q.    Sherry Pappas.  We talked a lot about

2    Ms. Pappas.

3        A.    Yeah.

4        Q.    Anything that we did not cover with regard to

5    Ms. Pappas' knowledge of your claims?

6        A.    Not that I am aware.

7        Q.    How about Angela Toney?

8        A.    She had a -- she was one I would often give

9    patients to.  She was a day nurse.  She was aware of

10   the situation where I was accused of not passing my

11   meds.  We talked about it.

12       Q.    Any other facts that she would have relevant

13   to your claims?

14       A.    Just her opinion.

15       Q.    All right.

16             I've got a few documents I want to just ask

17   you to identify for me, and you've Bates-Stamped them

18   so it's going to be easy to do.  I don't intend to

19   introduce them as exhibits.

20             JC321 is a Bates-stamped note.  Can you tell

21   me what that document is?

22       A.    Yeah.  I received this in the mail.  It was

23   an anonymous --

24       Q.    An e-mail?

1        A.    No.  It was actually -- came in an envelope.

2        Q.    You don't know who from?

3        A.    No return address.  Don't know.

4        Q.    When did you receive it?

5        A.    Somewhere around the date.  Probably after

6    that.

7        Q.    All right.  So you have no idea who this

8    would be from?

9        A.    No, and they never came forward.

10       Q.    Did you receive it at your home?

11       A.    Yes.

12       Q.    I have starting with JFC34 and through JFC27.

13   I guess these are three documents that look to be

14   medical records and I want to know if you can tell me

15   whose writing this is and who this is from.  I guess,

16   specifically, is this from Dr. Dipietra?

17       A.    These are different dates.

18       Q.    They look to be medical records.  I was very

19   challenged trying to read the writing but I just

20   wanted -- Is it Dr. Dipietra?

21       A.    Yes.  Dr. Dipietra.  I'm looking at them now.

22   I'm seeing if they are all from him.

23             It's from his office, yeah.

24       Q.    They all three appear to be the same form

326

1   with different writing on it and I can talk to him

2   about it.  We don't need to spend any more time on it.

3         A.   Okay.  Yeah.

4         Q.   Thank you.

5              MR. ASENSIO:  At this point, I think I'm

6   done.  Thank you, sir.

7              THE WITNESS:  You're welcome.

8              MR. MANSELL:  We'll read.

9              (Discussion off the record.)

10             MR. ASENSIO:  Just for the record, I'm done

11  but I am preserving the right to pursue before the

12  court the issue about the attorney-client privilege and

13  the questions concerning those issues.  Thanks.

14                        - - -

15             Thereupon, at 4:46 p.m., on Tuesday, March

16  11, 2014, the deposition was concluded.

17                        - - -

18

19

20

21

22

23

24

327

```
 1                        CERTIFICATE

 2   STATE OF OHIO        :
                                        SS:
 3   COUNTY OF _____       :

 4

 5            I, JOSEPH CASAGRANDE, do hereby certify that

 6   I have read the foregoing transcript of my deposition

 7   given on March 11, 2014; that together with the

 8   correction page attached hereto noting changes in form

 9   or substance, if any, it is true and correct.

10                        _____
                          JOSEPH CASAGRANDE
11

12            I do hereby certify that the foregoing

13   transcript of the deposition of JOSEPH CASAGRANDE was

14   submitted to the witness for reading and signing; that

15   after he had stated to the undersigned Notary Public

16   that he had read and examined his deposition, he signed

17   the same in my presence on the _____ day of

18   _____, 2014.

19

20

21                        _____
                          NOTARY PUBLIC - STATE OF OHIO
22   My Commission Expires:

23   _____, _____.

24
```

328

```
 1

 2                        CERTIFICATE

 3    STATE OF OHIO       :
                                        SS:
 4    COUNTY OF LICKING   :

 5            I, Sylvia A. Fraley, a Registered Diplomate
      Reporter, Certified Realtime Reporter and Notary Public
 6    in and for the State of Ohio, duly commissioned and
      qualified, do hereby certify that the within-named
 7    JOSEPH CASAGRANDE was by me first duly sworn to testify
      to the truth, the whole truth, and nothing but the
 8    truth in the cause aforesaid; that the deposition then
      given by him was by me reduced to stenotype in the
 9    presence of said witness; that the foregoing is a true
      and correct transcript of the deposition so given by
10    him; that the deposition was taken at the time and
      place in the caption specified and was completed
11    without adjournment; and that I am in no way related to
      or employed by any attorney or party hereto or
12    financially interested in the action; and I am not, nor
      is the court reporting firm with which I am affiliated,
13    under a contract as defined in Civil Rule 28(D).

14            IN WITNESS WHEREOF, I have hereunto set my
      hand and affixed my seal of office at Columbus, Ohio on
15    this 24th day of March, 2014.

16

17                       _____
                         SYLVIA A. FRALEY, RDR, CRR
18                       NOTARY PUBLIC - STATE OF OHIO

19    My Commission Expires:  May 4, 2018.

20                            - - -

21

22

23

24
```

EXHIBIT

JC 10

Form A

 OhioHealth

To be completed by associate and returned to Associate Health and Wellness

## Leave of Absence Application – OhioHealth

Associate Health Phone (614) 566-4100 or (740) 615-4100
Associate Health FAX  (614) 533-0039

| Associate Name _Joseph Casagrande_ | | | Clock Number _77893_ | | |
|---|---|---|---|---|---|
| Address _1426 Yorktown Rd._ | | | City _Columbus_ | State _OH_ | ZIP _43232_ |
| Home/Cell Phone Number _614-581-8001_ | | | E-mail address _jcasa123@aol.com_ | | |
| Work Phone Number _566-5471_ | Department Name _7 Orange_ | Supervisor _Amy Sayers_ | Supervisor Phone Number _566-4747_ | | Cost Center No. |

