## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

JOSEPH CASAGRANDE,

      Plaintiffs,

      v.

OHIOHEALTH, et al.

      Defendants.

**CASE NO. 2:13-CV-00238**
**JUDGE EDMUND A. SARGUS, JR.**
**MAGISTRATE JUDGE TERENCE P. KEMP**

### OPINION & ORDER

This matter is before the Court on Plaintiff Joseph Casagrande's and Defendants OhioHealth and Amy Sayers cross-motions for summary judgment. (ECF Nos. 34 and 35.) For the reasons below, the Court **DENIES** Plaintiff's motion for partial summary judgment and **GRANTS** Defendants' motion for summary judgment.

### I. BACKGROUND

**A. Facts**

Plaintiff, Joseph Casagrande, was hired by OhioHealth as a Registered Nurse ("RN") at Riverside Methodist Hospital ("Riverside") in November 2011. His first day at Riverside was December 5, 2011. Plaintiff was assigned to the "7-Orange" unit, which was managed by Defendant Amy Sayers. 7-Orange is a mid-level telemetry unit, comprised of patients who stay for ranges of three to fourteen days, and must be monitored by the RNs assigned to that unit.

In July 2012, Plaintiff, who suffers from anxiety, depression, and hypertension, sought medical treatment from his family physician, Dr. DiPietra. Dr. DiPietra and Plaintiff discussed the possibility of Plaintiff taking time off of work to treat his symptoms. Plaintiff then met with Defendant Sayers to talk about taking medical leave. Sayers suggested that Plaintiff take a medical leave of absence or seek assistance from the Employee Assistance Program. On July 20,

1

2012, Plaintiff applied for a medical leave of absence, seeking continuous leave until August 7, 2012, in order to treat his anxiety issues. OhioHealth granted Plaintiff's medical leave, but sent him a letter on July 24, 2012 informing him that, because he had only been employed with OhioHealth for seven months, he did not meet the one-year eligibility requirement under the Family and Medical Leave Act ("FMLA"). His leave was, thus, not covered by the Act, but Plaintiff was granted a leave of absence pursuant to OhioHealth's Leave of Absence Policy, and paid approximately 70 percent of his salary as short-term disability pay.

Shortly after Plaintiff's return to work, he was cited for some performance issues. On October 10, 2012, Sayers gave Plaintiff a verbal warning concerning his violation of OhioHealth's attendance policy. Sayers, Christy Griskey, one of the Clinical Nurse Managers, and Plaintiff met to discuss Plaintiff's performance. In her notes from the meeting, Sayers wrote:

> Joseph agreed that he is very overwhelmed at times on the unit....
> We provided Joseph with some other less acute nursing situations,
> units, and environments that he may be more comfortable in and
> feel more successful in. Joseph agreed to go home and consider if
> this is the best environment for him to be working in and to look
> for other less acute nursing opportunities to transfer to within
> OhioHealth.

(ECF No. 35 at 4) (citing Plaintiff Dep. at 187-88; Plaintiff Dep. Exhibit 36; Sayers Dep. at 13.)

On October 24, 2012, Plaintiff received a written warning for his performance. One of the issues cited in the warning was Plaintiff's lack of knowledge about his assigned patients. That same day, Plaintiff met again with Sayers and Griskey, both of whom told Plaintiff that he should seek an alternative position in which he could be more successful. According to Sayers, by October 24, 2012, "she did not believe that Plaintiff would be able to keep his position on the unit due to poor performance." (*Id.* at 5.)

2

In October 2012, Plaintiff began suffering an exacerbation of his preexisting health problems. He subsequently sought, and was granted, a second medical leave on November 2, 2012. On a medical leave application to OhioHealth, Dr. DiPietra noted that Plaintiff was unable to work from November 2, 2012 until November 22, 2012. As with his first medical leave, Plaintiff received a letter from OhioHealth indicating that his leave did not fall under the FMLA, and that he would be receiving 70 percent of his pay as short-term disability. In that letter, OhioHealth informed Plaintiff that it would be posting Plaintiff's position on November 8, 2012.

Over the next three months, the Parties corresponded by letter about various details of Plaintiff's leave. In a letter dated November 27, 2012, Plaintiff received notice that OhioHealth would continue his Temporary Disability Pay until February 12, 2013. During that time, Sayers had been looking for someone to fill Plaintiff's position on 7-Orange. She found a replacement, but could not confirm the hiring of that person until receiving management's approval. On December 11, 2012, Sayers received the necessary approval, and that same day sent a letter to Plaintiff informing him that, as stated in the November 8, 2012 letter, his position had been filled. On December 12, 2012, Dr. DiPietra faxed a leave extension request to OhioHealth, asking that Casagrande's medical leave be extended "at least through February." (ECF No. 34 at 6) (citing ECF No. 34-1 at 144-115, 342-43.)

Near the end of December 2012, Plaintiff started working with Rose Cacioppo, a Case Manager in OhioHealth's Associate Health and Wellness Program, to begin looking at different positions within OhioHealth that he could apply for upon his return from medical leave. In early January 2013, Plaintiff talked with Dr. DiPietra about returning to work. On January 3, 2013, Plaintiff contacted Cacioppo to discuss returning to work. Plaintiff, however, was hesitant to obtain a return to work slip from his doctor before securing a new position because he was

concerned that doing so would end his receipt of disability pay, thereby leaving him without an income. Cacioppo told Plaintiff to apply for positions within OhioHealth, go through the interview process, and secure a position before obtaining a return-to-work note.

Plaintiff applied for jobs throughout January 2013, but became frustrated with what he felt was a lack of response from OhioHealth's Human Resources Department. In an effort to further his job search, Plaintiff requested a meeting to talk more specifically about available and appropriate job opportunities within OhioHealth. On January 18, 2013, Plaintiff met with Cacioppo, Michael Kramb, a Human Resources Representative, and Jean Lefebvre, a Case Manager who assisted in handling Plaintiff's leave requests. At the meeting, the group discussed potential positions for Plaintiff, as well as some that he was then considering that Cacioppo, Kramb, and Lefebvre did not think would be a good fit.