COMPLETE AND SUBMIT TO ASSOCIATE HEALTH WITH REQUIRED FORMS FOR LEAVE OF ABSENCE PROCESSING

### Reason for Leave of Absence

☑ Health Condition of Self; is the Condition work related?  ☐ Yes  ☒ No
☐ Health Condition of Spouse          ☐ Health Condition of Parent
☐ Health Condition of Child; What is the age of the child? _____
☐ Parental Leave for:   ☐ Maternity  ☐ Paternity  ☐ Foster Care  ☐ Adoption
  If Pregnant or requesting paternal leave, provide Estimated Due Date: _____/_____/_____
  Do you have a spouse that works for OhioHealth?  ☐ Yes  ☐ No
☐ Personal Leave (no additional forms required)
  Reason requesting personal leave: _____
  Supervisor's approval (mandatory signature): _____
☐ Military Leave – when possible, submit official orders or schedule of annual training dates to include *Military Unit Training Assemblies "MUTA"* to report for duty and submit documentation of military pay and benefits during the period of leave.
☐ Qualifying Exigency Military FMLA          ☐ Military Caregiver FMLA Leave

### Type of Leave Needed  Check and complete dates for all that apply.

☑ Continuous (unable to work)  Begin Date for LOA coverage: _7/20/2012_   Return to Work Date _8/7/12_
☐ Intermittent (able to work, but may need time off periodically)

**Please check all that apply:**
☐ For Medical Treatments/Appointments   Begin Date:_____   End Date:_____
  What is the treatment/appt.schedule:_____
☐ For Episodes of Incapacity      Begin Date:_____   End Date:_____
  How often do you need to miss work due to this condition?
  _____times/week, or _____times/month, or _____times/year
  How long does each episode last? _____hours, or _____days
☐ For a Reduced Schedule
  What is the schedule? (hours per day)  M_____ T_____ W_____ Th_____ F_____ Sa_____ Su_____

If you are eligible, and medical documentation is received, FMLA will be applied to your qualified Serious Health Condition(s)

### Conditions of Leave

I agree and accept the conditions of my leave of absence as follows:
- I understand that if I do not return when my leave expires, I will be considered to have voluntarily terminated my employment except if I am on Military Leave, I must return to work in compliance with USERRA.
- I understand that if I accept other employment while on leave, this will be considered a voluntary resignation.
- I understand my leave of absence is administered by Associate Health and Wellness and subject to OhioHealth Human Resource Policies.
- I certify the above information is true and correct to the best of my knowledge and that intentional misrepresentation may result in termination.

Associate Signature _Joseph Casagrande_                Date _7/20/12_

8

**EXHIBIT**

JC  11

Form C

To be completed by Healthcare Provider and returned to Associate Health and Wellness for:

☒ Continuous Leave (greater than three days) to care for a Family Member
☐ Intermittent/Reduced Schedule for Patient/OhioHealth Associate
☐ Intermittent/Reduced Schedule to care for a Family Member

**OhioHealth**

## Family Medical Leave Medical Certification –
## OhioHealth Associate Health and Wellness

Associate Health Phone (614) 566-4100 or (740) 615-4100
Associate Health FAX  (614) 533-0039

*NOTE: Use Form B for a continuous medical leave for your patient/OhioHealth associate*

**FML SECTION A**   N/A

OhioHealth Associate's Name (Print):   Joe E Casagrande

Family Member's Name (if applicable): _____

☐ Spouse   ☐ Parent   ☐ Child:   Age of child: _____

Please describe medical facts related to the condition for which you patient seeks leave (such medical facts may include **symptoms,**

**diagnosis,** or any regimen of continuing treatment such as the use of specialized equipment):_____

In your opinion do these medical facts constitute a **serious health condition** under the FMLA as set forth on the reverse side?   ☐ Yes   ☐ No

☐ Hospital Care   ☐ Absence Plus Treatment   ☐ Chronic condition   ☐ Permanent or long term condition

**FML SECTION B**   N/A

## CONTINOUS CARE FOR YOUR PATIENT/OHIOHEALTH ASSOCIATE'S FAMILY MEMBER

▪ Does the patient require assistance for basic medical, hygienic, nutritional, safety, or transportation needs, or for providing physical or psychological care?   ☐ Yes   ☐ No

▪ Does above named associate need a **continuous period of time** to provide for their family member?
  If Yes: Length of Leave: Beginning date  7 / 19 / 12   Estimated end date  8 / 7 / 12

Below, please explain the care needed by the patient and why such care is medically necessary:_____

**FML SECTION C**

## INTERMITTENT LEAVE/CARE FOR PATIENT/OHIOHEALTH ASSOCIATE OR FAMILY MEMBER

▪ Does your patient need to take time off work intermittently or to work a less than full schedule as a result of his/her own serious health condition or their family member's, including any recover or flare-ups?   ☐ Yes   ☒ No   If yes, (Provide best estimate):

  Frequency: How often is the patient incapacitated due to this condition?   _____ x/week   _____ x/month   _____ x/year
  Duration: How long will each period of incapacity last?   _____ hour(s)   _____ day(s)

▪ And/or does your patient need to be absent from work for his/her own treatment or Family Member's?   ☐ Yes   ☐ No   If yes, (Provide best estimate):

  Frequency: How often is treatment required?   _____ x/week   _____ x/month   _____ x/year
  Duration: How long will each treatment last?   _____ hour(s)   _____ day(s)

Below, please explain the care needed by the patient and why such care is medically necessary:

Patient has severe anxiety d/o with
panic attacks.

TIM NUSS
CERTIFIED NURSE PRACTITIONER
CANYON MEDICAL CENTER
5969 E. BROAD ST.  STE. 200
COLUMBUS, OHIO  43213

Physician/Healthcare Provider Signature          Printed Name of Healthcare Provider

Date:  7/23/12      Phone:  614-864-6010       Fax:  614-552-5122      12

Casagrande v. OhioHealth 001170



EXHIBIT
JC 12



**OhioHealth**

Associate Health and Wellness
Suite 430
3545 Olentangy River Road
Columbus, OH  43214-3993

Phone: (614)566-4100
(740)615-4100
Fax: (614)533-0039

Joseph Casagrande
1426 Yorktown Road
Columbus, OH  43232

7/24/2012

TO:    Joseph Casagrande   OhioHealth Associate  -  RMH001

RE:  DENIED Family Medical Leave Absence

OhioHealth is committed to providing associates with time away from work to care for themselves and/or their family members in the event of a serious health condition. In accordance with the Family and Medical Leave Act (FML), in a rolling calendar year, OhioHealth provides 12 weeks of job protected leave to "eligible" associates for certain family and medical reasons.