In early February 2013, Plaintiff sought an extension of his medical leave from March 1, 2013 to April 20, 2013. Plaintiff asserts that he sought the extension at the suggestion of Cacioppo, since he had not yet found a new position. Plaintiff's leave request was granted, and he was again informed that it was not covered under the FMLA. On February 14, 2013, Plaintiff spoke with Cacioppo and informed her that Dr. DiPietra had cleared him to return to work.

On February 20, 2013, Plaintiff called Cacioppo and told her that, based on his understanding of the FMLA, he was entitled to its coverage as of December 5, 2012—the one year mark of his employment at OhioHealth. Accordingly, Plaintiff believed that the December 11, 2012 letter denying FMLA coverage was incorrect. The following day, February 21, 2013, Plaintiff sent Cacioppo an email memorializing his complaint. Cacioppo was out of the office, so Plaintiff was contacted by another individual within OhioHealth's Associate Health and Wellness Program. The employee to whom Plaintiff spoke stated that Plaintiff did not qualify

4

for FMLA coverage, as he had not been working at the time he reached one year of employment with OhioHealth, and thus, was ineligible to receive leave under the FMLA.

Subsequently, Plaintiff reached out to an individual at the Department of Labor, who also believed that Plaintiff was entitled to FMLA protection. Pursuant to the Department of Labor employee's advice, Plaintiff received a return to work note from Dr. DiPietra dated February 27, 2013, which Dr. DiPietra faxed to OhioHealth that day.

Following Plaintiff's inquiry about his FMLA eligibility, OhioHealth began looking into whether Plaintiff had, in fact, become eligible for FMLA protection during his medical leave. Because Plaintiff had met the one-year mark of employment during his time on leave, Defendants determined that he was eligible for FMLA coverage. Defendants then decided that, in keeping with the constraints of the FMLA, Plaintiff would be reinstated to his former position on 7-Orange. On March 12, 2013, Cacioppo called Plaintiff and informed him that OhioHealth wanted to offer him his original position on 7-Orange, which Plaintiff accepted. Additionally, Defendants paid Plaintiff for the time he had missed between his February 27, 2013 release to work and his first day back to work, March 18, 2013. Plaintiff, however, asserts that he "was not offered back pay or other compensation as a result of OhioHealth's admitted violation of his FMLA rights." (ECF No. 34 at 10.) Plaintiff filed this action seeking damages for the alleged FMLA violation on March 14, 2013.

Upon Plaintiff's return to work on March 18, 2013, he was disciplined for some performance issues. Between March and May 2013, Plaintiff was cited for various problems, including three Unusual Occurrence Reports ("UOR"). Plaintiff was not formally disciplined until July 1, 2013, when he received a written warning for three issues: failure to change a

patient's heparin[1] drip for over six hours; failure to contact a physician regarding a patient's low potassium levels; and failure to connect a patient's bicarbonate drip, causing the drip to run onto the floor. Later that month, on July 18, 2013, Plaintiff received a verbal warning for an outburst following his assignment to Patient Support Assistant ("PSA"). On September 20, 2013, Plaintiff was placed on a fact gathering suspension as a result of four issues that took place between August 30, 2013 and September 9, 2013.

Following an investigation, Defendants decided to terminate Plaintiff based on two of the issues that led to his fact gathering suspension: Plaintiff's delay in analyzing a patient's heparin drip; and Plaintiff's failure to follow Riverside's alcohol withdrawal detoxification protocol. Plaintiff appealed his termination. On November 13, 2013, Chief Nursing Officer Lisa Gossett notified Plaintiff that she was upholding his termination. Defendants subsequently made some attempts to schedule a meeting with Plaintiff and a committee of his peers to proceed with the appeal process. Plaintiff, however, would not confirm his availability. Defendants, therefore, informed Plaintiff that his October 11, 2013 termination was final.

**B. Procedural Background**

Plaintiff filed his initial complaint on March 14, 2013 against OhioHealth. (ECF No. 1.) On July 29, 2013 and October 29, 2013, respectively, Plaintiff filed his amended complaint (ECF No. 10) and a second amended complaint (ECF No. 18), both of which were brought against OhioHealth and Amy Sayers. In the second amended complaint, Plaintiff asserts a violation of the Family and Medical Leave Act, and retaliation in violation of the Family and Medical Leave Act.

---

[1] Heparin is an anti-coagulant that is used to regulate the thinness of a patient's blood, thus preventing medical problems such as blood clots. It requires regular management as it must stay at a particular level to maintain effectiveness. Deena Conti, Felix Guzman, Regina Hendrix, & Dana Moore, *Anticoagulation Drugs: What Nurses Need to Know*, Johns Hopkins Nursing (July 11, 2011) http://magazine.nursing.jhu.edu/2011/07/anticoagulation-drugs-what-nurses-need-to-know/.

On May 20, 2014, Plaintiff filed his motion for partial summary judgment on Count I—violation of the Family and Medical Leave Act—as well as on his claim for liquidated damages. (ECF No. 34.) On May 22, 2014, Defendants filed a motion for summary judgment on both FMLA claims brought by Plaintiff. (ECF No. 35.) The motions have been fully briefed, and are, therefore, ripe for this Court's review.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 390 (6th Cir. 2009); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A motion for summary judgment should be denied if "there is a genuine need for trial," which turns on "whether the evidence is such that a reasonable jury could return a verdict for the [non-moving party]." *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 375 (6th Cir. 2002).

Once "a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading." *Viergutz v. Lucent Technologies, Inc.*, 375 F. App'x. 482, 485 (6th Cir. 2010). Instead, the party opposing summary judgment "must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine need for trial." *Id.*; *see also Matsushita*, 475 U.S. at 587–88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

Here, the Parties have filed cross-motions for summary judgment. In reviewing cross-motions for summary judgment, the Court should "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Wiley v.*

7

*United States*, 20 F.3d 222, 224 (6th Cir. 1994). "The filing of cross-motions for summary judgment does not necessarily mean that the parties consent to resolution of the case on the existing record or that the district court is free to treat the case as if it was submitted for final resolution on a stipulated record." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation. *Taft Broad.*, 929 F.2d at 248.