Associates are eligible if they have met both of the following requirements as of the date leave commences:
- Employed at OhioHealth for at least one year
- Worked a minimum of 1,250 hours over the previous 12 months.

You have requested FML for: Denied.  We have reviewed your request and documentation. We are unable to approve your FML request because one or more of the following criteria was not met:

Policy: FMLA - 36 hours per wk
Class: FML
Type: Continuous

| Status | Criteria |
| --- | --- |
| Ineligible | Associate has worked for 12 months or more |
| Ineligible | Associate has worked 1250 hours in the previous 12 mos |
| Eligible | Associate has provided valid medical certification |
| Unknown | Conditions meet requirements under FMLA (see comments) |

Comments:  FMLA denied - employed less than one year with OhioHealth.  Is eligible for short-term disability.

IF YOUR RETURN TO WORK DATE CHANGES FROM THE SPECIFIED DATE, YOU ARE REQUIRED TO PROVIDE ASSOCIATE HEALTH AND WELLNESS UPDATED MEDICAL. YOU ARE ALSO RESPONSIBLE TO KEEP YOUR MANAGER INFORMED OF YOUR LEAVE OF ABSENCE STATUS AND NEW SCHEDULED RETURN TO WORK DATE.

Casagrande v. OhioHealth 001385

Joseph Casagrande

In accordance with OhioHealth policy, a leave of absence may be approved for up to six (6) months within a rolling calendar year and may be taken consecutively or non-consecutively. FML runs concurrently with work related and non-work related Medical Leave and counts as part of the employee's six (6) month Leave of Absence. Any leave taken in the 12 month period prior to the start of this leave will be used to calculate remaining, eligible leave time. After all eligible FML time has been used; you may continue on a Medical Leave or request another form of leave (e.g., Personal Leave) until a comparable regular position is available or until the maximum leave period expires.

During your FML, your benefits may continue. If you return to work before the expiration of your FML, you will be reinstated to the same or equivalent position at the same pay, benefits, and terms and conditions of employment held prior to your FML leave. If your leave exceeds 12 weeks, or is not covered under FML, your position may be posted and filled. If you do not return to work or request a leave extension by the original leave expiration date you will be considered to have voluntarily resigned.

If you continue to receive a pay check while on leave, your normal associate benefit premiums will be automatically deducted from your pay each pay period. If any portion of your leave is unpaid, you must pay the balance of your monthly benefit premium by the end of each month. Your payment must be made directly to Benefits by the last day of the month in which the premium is due. Your associate benefit premium must be received within 30 days of the date it is due. If you do not make your associate benefit premium payment in a timely manner, your associate benefits will be cancelled. You will be notified, in writing, within 15 days prior to the date of cancellation.

Due to changes in the Department of Labor Family and Medical Leave Act (FMLA) regulations, OhioHealth has modified the qualification for Perfect Attendance bonus. An associate on FMLA is not eligible for the Perfect Attendance Bonus until he/she has returned to work, is actively employed for a six-month period, and meets all other criteria for qualification.

As an associate, the following is a list of your responsibilities:

1. Provide notice to Associate Health and Wellness of the need for leave.
    a) for leave that is foreseeable -- 30 days notice.
    b) for leave that is unforeseeable -- as soon as practicable.
    c) comply with the OhioHealth's policy for requesting leave.

2. Advise Associate Health and Wellness and your manager if leave is to be taken intermittently or on a reduced schedule basis, and that the leave is to be specified as FML at the time of request, or absence.

3. Provide medical certification for leave taken as a result of a serious health condition.

4. Comply with arrangements to make group health benefit co-payments. (If applicable.)

5. Periodically advise your Manager and Associate Health and Wellness of your intent to return to work at the conclusion of leave.

6. Notify Associate Health and Wellness of any change in the circumstances for which leave is being taken.

7. Provide Associate Health and Wellness with a fitness for duty certification (Return-To-Work release), when leave is taken for your own serious health condition.

IMPORTANT CONTACT INFORMATION
Associate Health and Wellness: 614-566-4100 or 740-615-4100 (Leave of Absence Management Information)
Benefits Department: 614-544-5189

cc: Sayers,Amy Sue

Casagrande v. OhioHealth 001386

From:                                      11/05/2012 16:13    #112 P.001/002

BELIEVE IN *WE* 丗 OhioHealth                              F A X

                                          Associate Health & Wellness
                                          3545 Olentangy River Road, Suite 425
                                          Columbus, OH 43016
                                          P: (614) 566-4100 F: (614) 533-0039

DATE:        10/1/2012
SUBJECT:     Joseph Casagrande DOB: 3/19/56

---

TO:          Dr. Tim Nuss
FAX #:       614-552-5122 tel:                           **EXHIBIT**

                                                          JC  16

             Rose M. Cacioppo, MA,CRC, CDMS
             Case Manager, Riverside Hospital
FROM:        Return-To-Work Programs/Disability
             Services, Associate Health & Wellness
             614-566-3747 tel

NO. OF PAGES INCLUDING COVER: 2

---

Dear Dr. Nuss:

I am a case manager in the Associate Health & Wellness office at Joe's workplace. I understand that you will be
taking him off work for a medical leave of absence. Joe asked me to fax the following form B leave of absence
form to you for completion.

Please indicate medical reason for off work, begin date and estimated RTW date (or next appt for re-val.)

Please fax back to: 533-0039.

If you have any questions please advise.

Sincerely,

Rose M. Cacioppo, MA, CRC

This message is only intended for the individual or entity to which it is addressed and may contain information that is privileged, confidential and
exempt from disclosure. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering this message
to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this message is prohibited. If you have received
this message in error, please notify the sender by telephone or return fax, and destroy any record of it. Thank you.