## III. DISCUSSION

The FMLA entitles employees to an annual total of twelve weeks of leave for a number of reasons, including because of a "'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Arban v. West Publ'g Corp.*, 345 F.3d 390, 400 (6th Cir. 2003) (quoting 29 U.S.C. § 2612(a)(1)(D)). Upon returning from FMLA leave, an employee must be reinstated to his position or an equivalent position in terms of pay, benefits, and other conditions of employment. 29 U.S.C. § 2614(a)(1).

The FMLA makes it unlawful for any employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the Act]," 29 U.S.C. § 2615(a)(1), or to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the Act]." *Id.* at § 2615(a)(2). Consistent with these proscriptions, "[e]mployers may not discriminate against employees on FMLA leave in the administration of their paid leave policies." 29 C.F.R. § 825.207(a). Employers who violate the FMLA are liable to the employee for damages and such equitable relief as may be appropriate. 29 U.S.C. § 2617(a)(1).

There are two distinct theories for recovery under the FMLA: (1) the "entitlement" or "interference" theory arising from 29 U.S.C. § 2615(a)(1); and (2) the "retaliation" or

"discrimination" theory arising from 29 U.S.C. § 2615(a)(2).  Plaintiff asserts that he is entitled

to recovery under the interference theory.

## A. FMLA Interference[2]

> To establish a *prima facie* FMLA interference claim, a plaintiff must show that

> > (1) [he] was an eligible employee, (2) the defendant was an
> > employer as defined under the FMLA, (3) [he] was entitled to
> > leave under the FMLA, (4) [he] gave the employer notice of [his]
> > intention to take leave, and (5) the employer denied [or interfered
> > with] the employee['s] FMLA benefits to which [he] was entitled.

*Wallace v. FedEx Corp.*, 764 F.3d 571, 585 (6th Cir. 2014) (quoting *Edgar v. JAC Prods., Inc.*,

443 F.3d 501, 507 (6th Cir. 2006)).  Additionally, "[e]mployees seeking relief under the

[interference] theory must [also] establish that the employer's violation caused them harm." *Id.*

(quoting *Edgar*, 443 F.3d at 508) (internal citation omitted).  Under the interference theory, "[i]f

an employer interferes with the FMLA-created right to medical leave or to reinstatement

following the leave, a violation has occurred, regardless of the intent of the employer." *Seeger v.*

*Cincinnati Bell Telephone Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012) (quoting *Arban v. West*

*Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003)).  The Parties do not dispute that Plaintiff has

established elements two and four.  Thus, the Court will address each remaining element of

Plaintiff's interference claim in turn.

### 1. Eligible Employee

Pursuant to the FMLA, an eligible employee is an employee who has worked for the

same employer for at least 12 months and has worked for at least 1,250 hours. *See* 29 U.S.C. §

2611(2)(A).  It is undisputed that Plaintiff was not an eligible employee when he sought leave in

November 2012.  There is also no dispute that December 5, 2012 marked Plaintiff's completion

---

[2] Because Plaintiff and Defendants both argue FMLA interference in their motions for summary judgment, the Court
will conduct its analysis of those claims simultaneously.

of one year of employment with OhioHealth.  Plaintiff and Defendants, however, disagree on the point at which Plaintiff should be considered an eligible employee under the FMLA, thereby making it possible for Plaintiff to receive FMLA coverage.

To support their positions, both Parties cite 29 C.F.R. § 825.110(d), which states, in relevant part:

> [t]he determination of whether an employee meets the hours of service requirement and has been employed by the employer for a total of at least 12 months must be made as of the date the FMLA leave is to start. An employee may be on non–FMLA leave at the time he or she meets the 12–month eligibility requirement, and in that event, any portion of the leave taken for an FMLA–qualifying reason after the employee meets the eligibility requirement would be FMLA leave.

Plaintiff argues that he was not required to be "actively working" on December 5, 2012 in order to become FMLA eligible.  (ECF No. 38 at 29.)   Defendants counter that Plaintiff is ineligible to receive FMLA coverage because he was not covered at the time his November 2012 leave began. Defendants' further contend that, because Plaintiff had not reached one year of employment with OhioHealth at the time of his November 2012 leave, "based on the language of the Act and its implementing regulations, Plaintiff was not an eligible employee at the time of his request and therefore not entitled to the protections afforded by FMLA."  (ECF No. 35 at 22.)

Defendants seem to be misconstruing Plaintiff's argument.  Plaintiff is not seeking to have all of his leave covered by the FMLA; rather, he claims that he is entitled to FMLA coverage for leave taken beginning on December 5, 2012.  Both Parties understandably rely on the text of the regulation.  Defendants' interpretation and application of the statute, however, ignores the entirety of 29 C.F.R. § 825.110(d), particularly the portion that states "[a]n employee may be on non–FMLA leave at the time he or she meets the 12–month eligibility requirement,

and in that event, any portion of the leave taken for an FMLA–qualifying reason after the employee meets the eligibility requirement would be FMLA leave."

Defendants cite three cases in support of their argument, each of which can be distinguished from the case *sub judice*. In *Rollins v. Wilson County Government*, the Sixth Circuit upheld the district court's denial of FMLA coverage because the plaintiff had been employed for at least twelve months *at two separate entities*—the county school system and the county finance department. 154 F.3d 626 (6th Cir. 1998). The Court determined that the school system and the finance department "ha[d] separate origins, functions, and management," thereby rendering the plaintiff's months of employment shy of the twelve month requirement of employment with the same employer under the FMLA. *Id.* at 630. Here, there is no dispute that Plaintiff was employed at OhioHealth for twelve consecutive months when he reached one year of employment. Thus, *Rollins* is not persuasive.