Casagrande v. OhioHealth 001177

From:                                           11/05/2012 16:13      #112 P.002/002

Form B

To be completed by Physician or Healthcare Provider and returned to Associate Health

**Medical Certification Form – OhioHealth**    Associate Health Phone (614) 566-4100 or (740) 615-4100
**Associate Health and Wellness**                Associate Health FAX  (614) 533-0039

*(below information may be submitted on physician's own form/script)*                    ⚕ **OhioHealth**

Patient's name (Print): __Joe Casagrande__   DOB: _3_ / _19_ / _56_   Next Appt: _11_ / _19_ / _12_

Please describe the plan of care and relevant medical facts related to the condition for which your patient
seeks leave (such medical facts may include **symptoms, diagnosis,** or any regimen of
continuing treatment such as the use of specialized equipment):

· Patient was treated at Grant ER 11/4/12
for alcohol withdrawl.

ICD9 Code requested for short term disability pay (not required for FMLA):

291.0

| Serious Health Conditions |
|---|
| 1. Hospital Care |
| 2. Absence Plus Treatment (>3 days) |
| 3. Pregnancy |
| 4. Chronic Conditions Requiring Treatments |
| 5. Permanent/Long Term Conditions Requiring Supervision |
| 6. Multiple Treatment (Non-Chronic Conditions) |
| If Pregnant provide EDC: ___/___/___ |

**OhioHealth** offers a Return to Work Program. We provide on-site Transitional Work
coordinated with Rehabilitation Therapists (OT/PT – no acute therapy performed) and
supported by Return to Work Case Managers. We will provide a safe return to work for
your patient/our associate from your restrictions listed below.

RETURN TO WORK & PHYSICAL CAPABILITIES

In your opinion your patient is:

☐ **Unable to work in any capacity**  From: _11_ / _2_ / _12_   To: _11_ / _22_ / _12_

☐ **Capable of limited duty  MAY RETURN TO LIMITED WORK:** ___/___/___   ☐ full time   ☐ part time*
(complete work capabilities below)

*If part time please provide hourly restriction: _____

☐ **May gradually increase activities as tolerated:** ☐ Yes  ☐ No
☐ **May RTW with no restrictions on:** _11_ / _23_ / _12_

Family Medical Leave will be applied to qualified serious health conditions if your patient is determined eligible.

WORK CAPABILITIES

| % of Workday (8hr) | None at all 0% | Occasional 1-33% | Frequent 34-66% | Continuous 67-100% |
|---|---|---|---|---|
| Repetitions per hr. | | 4-6 | 7-12 | >12 |
| Lift/Carry: | | | | |
| Up to 10 lbs. | ☐ | ☐ | ☐ | ☐ |
| 11-20 lbs. | ☐ | ☐ | ☐ | ☐ |
| 21-50 lbs. | ☐ | ☐ | ☐ | ☐ |
| 51-100 lbs. | ☐ | ☐ | ☐ | ☐ |
| Bending | ☐ | ☐ | ☐ | ☐ |
| Twist/Turn | ☐ | ☐ | ☐ | ☐ |
| Reach below knee | ☐ | ☐ | ☐ | ☐ |
| Push/Pull | ☐ | ☐ | ☐ | ☐ |
| Squat/Kneel | ☐ | ☐ | ☐ | ☐ |
| Stand/Walk | ☐ | ☐ | ☐ | ☐ |
| Sit | ☐ | ☐ | ☐ | ☐ |
| No lifting above shoulder | ☐ | ☐ | ☐ | ☐ |

Lifting/Transferring of Patients: ☐ Yes  ☒ No  ☐ with assist
☐ Hand restrictions: ☐ Left ☐ Right
☐ Must wear splint
☐ No work with hot or cold substances
☐ No repetitive use Upper Extremity: ☐ Right ☐ Left ☐ Overhead

| Comments |
|---|
| TIM NUSS |
| CERTIFIED NURSE PRACTITIONER |
| CANYON MEDICAL CENTER |
| 5969 E. BROAD ST.  STE. 200 |
| COLUMBUS, OHIO  43213 |

Physician/Healthcare Provider Signature  _TPN cnp_

Printed Name of Healthcare Provider

Date: _11/6/12_     Phone: _864-6010_

Fax: _614 552-5122_

☐ Push/Pull–Beds/Carts: ☐ Yes ☐ No  ☐ with assist
No use of ☐ Left  ☐ Right

Casagrande v. OhioHealth 001178



EXHIBIT

Jc 17



Associate Health and Wellness
Suite 430
3545 Olentangy River Road
Columbus, OH 43214-3993

Phone: (614)566-4100
(740)615-4100
Fax: (614)533-0039

11/5/2012

Joseph Casagrande
1426 Yorktown Road
Columbus, OH 43232

TO:      Joseph Casagrande  OhioHealth Associate - RMH001

RE:  DENIED Family Medical Leave Absence

OhioHealth is committed to providing associates with time away from work to care for themselves and/or their family members in the event of a serious health condition. In accordance with the Family and Medical Leave Act (FML), in a rolling calendar year, OhioHealth provides 12 weeks of job protected leave to "eligible" associates for certain family and medical reasons.

Associates are eligible if they have met both of the following requirements as of the date leave commences:
· Employed at OhioHealth for at least one year
· Worked a minimum of 1,250 hours over the previous 12 months.

You have requested FML for: Denied.  We have reviewed your request and documentation. We are unable to approve your FML request because one or more of the following criteria was not met:

Policy: FMLA - 36 hours per wk
Class: FML
Type: Continuous

| Status | Criteria |
| --- | --- |
| Ineligible | Associate has worked for 12 months or more |
| Ineligible | Associate has worked 1250 hours in the previous 12 mos |
| N/A | Associate has provided valid medical certification |
| Ineligible | Conditions meet requirements under FMLA (see comments) |

Comments:  FMLA denied - employed less than one year with OhioHealth.  Is eligible for short-term disability.