Defendants also cite *Adams v. Honda of America Mfg., Inc.*, Case No. C-2-1-822, 2002 WL 31159307 (S.D. Ohio Sept. 19, 2002), in which the Court considered whether the plaintiff had worked the requisite 1,250 hours, and could then receive FMLA coverage. The defendant submitted an affidavit that indicated that the plaintiff had worked for 1131.55 hours during the relevant time period. The plaintiff's affidavit "d[id] not supply any reason she cannot present the relevant facts [to show that she had, in fact, worked for at least 1,250 hours]." *Id.* at *2. Moreover, the plaintiff argued that the relevant twelve months ended in December 2000, because that was when she entered her first leave request. The Court disagreed, finding that the relevant time period ended in April 2001, which is when the plaintiff went on leave. The plaintiff in *Adams* could not show that she had worked the requisite 1,250 hours between April 2000 and

11

April 2001 required for FMLA coverage.  In the case *sub judice*, Plaintiff's hourly requirement is

not in dispute.  Accordingly, *Adams* is distinguishable.

     Defendants relies most heavily on *Anderson v. Avon Products, Inc.*, 340 F. App'x 284

(6th Cir. 2009).  Initially, the Sixth Circuit found that two of Anderson's complaints of leave

request violations were meritless—one because it had been made prior to Anderson's one-year

mark of employment, and the other because the request was submitted following Anderson's

termination.  *Id*. at 287.  The Court determined that Anderson's remaining claim of FMLA

violation was unfounded, because he neglected to submit the FMLA paperwork, despite being

asked to do so by his manager.  Thus, his manager "was left to guess whether Anderson's request

was due to a 'serious health condition' under the FMLA, or simply a request for a sick day that

Anderson did not have." *Id*. (citing 29 U.S.C. § 2612(a)(1)(D)).  That set of facts does not hold

any weight when considered alongside the facts of the case here, particularly because there

appears to be no question that Anderson had not met the twelve-month employment requirement

for FMLA coverage.  This Court, therefore, does not find *Anderson* to bear an influence on the

case at issue.

     Ultimately, the most distinguishable factor between the case at bar and the cases cited by

Defendants is the date upon which the plaintiff in each case was seeking FMLA coverage.  In

each of the cited cases, the plaintiffs sought FMLA coverage for leave taken, and the Courts

determined that they could not be considered eligible employees under the statute.  Conversely,

this Court must decide whether, based on the undisputed material facts, Plaintiff met the

requirements of an eligible employee as of December 5, 2012.  As per the plain language of the

regulation, "[t]he determination of whether an employee meets the hours of service requirement

and has been employed by the employer for a total of at least 12 months must be made *as of the*

*date the FMLA leave is to start.*" 29 C.F.R. § 825.110(d) (emphasis added). Plaintiff is not

seeking FMLA coverage for the leave taken in November 2012; rather, he acknowledges that he

is not eligible for FMLA protections until December 5, 2012.

Finally, Defendants state "[t]o be clear, an employee can become entitled to job

protection under the Act while on a leave of absence that was not initially FMLA-qualifying."

(ECF No. 35 at 24) (citing 29 C.F.R. § 825.110(d)). Though that statement is made in support of

a different prong of the interference test, it bolsters the contention that it is, in fact, possible

under the FMLA for an employee to become eligible while on non-FMLA leave. Considering

that admission, along with the lack of issues of material fact regarding Plaintiff's date of

eligibility hours worked, this Court finds that Plaintiff has met the employee eligibility element

of the interference test.

### 2. Entitlement to FMLA Leave

The FMLA entitles eligible employees to a leave of absence for "a serious health

condition that makes the employee unable to perform the functions of the position of such

employee." 29 U.S.C. § 2612(a)(1)(D). A "serious health condition" entitling an employee to

FMLA leave means an illness, injury, impairment, or physical or mental condition that includes

continuing treatment by a health care provider. 29 C.F.R. § 825.114(a)(2). A serious health

condition involving continuing treatment by a health care provider consists of any one or more of

the following:

> (I) A period of incapacity (i.e., inability to work, attend school or
> perform other regular daily activities due to the serious health
> condition, treatment therefor, or recovery therefrom) of more than
> three consecutive calendar days, and any subsequent treatment or
> period of incapacity relating to the same condition, that also
> involves:
> (A) Treatment two or more times by a health care provider, by a
> nurse or physician's assistant under direct supervision of a health

13

> care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or
>
> (B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

29 C.F.R. § 825.114(a)(2)(i)(A) & (B). In defining serious health condition, the focus is on distinguishing between inpatient care and continuing treatment. Pursuant to the FMLA, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the Act. 29 U.S.C. § 2615(a)(1). An employer is required to grant leave to eligible employees when a serious health condition "makes the employee unable to perform the functions of the employee's job." 29 C.F.R. § 825.112(a)(4).

Plaintiff asserts that he suffered from a serious health condition and was, therefore, entitled to FMLA protections. Plaintiff states that he received inpatient care periodically throughout 2012: between August 29, 2012 and August 30, 2012; on November 4, 2012; and between December 14, 2012 and December 17, 2012. (ECF No. 34 at 14-15.) Each period of inpatient treatment concerned Plaintiff's ongoing medical conditions. Thus, Plaintiff's "periods of incapacity and inability to return to work exceeded the three day minimum provided under the FMLA regulations and resulted in a 'regimen of continuing treatment under the supervision of the health care provider.'" *Id.* (citing *Stimpson v. United Parcel Service*, 351 F. App'x 42, 48 (6th Cir. 2009)).

Defendants insist that Plaintiff's argument fails for two reasons. First, Defendants argue that Plaintiff failed to explain how his medical condition rendered him unable to perform the essential functions of his job, thereby leaving a "fatal" hole in Plaintiff's position. (ECF No. 37 at 8.) Defendants next contend that when Plaintiff told Cacioppo that he was ready to return to work on January 11, 2013, he was no longer entitled to FMLA coverage. According to

14

Defendants, Plaintiff's statement that he was able to return to work on January 11, 2013 demonstrates that Plaintiff was not suffering from a serious health condition, in turn divesting him of the FMLA protections, if any, under which he was covered.