IF YOUR RETURN TO WORK DATE CHANGES FROM THE SPECIFIED DATE, YOU ARE REQUIRED TO PROVIDE ASSOCIATE HEALTH AND WELLNESS UPDATED MEDICAL. YOU ARE ALSO RESPONSIBLE TO KEEP YOUR MANAGER INFORMED OF YOUR LEAVE OF ABSENCE STATUS AND NEW SCHEDULED RETURN TO WORK DATE.

Casagrande v. OhioHealth 001239

Joseph Casagrande

In accordance with OhioHealth policy, a leave of absence may be approved for up to six (6) months within a rolling calendar year and may be taken consecutively or non-consecutively. FML runs concurrently with work related and non-work related Medical Leave and counts as part of the employee's six (6) month Leave of Absence. Any leave taken in the 12 month period prior to the start of this leave will be used to calculate remaining, eligible leave time. After all eligible FML time has been used; you may continue on a Medical Leave or request another form of leave (e.g., Personal Leave) until a comparable regular position is available or until the maximum leave period expires.

During your FML, your benefits may continue. If you return to work before the expiration of your FML, you will be reinstated to the same or equivalent position at the same pay, benefits, and terms and conditions of employment held prior to your FML leave. If your leave exceeds 12 weeks, or is not covered under FML, your position may be posted and filled. If you do not return to work or request a leave extension by the original leave expiration date you will be considered to have voluntarily resigned.

If you continue to receive a pay check while on leave, your normal associate benefit premiums will be automatically deducted from your pay each pay period. If any portion of your leave is unpaid, you must pay the balance of your monthly benefit premium by the end of each month. Your payment must be made directly to Benefits by the last day of the month in which the premium is due. Your associate benefit premium must be received within 30 days of the date it is due. If you do not make your associate benefit premium payment in a timely manner, your associate benefits will be cancelled. You will be notified, in writing, within 15 days prior to the date of cancellation.

Due to changes in the Department of Labor Family and Medical Leave Act (FMLA) regulations, OhioHealth has modified the qualification for Perfect Attendance bonus. An associate on FMLA is not eligible for the Perfect Attendance Bonus until he/she has returned to work, is actively employed for a six-month period, and meets all other criteria for qualification.



As an associate, the following is a list of your responsibilities:

1. Provide notice to Associate Health and Wellness of the need for leave.
   a) for leave that is foreseeable -- 30 days notice.
   b) for leave that is unforeseeable -- as soon as practicable.
   c) comply with the OhioHealth's policy for requesting leave.

2. Advise Associate Health and Wellness and your manager if leave is to be taken intermittently or on a reduced schedule basis, and that the leave is to be specified as FML at the time of request, or absence.

3. Provide medical certification for leave taken as a result of a serious health condition.

4. Comply with arrangements to make group health benefit co-payments. (If applicable.)

5. Periodically advise your Manager and Associate Health and Wellness of your intent to return to work at the conclusion of leave.

6. Notify Associate Health and Wellness of any change in the circumstances for which leave is being taken.

7. Provide Associate Health and Wellness with a fitness for duty certification (Return-To-Work release), when leave is taken for your own serious health condition.

IMPORTANT CONTACT INFORMATION
Associate Health and Wellness: 614-566-4100 or 740-615-4100 (Leave of Absence Management Information)
Benefits Department: 614-544-5189


cc: Sayers, Amy Sue

Casagrande v. OhioHealth 001240

 OhioHealth

*Copy of letter sent via certified letter*

**FILE**

**EXHIBIT**

JC 18

November 8, 2012

Joseph Casagrande
1426 Yorktown Road
Columbus, OH 43232

Dear Joseph:

The Family Medical Leave Act (FML) is a Federal law created to protect workers from losing their jobs when they need time off to address critical personal and family matters. The law allows eligible workers to take up to 12 work weeks of leave during a 12 month period for their own serious health condition or to care for an ill family member. To be eligible for FML job protection, you must have worked for OhioHealth *for at least 12 months and worked 1,250 hours in a rolling calendar year.*

<u>*Based on the eligibility criteria listed above, in a rolling calendar year, you have not met the FML eligibility requirements and your job is not FML protected.*</u>

If you **have completed your six (6) months of continuous employment**, according to the Leave of Absence policy (4.20) you may be granted a leave for a period of up to 180 days within a rolling twelve month period. If you do not return within that time, we will consider you to have voluntarily resigned.

If you **have not been employed by OhioHealth for six (6) months**, according to the Leave of Absence policy (4.20), you are **not** eligible for a leave of absence and your employment with OhioHealth may end. When/if you are released to return to work, you are encouraged to re-apply for any open positions for which you qualify.

Due to our department's continued service needs, we will be posting your position effective November 8, 2012. Please feel free to contact me or Human Resource Associate Relations Representative: Susie Talebi at phone number: 566-4829.

We wish you well in your continued recovery and look forward to hearing from you.

Sincerely,

*Amy Sayers, RN, MSN, NM*

Amy Sayers, RN, MSN
7 Orange Nurse Manager

cc: Susie Talebi

FMLADeniedMgrLtr072110.doc





Casagrande v. OhioHealth 000017

 

**OhioHealth**

Associate Health and Wellness
Suite 430
3545 Olentangy River Road
Columbus, OH 43214-3993

Phone: (614)566-4100
(740)615-4100
Fax: (614)533-0039

Joseph Casagrande
1426 Yorktown Road
Columbus, OH 43232

11/27/2012

Dear Joseph,

This letter is to advise you that you are reaching the end of your Temporary Disability Pay (TDP) it will be paid out until 2/12/2013 if you have supporting medical documentation on file with Associate Health & Wellness. Any remaining SSP/TAP will be paid after TDP has been paid. If you remain off work due to Workers' Compensation, you will continue to receive Temporary Total Disability, if you have supporting medical documentation from your physician.

If you are enrolled in OhioHealth's medical, dental and/or vision benefits, you will be required to pay for your benefits once you are no longer receiving a pay check from OhioHealth. Please contact the Benefits Department at 614-544-5189 if you have any questions.

You will also receive information from your manager regarding the posting of your position. We encourage you to continue to update your manager as to your return to work plans.