The Court finds that Defendants' argument that Plaintiff's FMLA coverage ended on January 11, 2013—the date he stated he was ready to return to work—is stepping outside the bounds of this particular element of the test. This prong considers whether Plaintiff was eligible, which requires only an analysis of Plaintiff's reason for taking leave in the first place. In *Weimer v. Honda of America Mfg., Inc.*, this Court explained how an employee can lose FMLA protections under this element of the interference test:

> It is true that the FMLA does not provide an employee with carte blanche to obtain proper leave and then abuse that leave. This is made clear in the statutory scheme's conditioning of an employee's right to reinstatement following FMLA leave on that "eligible employee ... tak[ing] leave ... for the intended purpose of the leave." 29 U.S.C. § 2614(a)(1). Therefore, an employee who initially obtains valid leave for a qualifying reason and whose doctor supports continued leave, can nonetheless lose the protections of the FMLA when he or she does not use the leave for its intended purpose.

No. 2:06-CV-844, 2008 WL 2421648, at *4 (S.D. Ohio June 12, 2008) (citing *Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 681 (7th Cir. 1997)). Here, Defendants offer no argument that Plaintiff did not use his leave for its intended purpose prior to January 11, 2013. Thus, there is no genuine dispute of material fact that Plaintiff was covered properly under the FMLA from December 5, 2012 until January 11, 2013.

Considering Plaintiff's leave from January 11, 2013 through February 27, 2013—the date on which Dr. DiPietra faxed OhioHealth Plaintiff's return to work note—this Court does not find Defendants' arguments well taken. When Plaintiff stated that he was ready to return to work, he had not submitted a return to work note from his doctor, which suggests that, under the statute,

15

he was technically still covered. Defendants do not offer concrete evidence to show that Plaintiff was using his time post-January 11 for reasons that fall outside the bounds of FMLA leave. Rather, they rest their argument on the notion that Plaintiff's statement that he was ready to return to work is the equivalent of an abuse of his FMLA leave. Without adequate support for their position, Defendants' argument does not convince this Court that Plaintiff's statement that he was ready to return to work is sufficient to show that he was not using his FMLA leave for its intended purpose. Thus, the Court finds that Plaintiff has met the employee eligibility prong of his FMLA interference claim.

### 3. Employer Interference with FMLA Benefits

The final prong at issue in Plaintiff's interference claim is whether Defendants interfered with Plaintiff's FMLA benefits. Under 29 U.S.C. § 2614(a)(1)(A)-(B):

> any eligible employee who takes leave...for the intended purpose of the leave shall be entitled, on return from such leave (A) to be restored by the employer to the position of employment held by the employee when leave commenced; or (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

Thus, "[i]f an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred." *Saulter v. Detroit Area Agency on Aging*, 562 F. App'x 346, 360 (6th Cir. 2014) (quoting *Arban*, 345 F.3d at 401)). In order for Plaintiff to recover in an interference claim, he "must establish that [OhioHealth] denied [him] FMLA benefits to which [he] was entitled." *Travers v. Cellco Partnership*, 579 F. App'x 409, 414 (6th Cir. 2014) (quoting *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 447 (6th Cir. 2007)). An employee seeking relief pursuant to the interference theory must also demonstrate that the employer's alleged FMLA violation caused the employee harm. *Wallace*, 764 F.3d at 585 (quoting *Edgar*, 443 F.3d at 507) (internal citation omitted).

Plaintiff asserts that Defendants' primary interference with his FMLA benefits is evidenced by the delay in Plaintiff's reinstatement to his position on 7-Orange. Following the trajectory of Plaintiff's argument under the employee eligibility prong, Plaintiff contends that Defendants' misconduct began when Plaintiff informed Defendants of his readiness to return to work in January 2013. At that point, Plaintiff was not automatically restored to his previous position, but was told to apply for alternative positions within OhioHealth. Plaintiff maintains that he should be afforded FMLA benefits for the medical leave he took prior to returning to his position on 7-Orange on March 19, 2013. Plaintiff contends that Defendants should have known Plaintiff was covered under the FMLA as of December 5, 2012, and thus should not have insisted that Plaintiff apply for new positions within OhioHealth. Plaintiff argues that not being reinstated to 7-Orange in January 2013 coupled with being required to apply for different jobs within OhioHealth constitutes an FMLA violation, and, therefore, fulfills the fifth element of his FMLA interference claim.

Defendants insist that they did not interfere with Plaintiff's FMLA protections. First, Defendants note that any and all of Plaintiff's leave requests were readily granted. Regarding Plaintiff's reinstatement to his original position, Defendants maintain that Plaintiff resumed his position on 7-Orange upon his return to work, which Plaintiff acknowledged during a deposition. (ECF No. 37 at 12) (citing Plaintiff's Dep., ECF No. 34-1 at 149-51.) Defendants further assert that, though they did not automatically reinstate Plaintiff to his original position, they offered Plaintiff back pay for the period from February 27, 2013 through March 19, 2013, thereby covering Plaintiff's economic losses suffered during that time.

Plaintiff continually places the onus on Defendants regarding Plaintiff's delay in returning to work. Plaintiff's approach, however, seems to be one of having his cake and eating

it, too.[3]  Plaintiff uses the January 11, 2013 date to essentially make two opposing arguments.  In regard to the employee eligibility prong, Plaintiff argued that his statement that he was ready to return to work was nothing more than a mere statement, and does not indicate that he was no longer covered under the FMLA or should lose protections from that date forward.  Here, however, Plaintiff makes a seemingly incongruous argument that when he told OhioHealth that he was ready to return to work in January 2013, he should have been automatically reinstated to his position.  Certainly, reasonable jurors could reach conflicting conclusions with regard to whether Plaintiff suffered FMLA interference when he was not reinstated to his position in January 2013.