We appreciate your service to OhioHealth. Upon your medical release to return to work, OhioHealth requires that you provide the proper return to work documentation and contact your Associate Health & Wellness case manager. We also encourage you to contact your Associate Relations representative to assist you in re-applying for a position that will match your education, training, interests and abilities.

If you have any questions, please feel free to contact Rose Cacioppo, your case manager, or Human Resources.

Sincerely,

Associate Health and Wellness
Disability Management Services

cc:  Rose Cacioppo
     Sayers,Amy Sue
     Associate Relations Representative
     Benefits Department

Casagrande v. OhioHealth 001262

## FREQUENTLY ASKED QUESTIONS

1.   What happens when Temporary Disability Pay (TDP) ends?

You will be paid your TDP benefit (120 day benefit in a rolling calendar year). Your TAP benefit will be paid out following the end of TDP.  You will then go unpaid.  Once you have been out on a leave of absence for six months in a rolling calendar year, your position with OhioHealth will be terminated. You will then receive information regarding COBRA benefits and how to apply.

2.   If I am receiving Workers' Compensation what happens and is it different from TDP?

You will continue to be paid your Workers' Compensation (WC) pay, according to BWC Guidelines, if you are being treated by your physician for your WC illness or injury. You are responsible for providing medical documentation taking you off work. Once you have been out on a leave of absence for six months in a rolling calendar year, your position with OhioHealth may be terminated. If you have elected medical benefits, you continue to be responsible for paying your medical benefits portion to the Benefits Department. Once you are no longer employed by OhioHealth, you will receive information regarding COBRA benefits.

3.   How is my FMLA coverage affected?

If you were approved for FMLA coverage for your illness or injury leave of absence, you are entitled to it for 12 weeks in a rolling calendar year. Typically, if you had not returned to work within the 12 week period, your position may have been posted and filled. If you return to work full duty before your FMLA coverage expires you are entitled to your position. Typically, once you reach the end of TDP, your FMLA has already expired and your job may have been posted and filled.

4.   If my doctor releases me to return-to-work, what do I do?

Whenever you obtain a release to return-to-work from your doctor, you need to contact your case manager and provide the release. The case manager will work with you and your manager to determine if they can accommodate the restrictions or if you have a position to return to. Remember, if you were eligible for FMLA, and have been out longer than 12 weeks, your job may have been posted and filled. You will be referred to Human Resources to determine if there are any openings within your skills and abilities.

5.   If I elected Long Term Disability (LTD) but am released to return-to-work, why should I apply for LTD?

If you are released to return-to-work with restrictions, you may be eligible for partial benefits under the LTD plan. The application process takes 4-6 weeks from the date of application. For this reason, if you are unsure when you are returning to work, or returning with restrictions, you should apply as soon as possible. It is a benefit you have paid for, so it is better to apply for it and not need it, then wait until you have no income and apply late, thus potentially delaying your benefit payment.

Casagrande v. OhioHealth 001263

**EXHIBIT**

JC 21

 OhioHealth

December 11, 2012

Joseph Casagrande
1426 Yorktown Road
Columbus, OH   43232



**U.S. Postal Service**
**CERTIFIED MAIL   RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com

**O F F I C I A L   U S E**

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark
Here

Sent To *Joseph Casagrande*
Street, Apt. No.; or PO Box No.
City, State, ZIP+4

Dear Joseph:

The Family Medical Leave Act (FML) is a Federal law created to protect workers from losing their jobs when they need time off to address critical personal and family matters. The law allows eligible workers to take up to 12 work weeks of leave during a 12 month period for their own serious health condition or to care for an ill family member. To be eligible for FML job protection, you must have worked for OhioHealth **for at least 12 months and worked 1,250 hours in a rolling calendar year.**

*Based on the eligibility criteria listed above, in a rolling calendar year, you have not met the FML eligibility requirements and your job is not FML protected.*

If you **have completed your six (6) months of continuous employment**, according to the Leave of Absence policy (4.20) you may be granted a leave for a period of up to 180 days within a rolling twelve month period. If you do not return within that time, we will consider you to have voluntarily resigned.

If you **have not been employed by OhioHealth for six (6) months**, according to the Leave of Absence policy (4.20), you are **not** eligible for a leave of absence and your employment with OhioHealth may end. When/if you are released to return to work, you are encouraged to re-apply for any open positions for which you qualify.

Due to our department's continued service needs, we have filled your position effective December 11, 2012.  Please feel free to contact me or Human Resource Associate Relations Representative: Susie Talebi at 566-4829.

We wish you well in your continued recovery.

Sincerely,

*Amy Sayers, RN, MSN, NM*

Amy Sayers, RN, MSN
7 Orange Nurse Manager

cc: Susie Talebi

*Sent certified mail on 12/11/12*

FMLADeniedMgrLtr072110.doc

Casagrande v. OhioHealth 000556

Casagrande v. OhioHealth 000557



Riverside Methodist Hospital
7 Orange (14040)
3535 Olentangy River Rd.
Columbus, Ohio 43214

FILE

CERTIFIED MAIL

7011 3500 0001 0471 6535

Joseph Casagrande
1426 Yorktown
Columbus, OH

NIXIE      430    5E  1        00  01/05/13

RETURN TO SENDER
UNCLAIMED
UNABLE TO FORWARD

C: 43214399899        *1246-07113-13-42

UNITED STATES POSTAGE
$ 05.750
DEC 13 2012
MAILED FROM ZIP CODE 43214

UNCLAIMED

UNCLAIMED

EXHIBIT

JC 22

**CANYON MEDICAL CENTER**

# FAX

5969 E. Broad St., Suite 200
Columbus, OH 43213
Ph (614) 864-6010
Fax (614) 552-5122

To: Assoc. Health Ohio health    From: **TIM NUSS**
**CERTIFIED NURSE PRACTITIONER**
**CANYON MEDICAL CENTER**
Fax:                              Pages: 5969 E. BROAD ST., STE. 200 (including cover)
                                  COLUMBUS, OHIO 43213
Phone:                            Date:
Re: Joe Casagrande disability     CC:

☐ Urgent    ☒ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

Comments:

This fax transmission contains information that is confidential and may be privileged. It is intended only for the addressee(s) named above. If you receive this fax in error, please do not read, copy or disseminate it in any manner. If you are not the intended recipient, any disclosure, copying, distribution or use of the contents of this information is prohibited. Please reply to the message immediately by informing the sender that the message was misdirected. After replying, please destroy. Your assistance in correcting this error is appreciated.