Moreover, the plain language of the statute dictates that an employee who takes FMLA leave must be reinstated to his position, or one with equivalent benefits, pay, and employment conditions, upon his return to work.  29 U.S.C. § 2614(a)(1)(A)-(B).  Plaintiff offers no case law to support his argument that Defendants' purported failure to reinstate Plaintiff to his previous position when he stated he was ready to return to work, but had not provided a doctor's note indicating the same, is a violation of Plaintiff's FMLA protections.  There is no dispute that Plaintiff was restored to his position on March 19, 2013, and was offered payment for the period between the date of submission of his return to work doctor's note and March 19, 2013.[4]

---

[3] Even if the Court applied Plaintiff's argument in the opposite manner, i.e., that Plaintiff should have been reinstated to his position on 7-Orange in January 2013, then Plaintiff's argument under the employee eligibility prong would fail.  Thus, regardless of how this Court construes Plaintiff's arguments concerning his January 2013 statement that he was ready and able to return to work, Plaintiff is unable to establish a *prima facie* case of FMLA interference.

[4] It is clear that Plaintiff was entitled to FMLA protections beginning on December 5, 2012. Such protections, however, simply mandate that Plaintiff be reinstated to his position or an equivalent position upon his return to work. Moreover, an employer is permitted to offer employees paid medical leave benefits concurrently with FMLA unpaid leave. *See Seeger*, 681 F.3d at 281 (citing *Allen v. Butler Cnty. Comm'rs*, 331 F. App'x 389, 393 (6th Cir. 2009) (internal citation omitted).  It is undisputed that OhioHealth provided Plaintiff with paid disability leave for all of the relevant periods.  Plaintiff was, thus, not improperly denied any wages from the period of December 5, 2012 through February 26, 2013.  Rather, Plaintiff was only entitled to back wages accumulated between the submission of his doctor's return to work note on February 27, 2013, and Plaintiff's actual return to work on March 19, 2013.

18

Accordingly, this Court finds that Plaintiff has failed to demonstrate the final element necessary to establish a *prima facie* case of FMLA interference.

### 4. Harm

Even if Plaintiff had successfully established his *prima facie* case for FMLA interference, he still must show that Defendants' interference caused Plaintiff harm. *See Edgar*, 443 F.3d at 507-08 ("the FMLA is not a strict-liability statute.... Employees seeking relief under the entitlement theory must therefore establish that the employer's violation caused them harm.") (internal citations omitted); *see also Harris v. Metropolitan Government of Nashville and Davidson County, Tenn.*, 594 F.3d 476, 484 (6th Cir. 2010) ("even if a plaintiff could prove an FMLA violation under § 2615(a)(1), the FMLA provides no relief unless the plaintiff has been prejudiced by the violation.... A plaintiff seeking relief under the interference or entitlement theory must show that the violation caused him harm.") (internal citations omitted).

Plaintiff's harm arguments are primarily a restatement of the arguments made regarding Defendants' alleged interference with Plaintiff's FMLA coverage. Plaintiff asserts that he suffered harm when Defendants neglected to restore him to his position on 7-Orange in January 2013. Further, Plaintiff proffers that, even if he was not eligible for job restoration until the submission of his return to work note on February 27, 2013, Defendants failed to reinstate Plaintiff's job or an equivalent position for 20 days. While Plaintiff acknowledges that Defendants offered him back wages for those 20 days, Plaintiff notes that Defendants did so in June 2013, after the initiation of this litigation. Moreover, Defendants paid Plaintiff only for back wages, not for wages from January 11, 2013 on, nor for "liquidated damages or his attorneys' fees and costs, to which he is entitled under the Act." (ECF No. 38) (citing 29 U.S.C. § 2617(a)(1)(A)(3)).

Defendants contend that Plaintiff was not prejudiced by any of their actions. Defendants assert that each time Plaintiff sought leave, OhioHealth promptly granted the request. Indeed, Plaintiff was granted leave from November 2012 through April 20, 2013 under OhioHealth's Leave of Absence Policy. Defendants further maintain that they provided Plaintiff greater benefits than those required by the FMLA, as Plaintiff received 70 percent of his salary while on leave from November 2012 through February 2013. Defendants argue that, upon Plaintiff's return to work, he was restored to his former position. Plaintiff also received back pay for the two weeks it took to reinstate his position, even though Plaintiff had recently sought, and been granted, an extension of leave to end on April 20, 2013. Defendants, thus, insist that "Plaintiff was not denied the two benefits afforded by FMLA—job restoration and leave." (ECF No. 35 at 28.)

Plaintiff has not demonstrated that he suffered harm as a result of Defendants' FMLA interference. It is undisputed that Plaintiff was unequivocally granted each term of leave he sought, under OhioHealth's medical leave policy. Though Plaintiff was not reinstated to his original position immediately upon his return, he was offered back wages as compensation for the time he was not working. If Plaintiff suffered harm as a result of Defendants' delay in job reinstatement—the most logical harm given the facts—it is clear that Defendants attempted to remedy their mistake by providing those lost wages. Without additional evidence of harm, the Court finds that Plaintiff has not shown that he suffered harm as a result of Defendants' actions.

In addition to being unable to establish a *prima facie* case of FMLA interference, Plaintiff cannot show that he suffered harm as a result of Defendants' actions. The Court, thereby, **DENIES** Plaintiff's motion for partial summary judgment (ECF No. 34) and **GRANTS IN PART** Defendants' motion for summary judgment (ECF No. 35).