Casagrande v. OhioHealth 001183





**EXHIBIT**

JC 23



Associate Health and Wellness
Suite 430
3545 Olentangy River Road
Columbus, OH 43214-3993

Phone: (614)566-4100
(740)615-4100
Fax: (614)533-0039

Joseph Casagrande
1426 Yorktown Road
Columbus, OH 43232

12/13/2012

To:      Joseph Casagrande   OhioHealth Associate - RMH001

RE: Medical Leave of Absence - Extension

OhioHealth is committed to providing associates with time away from work to care for themselves and/or their family members in the event of a serious health condition. In accordance with the Family and Medical Leave Act (FML), in a rolling calendar year, OhioHealth provides 12 weeks of job protected leave to "eligible" associates for certain family and medical reasons. As this is an extension of your medical leave of absence, please be aware your FML may expire during this extension. Your FML approval is based upon your available FML hours. Please note, your FML job protection may expire prior to the end of your requested leave of absence. Contact Associate Health and Wellness at 614-566-4100 regarding your FML status/usage.

Associates are eligible for FML if they have met both of the following requirements as of the date leave commences:
*   Employed at OhioHealth for at least one year
*   Worked a minimum of 1,250 hours over the previous 12 months.

You have requested a medical leave of absence extension (your initial notice indicates if FML event was approved) for:
Illness - self . We have reviewed your request and documentation.

Continuous leave extension approved from: 07/19/2012 to Est. Return to Work: 03/01/2013

IF YOUR RETURN TO WORK DATE CHANGES FROM THE SPECIFIED DATE, YOU ARE REQUIRED TO PROVIDE ASSOCIATE HEALTH AND WELLNESS UPDATED MEDICAL. YOU ARE ALSO RESPONSIBLE TO KEEP YOUR MANAGER INFORMED OF YOUR LEAVE OF ABSENCE STATUS AND NEW SCHEDULED RETURN TO WORK DATE.

In accordance with OhioHealth policy, a leave of absence may be approved for up to six (6) months within a rolling calendar year and may be taken consecutively or non-consecutively. FML runs concurrently with work related and non-work related Medical Leave and counts as part of the associate's six (6) month Leave of Absence. Any leave taken in the 12 month period prior to the start of this leave will be used to calculate remaining, eligible leave time. If deemed eligible, after all eligible FML time has been used, you may continue on a Medical Leave or request another form of leave (e.g., Personal Leave) until a comparable regular position is available or until the maximum leave period expires.

IMPORTANT CONTACT INFORMATION
Associate Health and Wellness: 614-566-4100 or 740-615-4100 (Leave of Absence Management Information)
Benefits Department: 614-544-5189

cc: Sayers,Amy Sue

Page 1 of 1

Casagrande v. OhioHealth 001272





**Associate Health and Wellness**
Suite 430
3545 Olentangy River Road
Columbus, OH 43214-3993

Phone: (614)566-4100
(740)615-4100
Fax: (614)533-0039

Joseph Casagrande                                    2/15/2013
1426 Yorktown Road
Columbus, OH 43232

Dear Joseph:

This letter is a follow up to our ongoing conversations regarding your request for a leave extension as an accommodation because you wish to remain employed by OhioHealth despite the fact that you will not be returning to work at the conclusion of your six month leave of absence, originally estimated at 2/24/2013.

Your request has been reviewed by the Leave of Absence Extension Review Team and your request has been:

__x__ Approved until the following date: 4/20/2013

REMINDER: Since you are no longer receiving a paycheck that will cover deductions for your medical premiums and if elected Long Term Disability (LTD), you MUST contact OhioHealth benefits department at 544-5189 to coordinate separate payments. IF YOU DO NOT PAY YOUR MEDICAL AND LTD PREMIUMS YOUR COVERAGE MAY BE DISCONTINUED.

Following this extension, your termination will be processed and your medical benefits will continue through the end of the month of your termination date. After your termination month, information from benefits will be sent to you regarding continuing your medical insurance plans via COBRA.

If you receive a release to return to work, with or without restrictions, you may be interested in working with OhioHealth's job placement specialist. If you are, please let me know and I will refer you to this program.
If you have any questions, please feel free to contact me directly at (614)566-3747.

Best Regards,

Rose Cacioppo MA, CRC, CDMS
Disability Case Manager

cc: Benefits
    Associate Relations Representative
    Sayers, Amy Sue

Page 1 of 1

Casagrande v. OhioHealth 001279

REDACTED



FORTUNE "100 Best Companies to Work for 2010 "
----- Forwarded by Amy S Sayers/Staff/OhioHealth on 08/27/2013 11:01 AM -----

From:      Diane M Heyder/Staff/OhioHealth
To:        Amy S Sayers/Staff/OhioHealth@OhioHealth
Cc:        Rose M Cacioppo/Staff/OhioHealth@OhioHealth, Nancy Miller/Staff/OhioHealth@OhioHealth,
           Margery Sagraves/Staff/OhioHealth@OHIOHEALTH, Susan Talebi/Staff/OhioHealth@OhioHealth
Date:      02/15/2013 02:40 PM
Subject:   Joseph Casagrande #77893  Term extension letter- new term date: 4/20/2013



D. Marsha Heyder
Disability Claims Analyst
Associate Health & Wellness
Ph# 614-566-3237
Fax# 614-566-6772



FORTUNE "100 Best Companies to Work for 2010 " joseph casagrande.pdf

Casagrande v. OhioHealth 001405

REDACTED

FORTUNE "100 Best Companies to Work for 2010 "
—— Forwarded by Amy S Sayers/Staff/OhioHealth on 08/27/2013 11:02 AM ——

| | |
|---|---|
| From: | Rose M Cacioppo/Staff/OhioHealth |
| To: | Amy S Sayers/Staff/OhioHealth@OhioHealth |
| Cc: | Susan Talebi/Staff/OhioHealth@OhioHealth, Christine Moranda/Staff/OhioHealth@OhioHealth, Michael D Kramb/Staff/OhioHealth@OhioHealth, Nancy Miller/Staff/OhioHealth@OhioHealth |
| Date: | 02/21/2013 08:08 AM |
| Subject: | Fw: FMLA question |

Amy: Can you email me a copy of any correspondence that was sent to Joe? He may be talking about a the letter you sent to actually post his position dated 12/11/2013 but I do not have that on file in our office. However we have letters denying him as pf 11/5 based on medical taking him off work as of 11/2.