**B. FMLA Retaliation**

In order to establish an FMLA retaliation claim, Plaintiff must demonstrate that:

> (1) [he] was engaged in an activity protected by the FMLA; (2) the employer knew that [he] was exercising [his] rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to [him]; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. *Arban v. West Publ.'g Corp.*, 345 F.3d 390, 404 (6th Cir. 2003). [Plaintiff] bears the burden of demonstrating a causal connection. *Id.* [He] must show that the employer's stated reason for terminating [him] was pretextual and that the true reason for [his] dismissal was [his] medical leave. *Id.*

*Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006). When, as here, the Plaintiff presents circumstantial evidence of FMLA retaliation, "[t]his Court applies the familiar burden-shifting test articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Edgar*, 443 F.3d at 508. Pursuant to *McDonnell Douglas*, Plaintiff must first establish a prima facie case of retaliation by showing that he engaged in protected activity, suffered an adverse employment action, and that there was a causal connection between the two. *Laws v. HealthSouth N. Kentucky Rehab. Hosp. Ltd. P'ship*, 508 F. App'x 404, 408-09 (6th Cir. 2012) (citing *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007) (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001)). If Plaintiff can establish his *prima facie* claim of FMLA retaliation, Defendants must then "offer evidence of a legitimate, non-retaliatory reason for the adverse employment action." *Id.* (internal citation omitted). If Defendants are able to do so, "the burden then shifts back to [P]laintiff to prove, by a preponderance of the evidence, that the proffered reason is pretextual." *Id.* (internal citation omitted). Despite the shifting burden, "the ultimate burden of persuading the trier of fact that the defendant

21

intentionally discriminated against the plaintiff remains at all time with the plaintiff." *Hall v. Ohio Bell Telephone Co.*, 529 F. App'x 434, 439 (6th Cir. 2013) (citing *Bryson*, 498 F.3d at 570).

The primary issue under the retaliation theory is "whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012) (citing *Edgar*, 443 F.3d at 508) (internal quotations omitted). Unlike a claim for FMLA interference, "the employer's motive is an integral part of the [FMLA retaliation] analysis." *Demyonovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 433 (6th Cir. 2014) (internal quotation omitted). A plaintiff's burden in making out its *prima facie* case of retaliation "is not onerous" and is "easily met." *E.E.O.C. v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (citations omitted).

Here, Defendants only address the fourth prong under FMLA retaliation—causal connection—thereby conceding the other prongs of Plaintiff's retaliation claim. As such, the Court need not discuss the three undisputed elements.

### 1. Causal Connection

Defendants argue that Plaintiff's claim for FMLA retaliation fails because he cannot establish a causal link between his February 2013 request for job restoration and his October 2013 termination. Defendants contend that, if a causal connection hinges on temporal proximity alone, the time period between the protected activity and the adverse employment action must be less than six months apart to demonstrate a connection. (ECF No. 35) (collecting cases). Defendants assert that eight months elapsed between Plaintiff's FMLA leave and his termination, thereby making it impossible for Plaintiff to show causality. Regarding the discipline Plaintiff received upon his March 2013 return to work, Defendants insist that, because Plaintiff had

received reprimands for similar performance issues prior to taking medical leave, Plaintiff cannot show that the March 2013 discipline and subsequent termination were linked to his FMLA leave. (*Id.*) (citing *Arnold v. City of Columbus*, 515 F. App'x 524 (6th Cir. 2013) (plaintiff could not show that three investigations, which took place over several years, constituted pretext, because they were initiated prior to plaintiff taking protected action).

Plaintiff contends that he can demonstrate a causal connection in two ways. First, he points to the temporal proximity between his FMLA leave and his termination. Second, Plaintiff argues that the temporal proximity coupled with the "heightened scrutiny" he endured upon his return to work in March 2013 is sufficient to establish causality. (ECF No. 38 at 44.) Relying on the depositions of two of his coworkers, Plaintiff asserts that he was "coached and disciplined" for various issues, each one separate from the performance problems for which he had been disciplined in 2012. (*Id.*)

Plaintiff alleges that *Hamilton v. General Elec. Co.* is analogous to his case, thereby supporting his showing of a causal connection. 556 F.3d 428 (6th Cir. 2009). *Hamilton* concerned a General Electric Company ("GE") employee who, after thirty years of employment, experienced a tumultuous year with GE, which included three suspensions. Hamilton was terminated in August 2005, three months after he filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). The *Hamilton* Court held that the "temporal proximity of less than three months combined with the assertion that GE *increased* its scrutiny of Hamilton's work only after the EEOC complaint was filed are sufficient to establish the causation element of a prima facie case of retaliatory termination." *Id.* at 436 (emphasis in original).

To demonstrate a causal connection, "a plaintiff is required to proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action."

23

*Avery*, 104 F.3d at 861 (internal quotations omitted). Here, Plaintiff's case is distinguishable from *Hamilton*. Plaintiff fails to explain how the disciplinary action taken following his FMLA leave is different than the discipline he received in 2012. Moreover, a temporal proximity of three months is distinct from a temporal proximity of eight months. However, construing the evidence in the light most favorable to Plaintiff, a reasonable juror could find that Plaintiff did face increased scrutiny from March 2013 until his October 2013 termination. Considering the increased scrutiny with the temporal proximity, Plaintiff has established his *prima facie* case. The burden now shifts to Defendants to show a legitimate, non-retaliatory reason for termination.

### 2. Legitimate, Non-retaliatory Reason for Termination

Defendants argue that they have articulated two legitimate, non-retaliatory reasons for Plaintiff's termination: patient safety concerns and Plaintiff's failure to follow nursing policy. According to Defendants, the Sixth Circuit has consistently held that patient safety is a legitimate reasons for discharging an employee. Defendants contend that they hold patient safety in high regard, and consider it to be a very serious issue. Indeed, Defendants state that they have fired three other RNs based on patient safety concerns.

The record shows that Plaintiff was reprimanded for various performance issues before and after his protected leave, the majority of which concern primarily patient safety. Patient safety is, undoubtedly, a matter of high importance in a hospital or health care setting, and an employee's failure to follow protocol on multiple occasions could result in harm to a patient. *See Wilson v. Cleveland Clinic Foundation*, 579 F. App'x 392, 399-406 (6th Cir. 2014) (the Court determined that, even if the plaintiff had met *prima facie* elements of retaliation, her termination resulted from the violation of clinic policy which endangered a patient, thereby constituting a legitimate, non-retaliatory reason for her discharge). This Court thereby finds that

24

Defendants have articulated a legitimate, non-retaliatory reason for Plaintiff's termination. The burden now shifts back to Plaintiff to show that Defendants' proffered reasons were, actually, pretextual.