Joe called me yesterday (2/21/2013) inquiring and I told him I'd review the policy and law and provide that information to him. This morning I received the below email with him providing the information to me.

Chris is out of the office until TUesday. I will work with her to reply.

Rose M. Cacioppo, MA, CRC
Disability Case Manager
Associate Health and Wellness
614-566-3747
fax 614-566-6772
OhioHealth
3545 Olentangy River Road
Suite 425
Columbus, OH 43214-3908

FORTUNE "100 Best Companies to Work for 2010 "

Rose M. Cacioppo, MA, CRC
Disability Case Manager
Associate Health and Wellness
614-566-3747
fax 614-566-6772
OhioHealth
3545 Olentangy River Road
Suite 425

Columbus, OH 43214-3908

FORTUNE "100 Best Companies to Work for 2010 "

-----Forwarded by Rose M Cacioppo/Staff/OhioHealth on 02/21/2013 08:05AM -----
To: RCACIOP2@OhioHealth.com
From: Jcasa123@aol.com
Date: 02/21/2013 12:23AM
Subject: FMLA question

Hi Rose:
I'm writing this email with regard to the telephone conversation we had Wednesday morning
(2/20/2013) concerning the Family Medical Leave Act and the determination letter to me
dated December 11, 2012 from my unit manager Amy Sayers indicating that I did not
qualify for job protection under the provisions of FMLA and OhioHealth policies.

Upon reading the law it appears there are two tests (1. employment period and 2. hours
worked) which need to be met.
First is the underline{employment period,} which is required to be at least twelve months; and the
second is the underline{hours worked} requirement which is determined over a rolling calendar year
and requires 1,250 of hours worked within that rolling calendar year.

Upon reading OhioHealth Human Resources Policy #704.210 as revised February 2012 it
states as follows:
"*Associates are eligible for Family Medical Leave if they*
*have been employed by OhioHealth for at least twelve (12) months and have worked a*
*minimum of 1,250 hours during the previous twelve (12) months.*"

In addition, the FML Act indicates the following under Title I, Section 101 paragraph 2
"Eligible employee"
*IN GENERAL.--The term "eligible employee" means an employee who has been employed*
*(i) for at least 12 months by the employer with respect to whom leave is requested under*
*section 102; and (ii) for at least 1,250 hours of service with such employer during the*
*previous 12-month period.*

Based on the above I believe the letter referenced above dated December 11, 2012
indicating that I did not meet the FMLA eligibility requirements was an incorrect
determination, and in fact, I had met both the employment and hours worked requirements
under both the FML Act and OhioHealth policy due to the following reasons:

1: My employment start date was December 5, 2011. Therefore, based on the definition of
employment, my 12 months of "employment" had been satisfied as of December 5, 2012.
According to your letter to me dated February 1, 2013 indicating that my original
termination date would have been February 24, 2013, the end of my temporary disability
period (subsequently extended to April 20, 2013 per your email to me on February 15) as of
December 5, 2012 I should have still been considered an employee of OhioHealth, as so
defined, and therefore I was an employee of OhioHealth for at least 12 months as of my 12
month anniversary date, meeting requirement number 1.

2. As of the effective date of my temporary disability period (my disability pay began on
November 9, 2012) although this date is before my 12 month anniversary of December 5,
2012 I had accumulated more that the required 1,250 hours worked in the rolling twelve

month period. My total hours worked since December 5, 2011 to the beginning of my temporary disability period and also as of December 5, 2012 (the rolling 12 month period) amounted to 1,345.50 hours which exceeds the minimum required, meeting requirement number 2.

Therefore, it is my belief that I fulfilled both the employment and hours requirement for FMLA and I indeed qualified for job protection, and other protections under the provisions of OhioHealth company policy and also under the FMLA. Also, I believe that it was incorrectly determined by OhioHealth that I did not qualify, and therefore received an incorrect notice of determination from OhioHealth which I relied upon at the time. I therefore request that this determination be re-examined and re-determined as my being qualified for FMLA protection as of the date of qualification.

Also for my information purposes please inform me specifically how it was determined that I did not qualify for FMLA coverage and protection according to the OhioHealth letter to me dated December 11, 2012 as indicated above.
Thank you.

Sincerely,
Joseph Casagrande BSN, RN
614-581-8001

 **OhioHealth**



HUMAN RESOURCES
550 Thomas Lane
Columbus, Ohio 43214-3902

ohiohealth.com

October 11, 2013

Joseph Casagrande
1426 Yorktown Road
Columbus, Ohio 43232

Riverside Methodist Hospital
3535 Olentangy River Road
Columbus, Ohio 43214

Joseph:

We are sending you this correspondence to share with you the outcome of the Fact
Gathering Suspension Investigation. This letter is being sent via certified mail and email
at your request due to your inability to meet in person. Riverside Methodist Hospital fully
investigated the concerns that were addressed with you at the Investigatory Meeting on
September 20th, 2013 at 4pm. After reviewing the medical record documentation, as well
as the additional information that you provided to us, it has been determined that your
employment will be terminated effective October 11, 2013 for patient safety concerns,
and not following nursing policy.

If you feel that this termination was not consistent or appropriate within Riverside
protocols, you are able to institute a Problem Review by contacting Susan Talebi by
Monday, October 14, 2013 at 5pm at 614-566-4829.

Regards;

*Amy Sayers, RN, MSN, NM*

Amy Sayers
Nurse Manager, 7 Orange