### 3. Pretext

To demonstrate that Defendants' decision to discharge him was pretextual, Plaintiff "may show that (1) the employer's stated reason for terminating the employee has no basis in fact, (2) the reason offered for terminating the employee was not the actual reason for the termination, or (3) the reason offered was insufficient to explain the employer's action." *Singleton v. Select Specialty Hosp.-Lexington, Inc.*, 391 F. App'x 395, 400 (6th Cir. 2010) (internal citation omitted).

Plaintiff insists that Defendants have failed to state legitimate, non-retaliatory reasons for his termination, and, moreover, their reasoning is sufficient to show pretext. Plaintiff asserts that the reasons that formed the basis of his termination changed "numerous times," an indication that Defendants were looking for a reason to discharge Plaintiff.  (ECF No. 38 at 46-47.)  In particular, Plaintiff alleges that Sayers' desire to fire Plaintiff intensified upon his return to work in March 2013: "Ms. Sayers attempted to gather reports from employees who worked with Mr. Casagrande in order to find a legitimate basis upon which she could terminate [him]." (*Id.*) (citing *Jones v. Potter*, 488 F.3d 397, 408 (6th Cir. 2007)).  Plaintiff cites the depositions of two coworkers, both of whom stated that they had not received complaints about Plaintiff's work performance.  Similarly, each coworker testified that it seemed as though Sayers was especially critical of Plaintiff's work following his return from FMLA leave.  Plaintiff argues that Sayers' heightened scrutiny of Plaintiff, taken with the depositions of his coworkers, is sufficient to show that his termination was pretextual.

25

Defendants contest each of Plaintiff's arguments, but take particular issue with his reliance on the deposition testimony of his coworkers. Defendants claim that the depositions do not hold the weight that Plaintiff insists they do, primarily because neither coworker spoke to the actual reasons for Plaintiff's termination. Moreover, the coworkers did not testify regarding the business decision behind Plaintiff's discharge, nor did they possess personal knowledge about the decision making process. Defendants assert that, in addition to lacking personal knowledge about the termination decision making process, at least part of the testimony relied on by Plaintiff was based on the statements of yet another coworker and not on her personal knowledge or observations.

Defendants further insist that they have sufficiently shown that the termination decision was not pretextual. Again, Defendants note that the conduct that formed the basis of Plaintiff's termination—waiting five hours to address a patient's Heparin drip and failure to follow Riverside's alcohol withdrawal detoxification protocol—is undisputed. Defendants argue that Plaintiff has neglected to demonstrate that Defendants' reasons were unreasonable or dishonestly relied upon, further supporting a lack of pretext. Finally, Defendants maintain that Plaintiff failed to show that he was treated differently than coworkers who committed similar mistakes, referencing three RNs who were terminated based on workplace behavior similar to that committed by Plaintiff.

Considering Plaintiff's arguments under the pretext standard, the Court finds that Plaintiff has neglected to meet his burden of showing that "the employer's stated reason for terminating the employee has no basis in fact." *Singleton v. Select Specialty Hosp.-Lexington, Inc.*, 391 F. App'x at 400 (internal citation omitted). Given the undisputed material facts, Plaintiff cannot show that his termination had no basis in fact. The Court will, thus, examine the two additional

26

bases for pretext: whether "the reason offered for terminating the employee was not the actual reason for the termination, or…the reason offered was insufficient to explain the employer's action." *Id.*

Given the undisputed material facts, Plaintiff cannot show that his termination had no basis in fact. Looking at whether the reason for termination was not, in fact, the actual reason requires more analysis. Plaintiff, however, relies on the testimony of coworkers who have no involvement in the decision making process. It is well settled in the Sixth Circuit that arguments regarding the decision making process or the decision to take adverse action against an employee must come from, or be directly linked to, a decision maker:

> [t]urning to an evaluation of the statements, we have held that "[u]nless the statements or conduct of nondecision makers can be imputed to the ultimate decisionmaker, such statements or conduct can not suffice to satisfy the plaintiff's burden of demonstrating animus." *Noble v. Brinker Int'l., Inc.,* 391 F.3d 715, 724 (6th Cir. 2004) (internal quotations, citation, and alterations omitted). Thus, "[i]n evaluating the relevancy of discriminatory remarks" as part of a pretext analysis, "this court examines the identity of the speaker," as well as "the substance of the remarks."

*Clack v. Rock-Tenn Co.,* 304 F. App'x 399, 404 (6th Cir. 2008) (quoting *Hopkins v. Electronic Data Sys. Corp.,* 196 F.3d 655, 665 (6th Cir. 1999); *see also Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 354 (6th Cir. 1998); *Travers v. Cellco Partnership,* 579 F. App'x 409, 416-18 (6th Cir. 2014). Here, though Plaintiff alleges that Sayers made a concerted effort to find issues in his job performance upon which she could base his termination, he offers nothing further to support such arguments. Moreover, the deposition of his coworkers lacks a proper foundation, in that neither of them was involved with or had personal knowledge of the decision making process.

Finally, Plaintiff did not show that Defendants' proffered reasons for his termination were insufficient to support termination. Defendants note the termination of three RNs who, like Plaintiff, had job performance issues that resulted in their terminations. Plaintiff, however, did not present any evidence to show why or how he was treated more harshly or differently than those individuals.

Based on the foregoing, Plaintiff has not demonstrated that Defendants' decision to terminate him was pretextual. As such, he has not met his burden under the *McDonnell Douglas* standard. Defendants' motion for summary judgment on Plaintiff's claim of FMLA retaliation is **GRANTED**.

## IV. CONCLUSION

For the reasons stated above, Plaintiff's motion for partial summary judgment (ECF No. 34) is **DENIED**, and Defendants' motion for summary judgment is **GRANTED**.

**IT IS SO ORDERED.**

2-18-2015
**DATED**

**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**

28